# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

Case No. 06-20953-CIV-LENARD/TORRES

CITY OF ST. PETERSBURG,
a Florida municipality, *et al.,*

        Plaintiffs,

vs.

TOTAL CONTAINMENT, INC.,
a Pennsylvania corporation, *et al.*,

        Defendants.

_____/

## REPORT AND RECOMMENDATION ON DAYCO PRODUCTS, INC. AND DAYCO PRODUCTS, LLC'S MOTION FOR PARTIAL SUMMARY JUDGMENT

This matter is before the Court upon Defendants Dayco Products, Inc. and Dayco Products, LLC's ("Dayco"[1]) Motion for Partial Summary Judgment [**D.E. 456**] and related filings.[2]  Based on a thorough review of the motion, response, and reply, the statements of undisputed material facts submitted by the parties, and the materials submitted in support of and opposition to summary judgment, the undersigned finds that genuine issues of material fact exist with regard to some but not all of Plaintiffs'

---

[1]     The Dayco Defendants will be referred to as a single entity except where it is necessary to draw a distinction between the two.

[2]     The Honorable Joan A. Lenard referred this case to the undersigned Magistrate Judge for report and recommendation on all dispositive motions.  [D.E. 462].

claims against Dayco.  We therefore recommend that Dayco's motion for partial summary judgment be GRANTED in part and DENIED in part, as discussed in greater detail below.

## I.  BACKGROUND[3]

This case involves thermoplastic flexible piping ("FlexPipe") marketed and distributed by Defendant Total Containment, Inc. ("TCI") for use in underground fuel containment systems to enable petroleum fuels to be pumped from underground storage tanks ("USTs") to above-ground fuel dispensers such as those used to fill vehicles' fuel tanks.  Plaintiffs are the City of St. Petersburg, Florida ("City"), Twin Oil Company ("Twin Oil"), and Jeff Montgomery Associates ("JMA") (collectively, "Plaintiffs")[4], each of which purchased and installed or otherwise used FlexPipe at its fuel dispensing facilities and retail gasoline stations, respectively.

---

[3]      Because Fed. R. Civ. P. 56 requires that we view the facts in the light most favorable to the nonmoving party, the following summary of facts is gleaned primarily from Plaintiffs' Statement of Material Facts [D.E. 506].  Notably, there are several cross-motions for summary judgment pending before the Court; for each there is a set of purported statements of undisputed material facts.  The following summary provides a sufficient background for purposes of this particular motion, but is not tantamount to a finding of fact unless expressly noted.

[4]      Plaintiffs brought this action on behalf of themselves and a putative Class composed of "all persons and entities in the State of Florida (a) who presently own an underground piping system equipped with TCI thermoplastic flexible piping (including but not limited to that sold under the brand names "Enviroflex," "Omniflex," and "Monoflex") or (b) who formerly owned an underground piping system equipped with TCI thermoplastic flexible piping located in the State of Florida, and incurred any expenses associated with (1) repair or replacement of all or part of their underground piping system, and/or (2) a fuel leak from the underground piping system."  [D.E. 211 ("Plaintiffs' Second Amended Class Action Complaint for Declaratory and Injunctive Relief and for Damages"), ¶ 1].  For ease of reference, we will refer to Plaintiffs and the putative Class members simply as Plaintiffs, unless it is relevant to differentiate between the two.

FlexPipe is a flexible double-wall piping system originally designed to provide an environmentally-safe alternative to metal or rigid fiberglass piping systems commonly used at retail gas stations and other fueling outlets. FlexPipe was marketed and sold by TCI under various brand names, including but not limited to "Enviroflex," "Omniflex," and "Monoflex." Depending on the brand, FlexPipe may have a primary pipe ("primary pipe") which transfers fuel and which is fed into a secondary containment pipe surround the primary pipe ("secondary pipe"), or be made for direct burial because its construction contains an attached, outer secondary jacket. All forms of FlexPipe are multi-layered thermoplastic constructions, with a barrier inner layer in constant contact with fuel and subsequent layers designed to provide adhesion, burst strength, abrasion resistance, and, in direct burial models, a secondary jacket designed to contain leaks.

From 1990 to 1999, TCI contracted with Defendant Cleveland Tubing, Inc. to manufacture the secondary pipe. From 1990 to 1997, TCI contracted with Defendant Dayco to manufacture the primary pipe. Dayco in turn contracted with Cleveland Tubing to manufacture the inner layer of the primary pipe (the layer that is always in direct contact with the fuel). In 1997, TCI's agreement with Dayco ended and TCI then contracted directly with Cleveland Tubing to manufacture the primary pipe in addition to the secondary pipe. The TCI/Cleveland Tubing relationship ended in 1999; from that point on through 2002, TCI manufactured both the primary and secondary pipes in-house.

Plaintiffs generally allege that Defendants designed, manufactured, marketed, distributed, and sold to them FlexPipe that Defendants knew or should have known

was fundamentally unsuitable for its intended purpose of conveying and containing petroleum fuels from underground storage tanks to above-ground fuel dispensers. Plaintiffs further allege that Defendants engaged in a fraudulent scheme to market and sell defective FlexPipe for profit, knowing that the product was defective and not approved for sale by federal and state regulatory agencies.  Finally, Plaintiffs allege that as a result of Defendants' conduct, they purchased FlexPipe that has deteriorated and/or is deteriorating, resulting in physical damage to the FlexPipe itself and other components of Plaintiffs' fuel containment, conveyance, and delivery systems, and fuel leaks that contaminate the surrounding environment and require costly mediation.

Plaintiffs claim that Dayco negligently designed the FlexPipe primary pipe, and withheld from regulators, industry standard organizations, and the consuming public significant problems with the design and manufacturing techniques used to make the product.  [D.E. 505 at 3].  They assert the following claims against Dayco: (1) negligence (Count I); (2) strict products liability (Count II); (3) negligent misrepresentation/concealment (Count V); and (4) unjust enrichment (Count VII).

## II.   ANALYSIS

### A.   Summary Judgment Standard

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Imaging Bus. Mach., LLC. v. BancTec, Inc.*, 459 F.3d 1186, 1189 (11th Cir. 2006) (citing Fed. R. Civ. P. 56(c)).  In deciding a

summary judgment motion, the court must view all the evidence and make all reasonable inferences in the light most favorable to the nonmoving party. *Id.* (citing *Cruz v. Public Super Mkts., Inc.*, 428 F.3d 1379, 1382 (11th Cir. 2005)). A material fact is one that might affect the outcome of the case. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Where the non-moving party fails to prove an essential element of its case for which it has the burden of proof at trial, summary judgment is warranted. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Hilburn v. Murata Elecs. North Am., Inc.*, 181 F.3d 1220, 1225 (11th Cir. 1999). Thus, the task is to determine whether, considering the evidence in the light most favorable to the plaintiff, there is evidence on which the trier of fact could reasonably find a verdict in their favor. *See Anderson,* 477 U.S. at 251; *Hilburn*, 181 F.3d at 1225.

### B. *Statute of Limitations*

#### 1. *Tolling*

Dayco asserts that Plaintiffs' products liability and tort claims against Dayco are time-barred by the applicable statute of limitations.[5]  Florida has a four-year limitations period for bringing claims based on negligence, strict products liability, failure to warn, negligent misrepresentation, concealment, and unjust enrichment. Fla. Stat. § 95.11(3)(a), (e), (j), (k), and (p); *Senger Bros. Nursery, Inc. v. E.I. DuPont de Nemours & Co.*, 184 F.R.D. 674, 683 (M.D. Fla. 1999); *Fowler v. Towse*, 900 F. Supp.

---

[5]     The Court in this diversity case based on state claims must apply the substantive law of Florida. *Erie R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938). For purposes of the *Erie* analysis, statutes of limitations are substantive. *Guaranty Trust Co. of N.Y. v. York*, 326 U.S. 99, 108-112 (1945).

454, 459-60 (S.D. Fla. 1995); *Allocco v. City of Coral Gables*, 221 F. Supp. 2d 1317, 1359 n.17 (S.D. Fla. 2002).

Plaintiffs filed this lawsuit on April 12, 2006.  Dayco argues that any causes of action Plaintiffs may have against it must have accrued on or after April 12, 2002, to survive a statute of limitations challenge.   Generally, Dayco argues that the undisputed facts demonstrate that Twin Oil and JMA had actual knowledge of the very problems they complain about in this lawsuit prior to April 12, 2002, thus their claims accrued more than four years before filing suit and are time-barred by the four-year statute of limitations.[6]  Dayco also contends that the City's claims are barred by the statute of repose, Fla. Stat. § 95.031(2)(b).

It is Plaintiffs' position that all of their claims are tolled under *American Pipe and Constr. Co. v. Utah*, 414 U.S. 538 (1974), by the pendency of a putative nationwide class action in Alabama alleging the same claims.  *See May's Distrib. Co., Inc. v. Total Containment, Inc.*, Civil Case No. CV-03-02, which was filed on January 3, 2003, in the Circuit Court in Bullock County, Alabama.

*American Pipe* involved "an aspect of the relationship between a statute of limitations and the provisions of Fed. Rule Civ. Proc. 23 regulating class actions in the federal courts."  414 U.S. at 540.  As summarized by the Court in a subsequent, related decision:

---

[6]    Dayco claims that it is in exactly the same position as defendant Cleveland Tubing with regard to the statute of limitations argument.  Accordingly, Dayco adopts and incorporates in its entirety the brief and other filings submitted by Cleveland Tubing on this issue.  [D.E. 458 at 4].

> *American Pipe* was a federal antitrust suit brought by the State of Utah on behalf of itself and a class of other public bodies and agencies. The suit was filed with only 11 days left to run on the applicable statute of limitations. The District Court eventually ruled that the suit could not proceed as a class action, and eight days after this ruling a number of putative class members moved to intervene. This Court ruled that the motions to intervene were not time-barred. The Court reasoned that unless the filing of a class action tolled the statute of limitations, potential class members would be induced to file motions to intervene or to join in order to protect themselves against the possibility that certification would be denied. 414 U.S. at 553, 94 S.Ct. at 766. The principal purposes of the class action procedure - promotion of efficiency and economy of litigation - would thereby be frustrated. *Ibid*. To protect the policies behind the class action procedure, the Court held that "the commencement of a class action suspends the applicable statute of limitations as to all asserted members of the class who would have been parties had the suit been permitted to continue as a class action." *Id.*, at 554, 94 S.Ct. at 766.

*Crown, Cork & Seal Co., Inc. v. Parker*, 462 U.S. 345, 349 (1983) (expanding *American Pipe* to conform to its logical underpinnings by holding that the filing of a class action tolls the statute of limitations as to all members of the putative class, not just as to intervener).

Dayco (through incorporation of Cleveland Tubing's summary judgment motion on the issue) counters that the tolling doctrine established in *American Pipe* does not apply to or save Plaintiffs' claims. Dayco cites *Senger Bros.* in which the district court distinguished *American Pipe* and declined to apply its tolling rule because its jurisdiction was premised on diversity of citizenship rather than a federal question which was the basis for jurisdiction in *American Pipe*. 184 F.R.D. at 682 ("Plaintiff's reliance on *American Pipe* and *Crown* is misplaced. *American Pipe* and *Crown* did not involve a claim brought in federal court on diversity of citizenship. *See American Pipe*, 414 U.S. at 540, 94 S.Ct. 756 (claiming violations of § 1 of the Sherman Act, the

Clayton Act, and the False Claims Act); *Crown*, 462 U.S. at 346, 103 S.Ct. 2392 (alleging a violation of the Civil Rights Act)."). Citing *Senger*, then, Dayco argues that *American Pipe* is inapplicable here and the statutes of limitations for Plaintiffs' or putative class member's claims have not been tolled.

We disagree. The holding in *American Pipe* did not depend on the fact that the claims in the case were based on federal law. Rather, the purpose of the court-made tolling rule was to preserve the "efficiency and economy of litigation which is a principal purpose of the [Fed. R. Civ. P. 23 class action] procedure." 414 U.S. at 553. The Court explained that, in contrast with the difficulties and potential for unfairness that existed under an earlier version of Rule 23, "[u]nder present Rule 23, . . . [a] federal class action is no longer 'an invitation to joinder' but a truly representative suit designed to avoid, rather than encourage, unnecessary filing of repetitions papers and motions." *Id.* at 550.

The Court expressly noted that the tolling doctrine was "in no way inconsistent with the functional operation of a statute of limitations." *Id.* at 554. Limitations periods are designed "to put defendants on notice of adverse claims and to prevent plaintiffs from sleeping on their rights." *Crown*, 462 U.S. at 352. These goals are met when a class action is commenced, and tolling the limitations period "thus creates no potential for unfair surprise, regardless of the method class members choose to enforce their rights upon denial of class certification." *Id.* at 353.

Balancing the interests of plaintiffs, defendants, and the court system, then, the Court concluded that federal courts have inherent power to toll a statute of limitations

under certain circumstances not inconsistent with the legislative purpose of the limitations statute. It is clear that application of the tolling rule announced in *American Pipe* did not turn on the basis for the court's jurisdiction, i.e., federal question versus diversity, but rather from equitable principles applicable to federal class action lawsuits. *American Pipe* tolling thus applies regardless of *why* a case is in federal court.

Moreover, *American Pipe* tolling has been applied in Florida state courts. As the Eleventh Circuit noted subsequent to the *Senger* decision, "[t]here is no dispute that *American Pipe* has been followed in Florida state courts." *Raie v. Cheminova, Inc.*, 336 F.3d 1278, 1282 (11th Cir. 2003); *see also Hromyak v. Tyco Int'l Ltd.*, 942 So. 2d 1022, 1023 (Fla. 4th DCA 2006) (affirming trial court's determination that *American Pipe* tolling did not apply, not because Florida courts did not follow *American Pipe* but because the claims raised in the state action were not identical to the claims asserted in an earlier federal class action); *Latman v. Costa Cruise Lines, N.V.*, 758 So. 2d 699, 704 (Fla. 3d DCA 2000) (recognizing *American Pipe's* tolling rule and citing *Kornberg v. Carnival Cruise Lines, Inc.*, 741 F.2d 1332, 1336-67 (11th Cir. 1984), which itself cited *American Pipe*). *But see In re: Rezulin Prods. Liab. Litig.*, No. 00CIV-2843LAK, 2006 WL 695253, at *1 (S.D. N.Y. March 15, 2006) ("Florida does not permit class action tolling.") (citing *Senger Bros. Nursery, Inc. v. E.I. DuPont de Nemours & Co.*, 184 F.R.D. 674, 680 (M.D. Fla. 1999).

We conclude that tolling under *American Pipe* applies in this case to *Dayco Products, Inc.*, but not to *Dayco Products, LLC*. The original *May's* class action did not

name either of these two defendants when originally filed on January 3, 2003.  [D.E. 458, Ex. 1].  Dayco Products, Inc. was added as a defendant six months later, on July 1, 2003, upon the filing of the First Amended Complaint in *May's*.  [*Id.*, Ex. 2].  But Dayco Products, LLC was never named in the suit.

Generally, *American Pipe* tolling does not apply to a defendant who was not named in the class action lawsuit on which the tolling is based.  *Shriners Hosps. for Children v. Qwest Commications Int'l Inc.*, No. 04-cv-00781-REB-KLM, 2007 WL 2801494, at *4 (D. Colo. Sept. 24, 2007) (a defendant not named in the class action "cannot be seen as having been notified of the claims against it in the class action" and thus it would be improper to apply *American Pipe* tolling against such a defendant); *cf. Ballard v. Tyco Int'l*, No. 02-MD-1335-PB, 2005 WL 928537, at *3 (D. N.H. April 22, 2005) (rejecting plaintiffs' argument that *American Pipe* tolling should be extended to a defendant not named in a prior class action because the claims set forth in the original action were substantially similar to and involved the same evidence and witnesses as the claims against the defendant in the then-pending suit).

However, in *Becks v. Emery-Richardson, Inc.*, Nos. 86-6866-CIV-Gonzalez, 87-1554-CIV-Gonzalez, 1990 WL 303548, at *12 (S.D. Fla. Dec. 21, 1990), the district court applied tolling against AIG even though AIG had not been named as a defendant in an earlier class action.  The court found the "parental" relationship between AIG and two of its corporate subsidiaries which had been named as defendants in the earlier class action to be such that AIG was the "control person" as to these subsidiaries and "that constructive if not actual notice was given to AIG of this

litigation." *Id.*   Further, the court noted that AIG had argued no lack of notice, insufficient time to defend, or any other prejudice resulting from its inclusion in the lawsuit. *Id.*

Our case is distinguishable from *Becks*.   There is no allegation here of a "parental" relationship or any kind of corporate control between Dayco Products, Inc. and Dayco Products, LLC.   *Accord Ballard*, 2005 WL 928537, at *3.   We will not extend *American Pipe* tolling to Dayco Products, LLC, when it was not a defendant in the *May's* action on which tolling is based.   As for Dayco Products, Inc., however, *American Pipe* tolling commenced on July 1, 2003, the date it was first named as a defendant in *May's*.[7]

## 2.   *Effect of Statute of Limitations*

Next we must determine whether Plaintiffs' claims against both Dayco Defendants were timely-filed or are barred by the statute of limitations.   As previously mentioned, Florida has a four-year statute of limitations for bringing tort, product liability, and unjust enrichment claims.

Applying *American Pipe* tolling as discussed above, Plaintiffs' negligence, strict products liability, negligent misrepresentation/concealment, and unjust enrichment claims against Dayco Products, Inc. are timely if they accrued within four years of July 1, 2003, the date this defendant was named in the *May's* class action -- that is, July 1,

---

[7]      Plaintiffs' alternative argument that their fraudulent concealment claims toll the applicable statute of limitations is unavailing because Plaintiffs did not assert fraudulent concealment claims against the Dayco Defendants.

1999.  As for Dayco Products, LLC, without the benefit of tolling, the accrual date is April 12, 2002, four years before the present lawsuit was filed in this court.

Under Florida law, any statute of limitations begins to run from the time the cause of action accrues.  Fla. Stat. 95.031; *Fla. Power & Light Co. v. Allis Chalmers Corp.*, 85 F.3d 1514, 1518 (11th Cir. 1996).  "A cause of action accrues when the last element constituting the cause of action occurs."  Fla. Stat. § 95.031(1).  In products liability and tort actions, the statute of limitations begins to run "from the date that the facts giving rise to the cause of action were discovered, or should have been discovered with the exercise of due diligence."  Fla. Stat. § 95.031(2)(b); *Babush v. Amer. Home Products Corp.*, 589 So. 2d 1379, 1381 (Fla. 4th DCA 1991).  This "delayed discovery" doctrine:

> generally provides that a cause of action does not accrue until the plaintiff either knows or reasonably should know of the tortious act giving rise to the cause of action.  The delayed discovery doctrine applies to the accrual of a cause of action; it does not toll the applicable statute of limitations once the cause of action has accrued and the statute of limitations has begun to run.

*Raie*, 336 F.3d 1280 (internal citations and quotations omitted).

Florida courts have looked at three factors that bear on the issue of when the facts giving rise to a cause of action were or should have been discovered: (1) awareness of the existence of the injury; (2) knowledge of exposure to the defendant's product; and (3) knowledge of a possible causal link between the defendant's product and the injury.  *Babush*, 589 So. 2d at 1381 (summarizing the Florida Supreme Court's discussion in *Univ. of Miami v. Bogorff*, 583 So. 2d 1000 (Fla. 1991), of the extent of knowledge

necessary to commence the limitation period); *see also Doe*, 813 F. Supp. at 1554 (citing both *Bogorff* and *Babush*).

The knowledge required to commence a statute of limitations does not rise to that of legal certainty. *Bogorff*, 583 So. 2d at 1004. A plaintiff need not know the full extent of his injury. *Doe v. Cutter Biological*, 813 F. Supp. 1547, 1555 (M.D. Fla. 1993); *Fla. Power & Light*, 85 F.3d at 1519 (the fact that a plaintiff did not know the full extent of his injury or that the most substantial damages did not occur until a later date does not postpone the running of the limitations period). He "need only have notice, through the exercise of reasonable diligence, of the possible invasion of [his] legal rights." *Bogorff*, 583 So. 2d at 1004. However, there must be some knowledge beyond that of the injury alone; a plaintiff must have "knowledge that the connection between the injury and use of the product in question was 'to some extent causal'." *Walls v. Armour Pharm. Co.*, 832 F. Supp. 1467, 1478 (M.D. Fla. 1993) (quoting *Babush*).

To prevail on summary judgment based on a statute of limitations argument, Dayco must conclusively demonstrate that there is no disputed issue of material fact with respect to when Plaintiffs discovered or should have with the exercise of due diligence discovered the invasion of their legal rights. *Fowler v. Towse*, 900 F. Supp. 454, 459 (S.D. Fla. 1995); *Doe v. Cutter Biological*, 813 F. Supp. 1547, 1549 (M.D. Fla. 1993) ("Defendant has the final burden of showing the absence of any material fact in order to prevail on its motion."); *Keller v. Reed*, 603 So. 2d 717, 719-20 (Fla. 2d DCA 1992) (discussing standard while noting that the "determination of when a person

knew, or with the exercise of due diligence should have known, of the invasion of his or her legal rights is ordinarily a question for the trier of fact.").

> a.   <u>Twin Oil</u>

Twin Oil's claims arise from allegedly defective FlexPipe at its NMB, Miramar, and Hialeah stations.  Dayco claims (through incorporation of Cleveland Tubing's brief on the limitations argument) that Twin Oil was aware of recurring problems with FlexPipe in the mid-1990's, by September 8, 1998, or by January 29, 2002, when a leak occurred at the Miramar site.  Relying on an April 12, 2002, accrual date, Dayco asserts that all of Twin Oil's claims are time-barred.

Twin Oil's president, Gabriel Volante, testified in deposition that he had conversations with other station owners and members of the Florida Petroleum Marketers Association regarding problems with FlexPipe and leaks as early as the "mid-nineties."  He stated that, beginning in 1998, he started to hear "different stories about the problems flex piping was having."  On September 8, 1998, Twin Oil reported to Florida's environmental regulatory agency that an Enviroflex hose at its NMB station had leaked, resulting in the discharge of approximately 2,500 gallons of fuel into the environment, contaminating the property.  Volante retained a lawyer and considered suing Total Containment to recover costs associated with the leak.  He obtained an estimate (over $400,000) to clean up the NMB site.  To support a possible claim for restitution, Twin Oil preserved a portion of the FlexPipe removed from the NMB site.  Eventually Twin Oil received $3,667.96 from Fireman's Fund (Twin Oil's insurer) for fuel lost due to the leak.  Subsequent to the 1998 leak, Twin Oil began performing additional inspections at all its stations where flex hose was installed.

Plaintiffs argue that Volante's discussions about flexible piping and leaks were of a general nature rather than about problems unique to Defendants' FlexPipe at Twin Oil's stations.  Plaintiffs point out that manufacturers other than TCI made flexible piping, and some of Twin Oil's stations (including the NMB station) had flexible piping manufactured by other companies.  Plaintiffs argue there is no evidence that Twin Oil had any knowledge prior to September 1998 of either (1) injury or damages or (2) a possible link between FlexPipe and Twin Oil's injury or damages, as required by *Babush*, 589 So. 2d at 1381.

As for the leak at the NMB station in September 1998, Plaintiffs argue that they have not alleged that the failure in 1998 at the NMB station resulted from the defect at issue in this litigation, and they do not seek compensation for the 1998 leak.  Plaintiffs state that the pipe that is the subject of this litigation is pipe that was installed following the 1998 leak (at no cost to Twin Oil) which failed in 2005 and again in 2006.  Thus, Plaintiffs assert there is no evidence that Twin Oil knew or had reason to know that the pipe at issue in this case was defective until it leaked in 2005 or 2006 or that there was a possible link between any damage and Defendants.  "The mere fact that the earlier pipe failed due to an unrelated problem which was resolved has no bearing on whether Twin Oil's claim as to the new pipe is timely or not." [D.E. 503 at 11].

Finally, with regard to the January 29, 2002, leak at the Miramar station, Plaintiffs concede that if neither *American Pipe* nor fraudulent concealing tolling applies, Twin Oil's claims related to the 2002 Miramar leak are time-barred.  However,

Plaintiffs maintain that claims connected to the pipe installed in January 2002 (which remains in the ground) would not be time-barred because Dayco has not presented evidence that Twin Oil knew the pipe was defective more than four years prior to the filing of this lawsuit.  Furthermore, Plaintiffs say, Twin Oil's claims related to other pipe at other stations would not be barred because Dayco has failed to establish that the January 2002 Miramar failure provided Twin Oil with any knowledge related to FlexPipe at other stations.  [D.E. 505 at 1 (incorporating response set forth in D.E. 503 at 11)].

We find that *Dayco Products, Inc.* has not met its burden of showing that Twin Oil discovered or should have discovered through the exercise of due diligence that it had a cause of action against this Defendant prior to July 1, 1999.  Volante's discussions about flexible piping and leaks were of a general nature and we do not find them specific enough to constitute notice of an invasion of Twin Oil's legal rights.  As for the September 1998 leak at the NMB station, the Court notes that the form Volante submitted to the Florida environmental regulatory agency reported a "loose connection" and "puncture" as the causes of the leak.  [D.E. 430, Ex. 24].  Volante could have selected other causes for the leak – e.g., "corrosion," "split," and "unknown" were also listed on the form – but he did not.  We do not find that Twin Oil knew or should have known in September 1998 that the FlexPipe installed at its NMB station had the defect Plaintiffs now complain about or even that there was a causal connection between the leaks and FlexPipe.  And obviously, the 2002 leak at the Miramar station occurred after July 1, 1999.  On this record, Dayco Products, Inc. has not demonstrated

conclusively that prior to July 1, 1999, Twin Oil knew or should have known of a possible invasion of its legal rights. Dayco Products, Inc.'s statute of limitations argument thus fails as to the tort, products liability, and unjust enrichment claims, and its request for summary judgment on this ground should be denied.

However, we reach a different conclusion with regard to *Dayco Products, LLC's* limitations argument because tolling does not apply and the accrual date is April 12, 2002. Dayco points to Twin Oil's report of a leak in Enviroflex hose at the Miramar station on January 29, 2002, and subsequent related events, to show that Twin Oil was on notice of a potential invasion of its legal rights prior to April 12, 2002. We agree. Following the January 2002 leak, Volante sent a letter to TCI advising that the pipe had to be replaced "upon the original, installed piping cracking then breaking and ultimately leaking. *All visual indications point to a degrading or corrosion of the manufactured materials.*" [D.E. 430, Ex. 26 (3/13/02 Letter from Volante to TCI's President) (emphasis supplied)]. Volante also indicated that he was storing the removed pipe for TCI inspection. [*Id.*]. This incident, unlike Volante's general discussions about flexible piping and pipe leaks or having to replace a pipe after it leaked due to an unrelated problem (i.e., because of a loose connection or puncture), was sufficient to have put Twin Oil on notice prior to April 12, 2002, that it had potential claims against Dayco Products, LLC. Consequently, we find that Twin Oil's torts, strict products liability, negligent misrepresentation/concealment, and unjust enrichment claims - all of its claims - against Dayco Products, LLC are time-barred.

b.    JMA

JMA's claims arise from allegedly defective FlexPipe installed at its Hunter's Crossing Chevron station.  Through Cleveland Tubing's briefing on the limitations issue, Dayco asserts that JMA was on notice of a potential invasion of its legal rights as early as 1997, prior to the accrual of its causes of action against Dayco Products, Inc. on July 1, 1999 and Dayco Products, LLC on April 12, 2002 for these claims.

The Enviroflex brand of FlexPipe was initially installed in 1995 as part of the original construction of the Hunter's Crossing station.  Problems developed with the underground containment and dispensing system within a few years of installation. In June 1997 and again in October 1998, Jeff Montgomery, the sole proprietor of JMA, wrote to TCI about rainwater leaking into sumps.  [D.E. 430, Exs. 29 and 30].  On May 18, 1999, following an inspection of the system, Montgomery wrote to the president and chief operating officer of TCI.  In his letter Montgomery identified several problems with the TCI system, and noted the recommendation that "Enviroflex piping . . . must be inspected for 'microbacterial growth.'"  [D.E. 430, Ex. 32].  In 1999, the Enviroflex piping was removed and replaced with another TCI brand of flexible pipe, Omniflex. In February 2000, Montgomery again wrote to TCI to express displeasure with the system, specifically noting problems with the sumps and bulkhead fittings, and the fact that repairs made to the flexible piping rendered previously retractable flexible piping "basically non-retractable."  [D.E. 430, Ex. 33].  He also indicated in the letter and later on his intention to pursue legal action against TCI.

The Court finds that this evidence does not conclusively demonstrate that JMA knew FlexPipe was defective prior to the accrual dates of JMA's causes of action

against either Dayco Defendant.  Montgomery testified definitively that JMA did not experience any problems with Enviroflex pipe from the time it was installed until the time it was replaced by Omniflex pipe in 1999.  [D.E. 504, Ex. D at 5-7].  He specifically stated that there had been no problems with Enviroflex pipe as of June 29, 1999.  [*Id.* at 5].  The evidence reflects that the only problems JMA had with the system prior to June 29, 1999 related to non-pipe components.  JMA detected the first failure of the replacement FlexPipe in July 2002.  There is no record evidence showing that JMA knew or should have been aware of problems with FlexPipe prior to July 1, 1999 (for Dayco Products, Inc.) or April 12, 2002 (for Dayco Products, LLC).  Thus, we recommend that Dayco's motion for dismissal of JMA's claims based on a statute of limitations argument be denied.

      c.    <u>The City's Fleet West Facility</u>

      Dayco argues that the statute of repose, Fla. Stat. § 95.031(2)(b), bars the City's claims relating to the FlexPipe that was originally installed at the City's Fleet West facility in 1993.  This statute bars product liability actions

> if the harm was caused by exposure to or use of the product more than 12 years after delivery of the product to its first purchaser or lessee who was not engaged in the business of selling or leasing the product or of using the product as a component in the manufacture of another product.  All products, except those included within subparagraph 1. or subparagraph 2., are conclusively presumed to have an expected useful life of 10 years or less.

§ 95.031(2)(b).  Subparagraph 2 is relevant here and it provides that

> [a]ny product not listed in subparagraph 1., *which the manufacturer specifically warranted, through express representation or labeling, as having an expected useful life exceeding 10 years*, has an expected useful life commensurate with the time period indicated by the warranty or

label.  Under such circumstances, no action for products liability may be brought after the expected useful life of the product, or more than 12 years after delivery of the product to its first purchaser or lessee who was not engaged in the business of selling or leasing the product or of using the product as a component in the manufacture of another product, whichever is later.

§ 95.031(2)(b)2 (emphasis supplied).

We cannot say whether the statute of repose applies here.  Facts in evidence support Plaintiffs' claim that FlexPipe was supposed to last at least as long as the materials it was designed to replace (steel and fiberglass), i.e., 20 years or more.  [*See* D.E. 442, Ex. 16 at 2 (Fax by TCI's Mark Guindon); D.E. 445, Ex. 17 (Depo. of T. Gardner Bayless for the City); D.E. 447, Ex. 18 (Decl. of Patricia Elston for the City); D.E. 447, Ex. 19 (Depo. of Gabriel Volante for Twin Oil); D.E. 447, Ex. 20 (Decl. of Jeff Montgomery for JMA); D.E. 482 (1994 video of Enviroflex System)].  "An express warranty may be made in advertising and marketing materials."  *Becker v. Harken, Inc.*, No. 06-60255-CIV-Cohn/Snow, 2007 WL 1412937, at *3 (S.D. Fla. Ma 10, 2007).  On this record, it is a question of fact whether TCI warranted through advertising and marketing materials that FlexPipe's expected useful life would be more than ten years.  If that is the case, the statute of repose would not apply.  Accordingly, Dayco is not entitled to summary judgment on the City's claims on the basis of Fla. Stat. § 95.031(2)(b).

### C. *Defects or Failures of Dayco's Pipe at CSP's Municipal Fueling Station and JMA's Stations*

From 1990 to 1997, TCI contracted with Dayco for the design, testing, and manufacture of the primary hose used in the TCI secondary containment system.  In

October 1997,  Dayco and TCI terminated their Supply Agreement at which time Dayco stopped manufacturing all primary hose products for TCI.   TCI then began to manufacture the primary hose, after altering the hose design.

Dayco argues that it is entitled to summary judgment on the negligence and strict products liability claims brought by the City and JMA because neither of these Plaintiffs can show that the allegedly defective flexible hose at their stations was designed or manufactured by Dayco.   Plaintiffs do not dispute the fact that none of the leaking hose at these Plaintiffs' sites was Dayco-manufactured.  But they argue that Dayco should nevertheless be held liable as a designer of the pipe.  Plaintiffs assert that Dayco was responsible for the initial design of the primary pipe, including all material selection decisions, and that TCI subsequently copied Dayco's design, including the negligent material selection.

> Dayco ignores the fact that as a designer of the pipe, its liability extends beyond pipe it manufactured. . . .  Dayco negligently performed its design undertaking, and its negligence carried over to the primary pipe manufactured by TCI after 19[9]7.  Thus, Plaintiffs were damaged because of Dayco's negligence when they purchased and used negligently designed primary pipe made after 1997.

[D.E. 505 at 6-7].

Plaintiffs posit that liability can attach to the designer of a defective product even if the designer did not manufacture the product and even in the absence of privity between the designer and the aggrieved party, because Florida law imposes a duty of care on design professionals to exercise care in conformance with the standard of care used by similar professionals.  In attempting to ascribe liability to Dayco, Plaintiffs cite *Moranis v. Heathman*, 744 So. 2d 973 (Fla. 1999), and *Stone's Throw Condo. Ass'n, Inc.*

*v. Sand Cove Apts, Inc.*, 749 So. 2d 520 (Fla. 2d DCA 1999). Both cases deal with negligence claims against individuals who rendered professional services, not strict liability for product defects, and both are inapposite.

*Moranis* involved a negligence claim against engineers who made a pre-purchase inspection of a house pursuant to a contract between their employer (an engineering firm) and the prospective homeowner. The plaintiff alleged that he relied on the engineers' inspection and advice to purchase the home, and after purchase he discovered defects in the home that should have been, but were not, discovered in the engineering inspection. 744 So. 2d at 974-75. After reviewing Florida common law and relevant state statutes that permit malpractice claims based on a professional's failure to exercise due care in the rendition of professional services, the court concluded that the purchaser could assert a cause of action against the individual engineers despite the lack of a direct agreement between the purchaser and the engineers. *Id.* at 975-79. The court went on to hold that the economic loss rule did not bar the negligence claim notwithstanding a lack of personal injuries or property damage. *Id.* at 979-83.

In *Stone's Throw Condo. Ass'n*, a condominium association sued an architectural firm and the individual architect who designed the buildings and improvements comprising the condominium, alleging that they negligently misrepresented that the state minimum building codes had been met when they had not. 749 So. 2d at 521. The appellate court reversed the dismissal of the negligent misrepresentation claim on the basis of the holdings in *Moransais*, i.e., that Florida law recognizes a cause of

action against a professional based on his negligent acts despite the lack of a direct contract between the professional and aggrieved party and that the economic loss doctrine did not bar the claim even though the damages were purely economic in nature. *Id.* at 522-23. The court remanded the case for a determination as to whether a special relationship between the condominium association and the architect existed that would support a claim based on negligence. *Id.* at 523.

Both of these cases dealt with aggrieved parties' claims against professionals for their negligent provision of professional services, something our case does not involve. Neither case supports the proposition that Dayco as the designer of an allegedly defective product remains liable for its negligent design even after it stops manufacturing the product.

The only case Plaintiffs cite that involves product liability based on defective design is *Easter v. Aventis Pasteur, Inc.*, No. 5:03-CV-141 (TJW), 2004 WL 3104610 (E.D. Tex. Feb. 11, 2004). One of the defendants in that case, Eli Lilly & Co., designed, manufactured, patented, and licensed thimerosal, a preservative used in pediatric vaccines that contained harmful levels of mercury and caused the minor plaintiff's neurological injuries. *Id.* at *1. Plaintiffs asserted a negligent design, licensing, and marketing claim against Lilly. *Id.* at *2. Lilly sought dismissal of the design defect claim because although it (Lilly) was the original designer of the thimerosal, the actual thimerosal that was administered to and allegedly injured the minor plaintiff was manufactured by other companies. *Id.* at *8.

The court distinguished a case that Lilly had relied on, *Firestone Steel Prods. Co. v. Barajas*, 927 S.W.2d 608 (Tex. 1996), in which Firestone, "the original designer of a general product concept that is copied, modified and used by a manufacturer," was held not liable to a plaintiff injured by the modified product. 2004 WL 3104610, at *9 (citing *Barajas*, 927 S.W.2d at 601). The *Easter* court explained:

> *Barajas* is distinguishable because that case dealt with a mere product concept which was unlicensed and which was different from the final modified tire product that injured the plaintiff. In this case, the thimerosal was not simply a product concept, but a finished product. Also, the thimerosal given to [the minor plaintiff] as part of his vaccine regimen was not modified from Lilly's original design.
>
> * * *
>
> Lilly developed the design for thimerosal, used thimerosal in vaccines, licensed thimerosal to other manufacturers, and after its patent expired, knew that other manufacturers had copied its thimerosal design for use in vaccines. Lilly was in the best position to know about the potentially harmful effects of thimerosal, to warn others about them, and even, as plaintiffs allege, to conceal them as well. Plaintiffs allege that for many years Lilly promoted thimerosal as being non-toxic while concealing research findings which showed that it was indeed toxic. Under the holding in *Alm [v. Aluminum Co.*, 717 S.W.2d 588 (Tex. 1986)], Lilly, as a designer, has a duty to develop a safe design for thimerosal. Also, Lilly's design of and intimate knowledge about thimerosal also gives rise to a duty to inform users of hazards associated with the use of thimerosal. Therefore, the Court finds that the plaintiffs have adequately stated a design defect claim against Lilly.

*Id.*

*Easter* is factually distinguishable from our case, has not been followed by any Florida court, and does not state the law in Florida on strict products liability. The record reflects that TCI altered the design and construction of the primary hose after its Supply Agreement with Dayco ended. TCI made a conscious decision to modify the

primary hose.  Its stated goal was to change the hose to avoid infringing on Dayco's patent for the primary hose.  It made changes that were, in its view, sufficient to meet that goal.[8]  These included eliminating one layer of hose and changing the bonding process to utilize a new, proprietary adhesive.  [D.E. 534, Ex. 10 at 5-8].  Plaintiffs do not dispute that TCI "altered some aspects of the design to circumvent an existing patent" [D.E. 506 ¶ 6] but they attempt to minimize the point by highlighting the fact that TCI continued to utilize Carilon as the barrier layer.  But the product simply is not the same product that Dayco designed and manufactured.

We cannot accept the proposition that Dayco may be liable for defects in a product it did not manufacture and which was altered from its original design.  Plaintiffs have not cited any Florida authority that supports their theory, and in fact it runs counter to the law in this state that requires a plaintiff in a products liability action to prove that the manufacturer defendant produced the product that allegedly caused the injury.  *See, e.g., Morton v. Abbot Labs.*, 538 F. Supp. 593, 595 (M.D. Fla. 1982) (citing *West v. Caterpillar Tractor Co.*, 336 So. 2d 80 (Fla. 1976), in which the Florida Supreme Court adopted the doctrine of strict liability in tort as expressed in section 402A, Restatement  (Second) of Torts (1965))[9]; *Liggett Group Inc. v. Engle*, 853

---

[8]    Plaintiffs point to Dayco's patent infringement suit against TCI as evidence that TCI merely copied Dayco's design for the primary hose.  *Dayco Products, Inc. v. Total Containment, Inc.*, 329 F.3d 1358 (Fed. Cir. 2003).  But that suit did not relate specifically to the design or construction of the primary hose, which is the issue here.  Rather, the patents-in-suit in that case were "directed to flexible hoses and coupling assemblies that connect to each other for use in underground gas containment systems."  *Id.* at 1361.

[9]    "[S]trict liability should be imposed only when a product the manufacturer places on the market, knowing that it is to be used without inspection for defects,

So. 2d 434, 467 n. 46 (Fla. 3d DCA 2003) ("It is aphoristic that a plaintiff cannot prevail on claims for negligence, breach of warranty or strict liability, *unless the plaintiff establishes that the product which allegedly caused the plaintiff's injury was manufactured or sold by the defendant.*" (emphasis supplied)), *aff'd in part and rev'd in part on other grounds*, 945 So. 2d 1246 (Fla. 2006). We will not impose a perpetual duty on an initial product designer, even when that product has been redesigned, modified, and manufactured by other entities into a different product and sold for economic benefit by other entities.

Because the City and JMA have failed to show that their claims are based on hose that Dayco designed or manufactured, we recommend that judgment in favor of Dayco be entered on these two Plaintiffs' negligence and strict products liability claims. We make the same recommendation with respect to Twin Oil's claims against Dayco that relate to the NMB station. In its Reply brief, Dayco expanded its request for summary judgment to include such claims by Twin Oil because after Dayco moved for summary judgment, Plaintiffs clarified that Twin Oil is not making a claim for damage to *Dayco-designed or manufactured* hose at its NMB station. [D.E. 564 at 5 n.5 (citing D.E. 503 (Plaintiffs' Opp'n to Cleveland Tubing, Inc.'s Mot. for Partial Summ. J.) at 10)]. Given Plaintiffs' representation that Twin Oil is not seeking to recover based on the 1998 leak at the NMB station and the unrefuted evidence that the

---

proves to have a defect that causes injury to a human being." *West*, 336 So. 2d at 86. Before a manufacturer may be held liable under a strict liability theory, the user of the product "must establish *the manufacturer's relationship to the product in question*, the defect and unreasonably dangerous condition of the product, and the existence of the proximate causal connection between such condition and the user's injuries or damages." *Id.* at 87 (emphasis supplied).

hose at issue there is *not* Dayco-designed or manufactured, Twin Oil's negligence and strict liability claims for damage at the NMB station must also fail as a matter of law.

    **D.**     ***Plaintiffs' Claims Regarding Omniflex, Monoflex, and/or PP1502 Hose Products Manufactured by Dayco***

Dayco seeks dismissal of all claims by Plaintiffs that relate to Dayco's Omniflex, Monoflex, and PP1502 hose products because none of the Plaintiffs has established that any of these Dayco-manufactured products was installed in their stations, that any such hose was defective, failed, or leaked at their stations, or that any such hose caused any claimed injury or damage in this case. [D.E. 458 at 10-11, and citing *Morton*, 538 F. Supp. at 595 and *Engle*, 853 So. 2d at 467 n.46]. Plaintiffs do not dispute that they never installed or used these products, but argue against summary judgment because "variations in FlexPipe are not material because all FlexPipe, regardless of the model number, suffers from the same uniform defect." [D.E. 505 at 8]. Specifically (and as addressed in their memorandum in support of class certification [D.E. 441]), Plaintiffs allege that FlexPipe is defective because it does not perform as intended during its reasonably expected life, and the defect is uniform and inherent in the FlexPipe. [*Id.*]. Whereas, Plaintiffs say, all FlexPipe suffers from the same defect, they do not need to have used every model to proceed with their claims against Dayco regarding the Omniflex, Monoflex, and PP1502 hose products. [*Id.* at 9].

We conclude that Twin Oil, JMA, and the City lack standing to assert claims regarding Omniflex, Monoflex, or PP1502 because they did not have any such hose at their stations. Article III standing requires that a party must have suffered injury-in-

fact; there must be a causal connection between the injury and the conduct complained

of; and it must be likely that the injury will be redressed by a favorable court decision.

*Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992).  Stated more expansively,

> [f]irst, the plaintiff must have suffered an "injury in fact"- an invasion of
> a legally protected interest which is (a) concrete and particularized, and
> (b) "actual or imminent, not 'conjectural' or 'hypothetical'[]".   Second,
> there must be a causal connection between the injury and the conduct
> complained of- the injury has to be "fairly ... trace[able] to the challenged
> action of the defendant, and not ... th[e] result [of] the independent action
> of some third party not before the court."  Third, it must be "likely," as
> opposed to merely "speculative," that the injury will be "redressed by a
> favorable decision."

*Id.* at 560-61 (citations omitted).  It is apparent that Plaintiffs have not satisfied this

test with regard to Dayco-manufactured products that they never owned or used.

Plaintiffs have not directed us to any case that supports the notion that they may

proceed under a "uniform defect" theory notwithstanding their failure to satisfy Art.

III standing requirements.

Moreover, because they lack standing as to these hoses, they cannot represent

putative class members with potential claims as to these particular models of hoses.

"[A] plaintiff who lacks the personalized, redressable injury required for standing to

assert claims on his own behalf would also lack standing to assert similar claims on

behalf of a class."  *Carter v. West Publ'g Co.*, 225 F.3d 1258, 1262 (11th Cir. 2000)

(internal citation omitted); *see also Seacoast Sanitation Ltd., Inc. v. Broward Co., Fla.*,

275 F. Supp. 2d 1370, 1376-77 (S.D. Fla. 2003) ("Advancing one's claims as a putative

representative of a class of claimants does not obviate or diminish the Article III

standing requirement."; solid waste generator, which operated only in an *incorporated*

area of the county, lacked Art. III standing to challenge an ordinance that regulated flow of solid waste in the *unincorporated* areas of the county and thus could not advance claims as an individual party or as a class representative).  Accordingly, we recommend that Dayco's motion for summary judgment as to Twin Oil's, JMA's, and the City's Omniflex, Monoflex, and PP1502-related claims be granted.

### E.   *Economic Loss Doctrine*

Dayco argues that Plaintiffs are barred under Florida's "economic loss doctrine" from bringing tort (i.e., negligence and strict products liability) claims for economic damages against Defendants for alleged damage to the TCI systems or their component parts.  Dayco claims that the following are "economic losses" for which Plaintiffs may not recover in tort:  the cost of replacing, testing, and repairing the entire TCI system installed at each site, reimbursement for maintenance costs, payment for alleged lost profits and diminished consumer confidence, and potential future and other alleged damages.  In support of its argument on the economic loss doctrine, Dayco adopts and incorporates the brief and other materials that Cleveland Tubing filed relative to this issue.  [D.E. 458 at 11 (citing D.E. 430-435)].

The economic loss doctrine is a judicially-created doctrine that precludes recovery in tort where the only damages suffered are economic losses.  *Indem. Ins. Co. of N. America v. American Aviation, Inc..*, 891 So. 2d 532, 536 (Fla. 2004).  Economic losses "are, simply put, disappointed economic expectations."  *Id.* at 536 n.1.  They may be defined as "damages for inadequate value, costs of repair and replacement of the defective product, or consequent loss of profits."  *Id.* (quoting *Casa Clara Condo. Ass'n,*

*Inc. v. Charley Toppino & Sons, Inc.*, 620 So. 2d 1244, 1246 (Fla. 1993) (internal citation omitted)). More specifically, and applicable here in a products liability context, economic losses include "the diminution in the value of the product because it is inferior in quality and does not work for the general purposes for which it was manufactured and sold." *Id.* (same).

### 1. *Damage to Other Property*

The economic loss doctrine is applied when a defect in a product causes damage to the product but causes no personal injury or damage to other property. *Indem. Ins., 891* So. 2d at 536. The doctrine developed to protect manufacturers from liability for economic damages caused by a defective product beyond the damages provided for by warranty law. *Id.* at 538. When a defective product damages only itself, "the injury suffered - the failure of the product to function properly - is the essence of a warranty action, through which a contracting party can seek to recoup the benefit of its bargain." *Id.* at 540 (quoting *East River Steamship Corp. v. Transamerica Delaval, Inc.*, 476 U.S. 858, 868 (1986)).

The Florida Supreme Court first adopted the products liability economic loss doctrine in *Florida Power & Light Co. v. Westinghouse Electric Corp*, 510 So. 2d 899, 902 (Fla. 1987). *Id.* In that case, Florida Power & Light ("FPL") contracted with Westinghouse to design, manufacture, and furnish two nuclear steam supply systems, including six steam generators. 510 So. 2d at 900. Leaks were discovered in all six generators. *Id.* FPL sued Westinghouse for breach of express warranties in the contracts and for negligence, and sought damages for the cost of repair, revision, and

inspection of the steam generators.  *Id.*  After considering the policy implications of a

rule that limited tort recovery for economic losses when a product damages only itself,

the Florida Supreme Court held that

> contract principles [are] more appropriate than tort principles for
> resolving economic loss without an accompanying physical injury or
> property damage.  The lack of a tort remedy does not mean that the
> purchaser is unable to protect himself from loss.

*Id.* at 902. As the Florida Supreme Court later explained, "[in *Florida Power*] we

expressly limited tort liability with respect to defective products to injury caused to

persons or damage caused to property other than the defective product itself." *Indem.*

*Ins.*, 891 So.3d at 541.

Plaintiffs have pled in this case that defects in FlexPipe caused damage to "other

components" of their fuel containment, conveyance, and delivery systems.  It is Dayco's

position, however, that to the extent the "other components" relate to the *TCI system*,

those damages are barred as economic losses.  Dayco claims that "[n]one of the named

Plaintiffs bought (or owned) anything short of the TCI system *as a system*." [D.E. 564

at 7 (emphasis in original)].  "[T]he TCI system was sold and operated as a system, and

"components" such as "dispensers, secondary containment pipe, sumps, bulkheads,

fittings, or couplings" do not constitute 'other property' for economic loss purposes. [*Id.*

at 8].

Plaintiffs acknowledge that they may not recover in tort for damage to the

product itself but argue that the "product" is the FlexPipe alone.  Their position is that

the FlexPipe was intended to be, and was, sold as a discrete finished product, not as

an entire fuel dispensing system as Defendants suggest.  Plaintiffs claim that the

"underground storage and conveyance system is comprised of several separate products that work together" and these other non-pipe products were also damaged by the discharge of petroleum products. [D.E. 505 at 11]. Plaintiffs assert that the economic loss doctrine does not preclude recovery in tort for damage to this "other property."

The question, then, is what is "other property." In general, damage to a machine that is caused by a defective component is considered damage to the product itself, not damage to "other property." *See, e.g., East River*, 476 U.S. at 867-68 ("all but the very simplest of machines have component parts" and to allow damages to components of an integrated package to constitute "other property" would "require a finding of 'property damage' in virtually every case where a product damages itself."); *Turbomeca, S.A. v. French Aircraft Agency, Inc.*, 913 So. 2d 714, 717 (Fla. 3d DCA 2005) (damages for loss of helicopter were barred by the economic loss doctrine because the helicopter airframe and engine were one product, not two separate pieces of property; "[c]ourts have refused to bifurcate products into parts where a component part harms or destroys the finished product."). *Compare Comptech Int'l, Inc. v. Milam Commerce Park, Ltd.*, 753 So. 2d 1219, 1226 (Fla. 1999) (subject of the contract was the renovation of a warehouse - a service, not a product, but to the extent the warehouse was the object of the contract, the computers inside the warehouse that were damaged during renovation were not an integral part of the "product" and were, therefore, "other property").

In *Casa Clara*, the Florida Supreme Court explained that the character of the loss determines the appropriate remedies. 620 So. 2d at 1247. To determine the

character of a loss, "one must look to the product purchased by the plaintiff, not the product sold by the defendant." *Id.* In *Casa Clara*, the plaintiffs were homeowners who sued the defendant when the concrete the defendant supplied for their homes caused damage to the reinforcing bars embedded in the concrete and the buildings themselves. *Id.* at 1245. The plaintiffs argued that the concrete damaged "other" property because the individual components and items of building material, not the homes themselves, were the products they had purchased. *Id.* at 1247. The Florida Supreme Court disagreed, holding that the plaintiffs bought a finished house, not individual components. *Id.* The concrete was "an integral part of the finished product and, thus, did not injure 'other' property." *Id. See also Fishman v. Boldt*, 666 So. 2d 273, 274 (Fla. 4th DCA 1996) (the product purchased by the plaintiff was a home with all its component parts, including the seawall, pool, and patio, consequently, no "other property" was damaged when the seawall failed and the home, pool, and patio were damaged, meaning economic loss doctrine precluded recovery in tort).

We are unable to determine, on the record before us, whether Twin Oil and the City (but not JMA) intended to, and did, purchase completely integrated fuel storage and dispensing *systems*, or whether they purchased FlexPipe as a discrete product that worked in conjunction with other discrete products. As noted, Dayco claims that none of the Plaintiffs bought anything short of the TCI *system* and that sumps, bulkheads, couplings, etc. were just component parts of that system. [D.E. 564 at 7-8]. But Plaintiffs state that, even though they could have, and in some cases did, purchase all of the products from TCI, FlexPipe was intended to be, and was, sold as a discrete

finished product. [D.E. 505 at 11]. Plaintiffs cite testimony from a TCI sales manager who explained that customers could and often did mix and match components from different manufacturers. [D.E. 504, Ex. F at 25, 85-87]. With the exception of JMA, discussed *infra*, it is not clear how much mixing and matching, if any, occurred at the Twin Oil and City sites. Because we are unable to discern what the specific "product" is that Twin Oil and the City purchased, whether it all came from TCI and whether or not FlexPipe was purchased as a component of an integrated system, we cannot determine whether "other property" in addition to the "product" itself was damaged by the leaks.[10] The economic loss doctrine is clear, though: Plaintiffs may not recover in tort for damage to any part of an integrated fuel storage and dispensing *system*.[11]

---

[10]      Plaintiffs are not very specific about what constitutes "other property." In their response to the summary judgment motion, for example, they claim "damage to the *other* products that work in conjunction with the FlexPipe to store and dispense fuel." [D.E. 505 at 10-11 (emphasis in original)]. In their complaint, Plaintiffs refer to "other products" as, e.g., "components of Plaintiffs' and Class members' fuel containment, conveyance and delivery systems" (D.E. 211, ¶ 4); "other components of Plaintiffs' and Class members' UST systems" (*Id.*, ¶ 72); "UST fuel delivery systems . . . and other [non-FlexPipe] components of UST systems" (*Id.*, ¶ 128); "fuel delivery systems" (*Id.*, ¶¶ 139, 142); and "UST systems and/or their components" (*Id.*, ¶ 146). One of their experts, Thomas J. Schruben, describes an UST system as consisting of "tanks, pumps, sumps, fill pipe, product delivery pipe, dispensers, vent lines, etc." [D.E. 445, Ex. 2]. Unfortunately, but not dispositively, Plaintiffs have not clearly identified what exactly was damaged by leakage from the FlexPipe.

[11]      Dayco suggests that another district court has already determined that the TCI system was sold and operated as a system and that "components" such as sumps, bulkheads, and couplings do not constitute "other property" for economic loss purposes. Dayco cites to *Brookshire Bros. Holding, Inc. v. Total Containment, Inc.*, No. 04-1150, a case in the Western District of Louisiana that involves failures and/or leaks of TCI FlexPipe in Texas and Louisiana and many of the defendants sued in our case. However, that court did not analyze whether non-pipe components of the underground storage and conveyance system constituted "other property" as has been argued by Plaintiffs in our case.

The *Brookshire* court described in general terms "systems" as being comprised

JMA, however, is in a different posture from Twin Oil and the City.   The evidence before us is that JMA purchased an entire TCI system as a *system*.   Jeff Montgomery, the sole proprietor of JMA, testified that he purchased "the entirety of the TCI system" which consisted of "everything underground up to the point of distribution at the dispenser" including "[t]anks, sumps, and conveyance lines."  [D.E. 562, Ex. A at 23].   From JMA's perspective, it intended to and did purchase an entire TCI *system*.   *See Casa Clara*, 620 So. 2d at 1247 (court should look at the product purchased by the plaintiff, not the product sold by the defendant, to determine the

---

of primary pipes contained within larger secondary pipes, which connected USTs to the above-ground fuel dispensers.  2007 WL 1896065, at *1 (W.D. La. July 7, 2006).  The court noted that the systems "incorporate numerous other components, such as sumps, connectors, couplings, and fittings."  *Id.*  Although we are not intimately familiar with the details of the *Brookshire* case, it is not clear that the plaintiffs were seeking to recover for damage to non-pipe components of their system.  The only specific discussion about "other property" related to damages from environmental pollution to land.  *Id.* at *7 ("Brookshire Brothers contends that it has sustained environmental pollution to land from the defective flexpipe and further asserts that it had discovered contamination at its stores in [several cities].").  Because under the Texas economic loss rule "environmental pollution to land is damage to other property," the court held that the economic loss doctrine did not bar such recovery.  *Id.*  The court on other occasions echoed its conclusion that "other property" included land contamination.  *See, e.g.,* rulings dated January 18, 2007 at 2007 WL 184600, at *7 (Cleveland Tubing's motion for summary judgment based on the economic loss doctrine was granted to the extent that Texas law barred recovery "for pure economic losses for those damages that occurred in Texas, with the exception of damages to other property which includes land contamination in Texas."); October 18, 2006 at 2006 WL 2997976, at *4.

It is true that the court did state on more than one occasion that it never intended to include "the Total Containment System as other property," *see, e.g.,* ruling dated May 4, 2007 at 2007 WL 1322376, at * 1, but Dayco has not directed us to a discussion of what exactly the "Total Containment System" consisted of, whether it included non-pipe products, and why these were not deemed "other property." Furthermore, although we give careful consideration to another district court's ruling, we are not bound by it.  *See, e.g., Fox v. Acadia State Bank*, 937 F.2d 1566, 1570 (11th Cir. 1991) ("a district court is not bound by another district court's decision, or even an opinion by another judge of the same district court.").

character of the loss).  JMA may, therefore, not recover in tort for damage to non-pipe products that are merely component parts of the integrated TCI system.[12]

## 2.   *Other Damages*

Each of the Plaintiffs seeks tort damages for the cost of remediating soil contamination.  Dayco does not dispute that Plaintiffs may recover for any environmental damages to land they can prove at trial.

In addition, Twin Oil and JMA seek damages for business disruption losses.  The economic loss doctrine prohibits recovery in tort for any such losses that are attributable to the defective "product," whatever that is in this case.  *See Casa Clara*, 620 So. 2d at 1246 (economic loss has been defined as "consequent loss of profits without any claim of . . . damage to other property").  If these Plaintiffs are somehow able to prove they lost business as a result of damage to "other property" and/or from contaminated soil, they may recover for those losses.

In summary, we recommend that Dayco's motion for summary judgment based on the economic loss doctrine be granted in part and denied in part, as discussed above.  Plaintiffs may not recover in tort for economic losses or damage to the product itself.  Damage to "other property" to the extent it can be proved is recoverable.

## F.   ___Twin Oil's Standing to Assert Claims to "Other Property" at the Hialeah and Miramar Stations___

Dayco challenges Twin Oil's standing to assert any claims for damage to "other property," including environmental contamination and remediation, at the Miramar

---

[12]      We note in any event that we have already determined *supra* that JMA's negligence and strict products liability claims fail because JMA (as well as the City) failed to show their claims are based on Dayco-designed or manufactured hose.

and Hialeah stations on the ground that Twin Oil does not actually own the stations at these locations and thus is not the real party in interest as required by Fed. R. Civ. P. 17(a).  The true owner of the property interest, Dayco argues, is the proper party plaintiff.

In response, Plaintiffs contend that Twin Oil has suffered "injury-in-fact" and does have standing to assert claims at the Hialeah and Miramar sites because it owns all of the underground equipment, including the FlexPipe, installed at these locations. Plaintiffs point to evidence in the record showing that Twin Oil has operated the fueling stations in Hialeah and Miramar for over twenty years pursuant to long-term lease agreements.  The agreements acknowledge that Twin Oil owns and is responsible for personal property such as tanks and other equipment at the sites.  When the FlexPipe leaked, the piping itself as well as other equipment in the underground storage systems were damaged.  Twin Oil paid the costs incurred in connection with the leaks.  In addition, Twin Oil by contract guaranteed it would "safeguard" the owner of the property from "negative effects of any environmentally hazardous material used on [the owner's] property."  [D.E. 506, Ex. O at ¶ 5; Ex. P at ¶ 14].  Twin Oil thus asserts that it, not the property owner, bears the financial burden of environmental remediation of the soil resulting from leaks in its FlexPipe.

In its reply, Dayco (through adoption of TCI's reply to Plaintiffs' argument on this issue [D.E. 564 at 8 n.5 (citing D.E. 561 at 5-6)]) concedes that Twin Oil may assert claims for damage to its *own* property (the Flexpipe and the underground system) but argues Twin Oil has no standing to sue for damage to "other property" owned by the owner of the Hialeah and Miramar properties.  Dayco contends that Twin

Oil's contractual obligations do not confer standing to sue on behalf of the property owner.  "The mere existence of contractual obligations on behalf of a lessee to protect or repair the lessor's property are insufficient to confer standing, absent proof that the lessee has in fact made satisfaction of the alleged injury to the lessor."  [D.E. 561 at 5 (citing *Burnette v. Thomas*, 349 So. 2d 1208, 1211-12 (Fla. 2d DCA 1977))].  Dayco maintains that Twin Oil has not proven nor even alleged that it made reparations or satisfaction to the property owner for any alleged damage at Hialeah or Miramar (such as for diminution in property value and monies expended for remediation).

Federal Rule of Civil Procedure 17(a) provides that an action in federal court must be prosecuted in the name of the "real party in interest."  The real party in interest requirement is a means to determine whether a party possesses an enforceable right.  *Tribue v. Hough*, No. 3:04CV286/RV/EMT, 2006 WL 212017, at *2 (N.D. Fla. Jan. 26, 2006); 6A Wright & Miller, *Federal Practice and Procedure* § 1542 at 327 (2d ed. 1990).  "[A] party has no standing to assert a right if it is not his own."  *United States v. 936.71 Acres of Land, More or Less*, 418 F.2d 551, 556 (5th Cir. 1969). Whether a party is a real party in interest depends on his substantive rights which, where the claim is one that involves a property interest, is determined by state law.  *Id.; see also Tribue*, 2006 WL 212017, at *2.[13]

---

[13]      We note that there is a distinction between a party's standing to sue under Article III and his "standing" to prosecute a claim as the real party in interest pursuant to Rule 17(a).  *See, e.g., Live Entertainment, Inc. v. Digex, Inc.,* 300 F. Supp. 2d 1273, 1277 (S.D. Fla. 2003) ("There is a distinction between questions of Article III standing and Rule 17(a) real party in interest status."); *Gonzalez ex. rel. Gonzalez v. Reno,* 86 F. Supp. 2d 1167, 1182 (S.D. Fla. 2000) ("[t]he concepts of a plaintiff's standing to sue and his status as the real party in interest are interrelated, yet conceptually distinct.").  Article III standing requires that a party must have suffered

We find (and Dayco concedes) that Twin Oil meets the real party in interest test as to the property it owns at the Miramar and Hialeah sites. It has already incurred financial costs as a result of the leaks at those locations and thus has a sufficient interest in this action to entitle it to be heard on the merits.

There is a question of fact about damage to property owned by the Miramar and Hialeah owners, however. The president of Twin Oil claims generally that Twin Oil incurred $203,902.96 in remediation costs and expenses as a result of the FlexPipe leaks. [D.E. 447, Ex. 19]. While the record reflects that Twin Oil paid for remediation services at the *NMB* station [D.E. 509, Ex. F], Twin Oil has not pointed to specific documentation showing payment for remediation services at the *Hialeah and/or Miramar* sites. If Twin Oil cannot demonstrate it paid for damages incurred by the owner of the Hialeah and Miramar properties pursuant to its contractual obligations, it cannot recover for such loss. *See Burnette*, 349 So. 2d at 1212 (court adopts rule that "reparation or satisfaction to the landlord is a condition precedent to the tenant's right

---

injury-in-fact; there must be a causal connection between the injury and the conduct complained of; and it must be likely that the injury will be redressed by a favorable court decision. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992). A "real party in interest" is the party in whose name a federal suit shall be prosecuted and who by substantive law has the right sought to be enforced and who possesses a significant interest in the action to entitle him to be heard on the merits. *Gonzalez*, 86 F. Supp. 2d at 1182. "Standing is similar to the real party in interest rule inasmuch as both terms are used to designate a plaintiff who possesses a sufficient interest in the action to entitle him to be heard on the merits." 6A Wright & Miller, *Federal Practice and Procedure* § 1542 (Supp. 2007); *see also Gonzalez*, 86 F. Supp. 2d at 1182 n.18 (noting that the real party in interest and Article III standing questions are similar, and that the "notable distinctions are somewhat academic"). For the reasons articulated above, we find that Twin Oil has satisfied the requirements of both Article III standing and Rule 17(a) real party in interest status and has standing to sue for the above-delineated damages at the Hialeah and Miramar sites.

to sue, and that until such reparation is made, there has been no injury to the tenant").

We will not foreclose the opportunity for Twin Oil to make such a presentation at trial.

We note that there is nothing in the leasing agreements between Twin Oil and the

Hialeah and Miramar property owner that suggests Twin Oil is obligated to pay for

diminution in property value as a result of Twin Oil's activities.

### G. Negligent Misrepresentation/Concealment Claim

Dayco asserts that Plaintiffs cannot meet their burden of proof with regard to

allegations of negligent misrepresentation or concealment because none was in

contractual privity with Dayco, had ever communicated with representatives of Dayco,

or was even aware of the existence of Dayco prior to this litigation.  Accordingly, Dayco

urges dismissal of this claim against it.

Under Florida law, to establish a claim for negligent misrepresentation, a

plaintiff must prove:

> (1) [a] misrepresentation of a material fact; (2) the representor ... ma[d]e
> the representation without knowledge as to its truth or falsity, or ...
> under circumstances in which he ought to have known of its falsity; (3)
> the representor ... intend[ed] that the misrepresentation induce another
> to act on it; [and] (4) injury must result to the party acting in justifiable
> reliance on the misrepresentation.

*Souran v. Travelers Ins. Co.*, 982 F.2d 1497, 1503 (11th Cir. 1993) (internal citations

omitted); *Allocco v. City of Coral Gables*, 221 F. Supp. 2d 1317, 1355 (S.D. Fla. 2002);

*Atlantic Nat'l Bank of Fla. v. Vest*, 480 So. 2d 1328, 1331-32 (Fla. 2d DCA 1986).

The elements of an inducement claim are similar to those for negligent

misrepresentation:

> (1) a misrepresentation or omission of a material fact; (2)(a) knowledge
> of the representor of the misrepresentation or (b) representations made

by the representor without knowledge as to either the truth or falsity, or (c) representations made under circumstances in which the representor ought to have known, if he did not know, of the falsity thereof; (3) an intention that the representor induce another to act on it; and (4) resulting injury to the party acting in justifiable reliance on the representation.

*Livingston v. H.I. Family Suites, Inc.*, No. 605cv860ORL19KRS, 2006 WL 1406587, at

*7 (M.D. Fla. May 22, 2006).

Plaintiffs counter that, under Florida law, privity is not required to establish a claim for negligent misrepresentation/concealment.   Plaintiffs cite Restatement (Second) of Torts § 552 which provides that a party who in the course of its business, or in any other transaction in which it has a pecuniary interest, supplies false information negligently is liable to a party harmed by that false information.[14] Plaintiffs contend that the absence of privity is not dispositive of a claim because "the negligent maker of a misrepresentation is liable if he 'knows his recipient intends to

----

[14]     Restatement (Second) of Torts § 552 provides in relevant part:

(1) One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

(2) Except as stated in Subsection (3), the liability stated in Subsection (1) is limited to loss suffered
            (a) by the person or one of a limited group of persons for whose benefit and guidance he intends to supply the information or knows that the recipient intends to supply it; and

            (b) through reliance upon it in a transaction that he intends the information to influence or knows that the recipient so intends or in a substantially similar transaction.

transmit the information to a similar person, persons or group.'" [D.E. 503 at 18 (quoting *NationsBank N.A. v. KPMG Peat Marwick LLP*, 813 So. 2d 964, 967 (Fla. 2d DCA 2002))].

Section 552 is inapplicable here. That section has been applied in cases where individuals who provide professional services, such as auditors and appraisers, are sued for negligent misrepresentation of information that third parties rely on to their detriment. That did not happen in this case. Moreover, the theme running through these and other cases is that the defendant must know that its misrepresentations will be conveyed to and relied upon by third parties to their detriment. As comment h. to § 552(2) explains:

> It is enough that the maker of the representation intends it to reach and influence either a particular person or persons, known to him, or a group or class of persons, distinct from the much larger class who might reasonably be expected sooner or later to have access to the information and foreseeably to take some action in reliance upon it. It is enough, likewise, that the maker of the representation knows that his recipient intends to transmit the information to a similar person, persons or group. . . . It is not enough that the maker merely knows of the ever-present possibility of repetition to anyone, and the possibility of action in reliance upon it, on the part of anyone to whom it may be repeated.

One of the cases cited by Plaintiffs, *NationsBank,* involved a claim of negligent misrepresentation against an accounting firm which had prepared annual audited financial statements that were used by lender banks to assess the true financial condition of a borrower and thereby allow the banks to decide whether to renew, increase, or call the amount of a line of credit available to the borrower. 813 So. 2d at 965. The accounting firm, which had been the borrower's independent auditor since well before the banks opened the line of credit, prepared audited financial statements

during the existence of the line of credit.  *Id.*  The firm's engagement partner who supervised the borrower's account testified that "early on" he read the line of credit agreement and understood the necessity and the requirement for the annual financial statements.  *Id.*

After the borrower sought bankruptcy protection, the banks sued the accounting firm for preparing inaccurate audited financial statements that did not correctly state the borrower's precarious financial condition and upon which the banks had relied.  *Id.* at 966.   Ultimately, a jury found the accounting firm liable for negligent misrepresentation.  *Id.*

On appeal, the court looked to *First Fla. Bank, N.A. v. Max Mitchell & Co.*, 558 So. 2d 9 (Fla. 1990), in which the Florida Supreme Court determined that claims against accounting firms for negligent misrepresentation were within the ambit of § 522 of the Restatement.  *Id.* at 966-67.

> "[L]iability should extend not only to those with whom the accountant is
> in privity or near privity, but also to those persons, or classes of persons
> . . . *whom he knows his client intends will so rely.*  On the other hand, as
> the commentary makes clear, [section 552] prevents extension of liability
> in situations where the accountant 'merely knows of the ever-present
> possibility of repetition to anyone, and the possibility of action in reliance
> upon [the audited financial statements], on the part of anyone to whom
> it may be repeated.'  Restatement (Second) of Torts, § 552, comment h.
> As such it balances, more so than the other standards, the need to hold
> accountants to a standard that accounts for their contemporary role in
> the financial world with the need to protect them from liability that
> unreasonably exceeds the bounds of their real undertakings." [e.s.]

813 So. 2d at 967 (quoting *Max Mitchell*, 558 So. 2d at 15-16) (emphasis supplied in original).  The *NationsBank* court found particularly relevant the fact that § 552 does not always require the maker of a negligent misrepresentation to intend reliance by

a third person; "it is sufficient if the maker knows that his client will give the information to another who will rely on it in making a business decision." *Id.* Turning to the facts before it, the court found sufficient evidence had been presented to the jury for a prima facie case that the accounting firm had actual knowledge of the banks' reliance on the annual audited financial statements in deciding whether to continue the line of credit. *Id.* at 967-68.

Another case cited by Plaintiffs, *Wassall v. W.H. Payne*, 682 So. 2d 678 (Fla. 1st DCA 1996), did not involve § 552, but there the court permitted an action for negligent misrepresentation notwithstanding the lack of privity between the lessee of real property and the seller of the property. According to the lessee, the seller made false statements regarding the property's propensity for flooding, knowing and intending that the purchaser of the property – who, according to the lessee, was originally going to be him – would rely on the false statements and consummate the sale. *Id.* at 679-80. The court based its holding on principles enunciated in another district court decision, where actual knowledge by the defendant that material misrepresentations were being used to induce third parties to undertake financial risks subjected the defendant to possible liability for resulting damages. *Id.* at 680-81 (citing *Wallis v. S. Fla. Sav. Bank*, 574 So. 2d 1108, 1110-1111 (Fla. 2d DCA 1990)).[15]

_____

[15]      Another case cited by Plaintiffs, *Cooper v. Brakora & Assoc., Inc.*, 838 So. 2d 679, 681 (Fla. 2d DCA 2003), does state that privity is not dispositive of claims under § 552, but the  holding in that case turned on the plaintiff's failure to state a claim for negligent misrepresentation under § 552, not on privity. The court concluded that the buyer of residential property could not maintain a claim for negligent misrepresentation against the appraiser of his property because the appraisal was intended to assist in the buyer's application for a mortgage loan, not the purchase and sale of the property. *Id.* at 682. The court found noteworthy the fact that the contract for purchase and sale of the house was not conditioned on an appraisal but on the

Here, the thrust of Dayco's argument is that Plaintiffs have not shown that Dayco made any representations to them or that Plaintiffs relied upon anything Dayco said or did when they purchased FlexPipe from TCI.  Consequently, Dayco contends, Plaintiffs cannot prove the core element of their negligent misrepresentation/ concealment claim.

The Court agrees.  Plaintiffs have failed to establish that they justifiably relied on any representations (or alleged misrepresentations) by Dayco or that Dayco concealed material facts on which Plaintiffs relied to their detriment.  *Souran*, 982 F.2d at 1505 (fourth element of a negligent misrepresentation claim is that the plaintiff justifiably relied on the defendant's misrepresentation).  It is undisputed that Plaintiffs had no dealings with Dayco or even knew of Dayco's existence prior to this litigation.  Plaintiffs have not presented evidence that Dayco knew or had reason to believe that any alleged misrepresentations made by TCI would in turn be transmitted to Plaintiffs or similar persons and that that information would be relied on by Plaintiffs or others in making business decisions.  Under these circumstances, Plaintiffs cannot maintain their claim for negligent misrepresentation.  We accordingly recommend judgment for Dayco on Count V.[16]

---

buyer obtaining a mortgage.  *Id.*  The appraisal was performed at the bank's request, to assist it in evaluating the risk involved in loaning money to the buyer.  *Id.*  Thus, the ruling in *Cooper* depended on the purpose of the appraisal, not on whether privity existed between the buyer and the appraiser.

[16]     Plaintiffs cite two additional cases pertaining to a duty to disclose, neither of which is applicable in a product liability case.  *See Brandon Financial Corp. v. Calton, Inc.*, No. 90-278-CIV-ORL-19, 1991 Lexis 19847, at *9 (M.D. Fla. Sept. 30, 1991) (denying summary judgment on a claim for common law fraud where disputed facts existed as to whether a corporate officer directed or authorized fraudulent misrepresentations or disclosures in a securities fraud case) and *Mettler, Inc. v. Ellen*

**H.    *Unjust Enrichment Claim***

Dayco challenges Plaintiffs' unjust enrichment claim for the same reasons dismissal of the negligent misrepresentation/concealment claim is appropriate; namely, that none of the Plaintiffs was aware of Dayco's existence or had any contact with Dayco prior to this litigation.  To prevail on a claim for unjust enrichment, a plaintiff must prove the following: "(1) a benefit conferred upon the defendant by the plaintiff, (2) appreciation by the defendant of such benefit, and (3) acceptance and retention of such benefit by the defendant under such circumstances as it would be inequitable for him to retain it without paying the value thereof." *Fowler v. Towse*, 900 F. Supp. 454, 460 (S.D. Fla. 1995).  A defendant "is liable for services rendered only when he requests the other party to perform the services or knowingly and voluntarily accepts their benefits." *Coffee Pot Plaza P'ship v. Arrow Air Conditioning and Refrigeration, Inc.*, 412 So. 2d 883, 884 (Fla. 2d DCA 1982); *Fowler*, 900 F. Supp. at 460 (citing *Coffee Pot*).

The Court agrees that Dayco is entitled to summary judgment on this count.  As noted above, it is undisputed that Plaintiffs had no dealings with Dayco or even knew of Dayco's existence until after this litigation ensued.  Accordingly, Plaintiffs cannot establish that Dayco requested anything from Plaintiffs or knowingly and voluntarily accepted benefits from them.  *See Coffee Pot*, 412 So. 2d at 884 ("Coffee Pot did not request that Arrow repair and install the refrigeration equipment.  Moreover, it cannot

---

*Tracy, Inc.*, 648 So. 2d 253, 255 (Fla. 2d DCA 1994) (concluding that retail store's allegation that it did not have an equal opportunity to become apprised of the information regarding defendant's intent to open a discount outlet (notwithstanding defendant's alleged promise to refrain from doing just that) coupled with other allegations of fraud was sufficient to state a claim for fraud in the inducement).

be said that Coffee Pot knowingly and voluntarily accepted the benefits of Arrow's work since it did not come into control of the equipment until after Arrow had completed the work. . . ."). This claim fails as a matter of law, and we recommend entry of judgment for Dayco on Count VII.

###    I.    *Punitive Damages*

Dayco seek summary judgment on Plaintiffs' punitive damages claims. TCI argues that Plaintiffs have failed to provide any evidence indicating that any alleged negligence on its part rises to the level of misconduct required to merit an award of punitive damages and, accordingly, summary judgment should be granted.

Plaintiffs' initial response is that it is premature for the Court to consider their punitive damages request at this time. Plaintiffs cite two sections of the Florida statutes that deal with punitive damages. The first is Fla. Stat. § 768.72(2), which provides that a defendant "may be held liable for punitive damages only if the trier of fact, based on clear and convincing evidence, finds that the defendant was personally guilty of intentional misconduct or gross negligence." The second is Fla. Stat. § 768.725, which requires a plaintiff in a civil action to "establish at trial, by clear and convincing evidence, its entitlement to an award of punitive damages." Reading these provisions together, Plaintiffs conclude that the request for punitive damages is a question for the jury at trial and not an issue that can be decided on a motion for summary judgment.

This argument is meritless. Plaintiffs have not cited any cases that support this interpretation of the punitive damages statute. A court can dispose of practically any issue at the summary judgment stage, burden of proof notwithstanding. And, as Dayco

points out (through adoption of the Reply TCI filed on this issue [D.E. 564 at 10 n.13 (citing D.E. 561 at 10-11)]), courts regularly dispose of unfounded punitive damages claims by summary judgment. *See, e.g., Liboy v. Rogero*, 363 F. Supp. 2d 1332, 1342 (M.D. Fla. 2005) (granting defendants' motion for summary judgment on punitive damages claim); *Laughlin v. Pilot Travel Centers, LLC*, No. 5:05-cv-342-Oc-10GRJ, 2007 WL 121344, at *5-*6 (M.D. Fla. Jan. 11, 2007) (same); *Tiller v. Ford Motor Co.*, No. 3:03-CV-489-J-32HTS, 2006 WL 166530, at *3 (M.D. Fla. Jan. 21, 2006) (same).

Plaintiffs' next point is well-taken, though. They claim that Dayco is advocating the wrong standard for showing entitlement to an award of punitive damages. According to Dayco, Plaintiffs must show it engaged in willful and wanton misconduct which is defined as a

> gross and flagrant character, evincing reckless disregard of human life, or of the safety of persons exposed to its dangerous effects, or there is that entire want of care which would raise the presumption of a conscious indifference to consequences, or which shows wantonness or recklessness, or a grossly careless disregard of the safety and welfare of the public, or that reckless indifference to the rights of others which is equivalent to an intentional violation of them.

[D.E. 458 at 17 (quoting *White Constr. Co., Inc. v. Dupont*, 455 So. 2d 1026, 1029 (Fla. 1984) (internal citation omitted)]. This standard requires evidence akin to manslaughter in a civil case to support an award of punitive damages. *White Constr.*, 455 So. 2d at 1028; *see also Chrysler Corp. v. Wolmer*, 499 So. 2d 823, 824-25 (Fla. 1986) (reaffirming *White Constr.* and other cases which held that the standard for awarding punitive damages is the same as that required to sustain a conviction for manslaughter); *Jeep Corp. v. Walker*, 528 So. 2d 1203, 1205-1206 (Fla. 4th DCA 1988) (citing *Chrysler Corp.* for the "reckless disregard for human life equivalent to

manslaughter" standard, and commenting that "the Florida Supreme Court has all but eliminated punitive damage awards in products liability cases").

However, the Florida Legislature rewrote § 768.72 when it enacted the 1999 Tort Reform Act. The revised statutory section sets forth the degree of negligence required to sustain a punitive damages claim:

> (2) A defendant may be held liable for punitive damages only if the trier of fact, based on clear and convincing evidence, finds that the defendant was personally guilty of intentional misconduct or gross negligence. As used in this section, the term:
>
> (a) "Intentional misconduct" means that the defendant had actual knowledge of the wrongfulness of the conduct and the high probability that injury or damage to the claimant would result and, despite that knowledge, intentionally pursued that course of conduct, resulting in injury or damage.
>
> (b) "Gross negligence" means that the defendant's conduct was so reckless or wanting in care that it constituted a conscious disregard or indifference to the life, safety, or rights of persons exposed to such conduct.

§ 768.72(2). Although some state and federal court decisions still cite the more stringent "willful and wanton" standard, those cases usually cite *White Constr.* or other pre-Tort Reform Act cases without any reference to the 1999 amendment. *See, e.g., Tiger Point Golf & Country Club v. Hipple*, 977 So. 2d 608, 610-11 (Fla. 1st DCA 2007) (citing *White Constr.* and other pre-1999 decisions); *Estate of Williams v. Tandem Health Care of Fla., Inc.*, 899 So. 2d 369, 378-79 (Fla. 1st DCA 2005) (citing *White Constr.*); *Liboy*, 363 F. Supp. 2d at 1342 (citing *Owens-Corning Fiberglas Corp. v. Ballard*, 749 So. 2d 483, 486 (Fla. 1999) (quoting *White Constr.*)).

Other cases apply – correctly in our view – the present statutory standard. In *IBP, Inc. v. Hady Enters., Inc.*, 267 F. Supp. 2d 1148, 1170 n.33 (N.D. Fla. 2002), for

example, the district court rejected the defendant's suggestion that punitive damages could only be awarded where there had been a showing of willful or wanton misconduct. "[T]he cases provided by [the defendant] were decided before the Florida legislature's amendment of Section 768.72, which allows recovery of punitive damages based on clear and convincing evidence of 'intentional misconduct' or 'gross negligence.' 1999 Fla. Laws, ch. 99-225, § 22." *Id. See also Southstar Equity, LLC v. Chau*, No. 2D05-1306, 2008 WL 313606, at *6-*7 (Fla. 2d DCA 2008) (citing § 762.72(2), Fla. Stat. (2001), and repeating the negligence standard and definitions contained therein); *Tiller v. Ford Motor Co.*, No. 3:03-CV-489-J-32HTS, 2006 WL 166530, at *2-*3 (M.D. Fla. Jan. 21, 2006) (same). Furthermore, Florida's standard jury instructions on punitive damages in civil cases were amended to reflect the 1999 legislative changes to § 768.72. *See Standard Jury Instr.-Civil Cases (No. 00-02)*, 797 So. 2d 1199, 1201-1202 (Fla. 2001).

The current punitive damages standard in Florida requires Plaintiffs to demonstrate either intentional misconduct or gross negligence by Dayco. The former requires a showing that Dayco had "actual knowledge of the wrongfulness of the conduct and the high probability that injury or damage to the claimant would result and, despite that knowledge, intentionally pursued that course of conduct, resulting in injury or damage." § 768.72(2)(a). The latter requires a showing that TCI's conduct "was so reckless or wanting in care that it constituted a conscious disregard or indifference to the life, safety, or rights of persons exposed to such conduct." § 768.72(2)(b). As discussed *supra*, there is evidence in this record suggesting that Dayco knew of the alleged defect in FlexPipe and of the damage that likely would result

therefrom, but knew FlexPipe was marketed and sold to potential customers as a superior alternative to traditional piping materials. Accordingly, we recommend denial of Dayco's motion for summary judgment on the punitive damages issue, to the extent tort claims against Dayco survive summary judgment, as there are disputed issues of material fact with regard to whether Dayco's conduct qualifies as intentional misconduct.

### J.   *Attorneys' Fees*

Dayco move to dismiss Plaintiffs' claims for attorneys' fees. We recommend denial of this portion of the motion because Plaintiffs have not pled a count for attorneys' fees. The motion is premature as all issues relative to attorneys' fees will be resolved after trial.

### III.   CONCLUSION

Based on the foregoing, the undersigned Magistrate Judge recommends that Defendants Dayco Products, Inc.'s and Dayco Products, LLC's Motion for Partial Summary Judgment [**D.E. 456**] be **GRANTED in part and DENIED in part**, as follows:

(1)   Judgment be entered for Defendants Dayco Products, Inc. and Dayco Products, LLC and against Plaintiffs Twin Oil Company, Jeff Montgomery Associates, and City of St. Petersburg on:

      (a)   Count V (negligent misrepresentation);

      (b)   Count VII (unjust enrichment); and

      (c)   any claim that is based on damage resulting from Omniflex, Monoflex, and PP1502 hose products.

(2)    Judgment be entered for Defendants Dayco Products, Inc. and Dayco Products, LLC and against Plaintiffs Jeff Montgomery Associates and City of St. Petersburg on:

(a)    Count I (negligence); and

(b)    Count II (strict products liability).

(3)    Judgment be entered for Defendant Dayco Products, Inc. and against Plaintiff Twin Oil Company on:

(a)    Count I (negligence) as to claims relating to damage at the North Miami Beach station;

(b)    Count II (strict products liability) as to claims relating to damage at the North Miami Beach station.

(4)    Judgment be entered for Defendant Dayco Products, LLC and against Plaintiff Twin Oil Company on:

(a)    Count I (negligence);

(b)    Count II (strict products liability).

(5)    The remainder of Dayco Products, Inc.'s and Dayco Products, LLC's Motion for Partial Summary Judgment be denied.

Pursuant to Local Magistrate Rule 4(b), the parties have ten days from the date of this Report and Recommendation to serve and file written objections, if any, with the Honorable Joan A. Lenard, United States District Judge.   Failure to timely file objections shall bar the parties from a *de novo* determination by the District Judge of an issue covered in the report and bar the parties from attacking on appeal the factual findings contained herein.   *R.T.C. v. Hallmark Builders, Inc.,* 996 F.2d 1144, 1149

(11th Cir. 1993); *LoConte v. Dugger*, 847 F.2d 745 (11th Cir. 1988); *Nettles v. Wainwright*, 677 F.2d 404, 410 (5th Cir. Unit B 1982) (en banc); 28 U.S.C. § 636(b)(1).

**DONE AND SUBMITTED** in Chambers at Miami, Florida this 9th day of October, 2008.

EDWIN G. TORRES
United States Magistrate Judge