UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 06-20953-CIV-LENARD/TORRES

CITY OF ST. PETERSBURG,
a Florida municipality, *et al.,*

       Plaintiffs,

vs.

TOTAL CONTAINMENT, INC.,
a Pennsylvania corporation, *et al.*,

       Defendants.
_____/

**REPORT AND RECOMMENDATION ON POLYFLOW, INC.'S
MOTION FOR SUMMARY JUDGMENT**

    This matter is before the Court upon Defendant Polyflow, Inc.'s ("Polyflow") Motion for Summary Judgment [**D.E. 437**] and related filings.[1] Based on a thorough review of the motion, response, and reply, the statements of undisputed material facts submitted by the parties, and the materials submitted in support of and opposition to summary judgment, the undersigned finds that genuine issues of material fact exist with regard to some but not all of Plaintiffs' claims against Polyflow, as discussed in greater detail below. We therefore recommend that Polyflow's motion for partial summary judgment be GRANTED in part and DENIED in part.

---

      [1] The Honorable Joan A. Lenard referred this case to the undersigned Magistrate Judge for report and recommendation on all dispositive motions. [D.E. 462].

## I.  BACKGROUND[2]

This case involves thermoplastic flexible piping ("FlexPipe") marketed and distributed by Defendant Total Containment, Inc. ("TCI") for use in underground fuel containment systems to enable petroleum fuels to be pumped from underground storage tanks ("USTs") to above-ground fuel dispensers such as those used to fill vehicles' fuel tanks.  Plaintiffs are the City of St. Petersburg, Florida ("City"), Twin Oil Company ("Twin Oil"), and Jeff Montgomery Associates ("JMA") (collectively, "Plaintiffs")[3], each of which purchased and installed or otherwise used FlexPipe at its fuel dispensing facilities and retail gasoline stations, respectively.  Defendant Polyflow was formed in March 2002.  Through a series of financial transactions occurring on or about July 2, 2002, Polyflow purchased TCI's pipe production assets.

---

[2]  There are several cross-motions for summary judgment pending before the Court; for each there is a set of purported statements of undisputed material facts. The following summary provides a sufficient background for purposes of this particular motion, but is not tantamount to a finding of fact unless expressly noted.

[3]  Plaintiffs brought this action on behalf of themselves and a putative Class composed of "all persons and entities in the State of Florida (a) who presently own an underground piping system equipped with TCI thermoplastic flexible piping (including but not limited to that sold under the brand names "Enviroflex," "Omniflex," and "Monoflex") or (b) who formerly owned an underground piping system equipped with TCI thermoplastic flexible piping located in the State of Florida, and incurred any expenses associated with (1) repair or replacement of all or part of their underground piping system, and/or (2) a fuel leak from the underground piping system." [D.E. 211 ("Plaintiffs' Second Amended Class Action Complaint for Declaratory and Injunctive Relief and for Damages"), ¶ 1].  For ease of reference, we will refer to Plaintiffs and the putative Class members simply as Plaintiffs, unless it is relevant to differentiate between the two.

Plaintiffs allege generally that these and other Defendants designed, manufactured, marketed, distributed, and sold to them FlexPipe that Defendants knew or should have known was fundamentally unsuitable for its intended purpose of conveying and containing petroleum fuels from underground storage tanks to above-ground fuel dispensers. Plaintiffs further allege that Defendants engaged in a fraudulent scheme to market and sell defective FlexPipe for profit, knowing that the product was defective and not approved for sale by federal and state regulatory agencies. Finally, Plaintiffs allege that as a result of Defendants' conduct, they purchased FlexPipe that has deteriorated and/or is deteriorating, resulting in physical damage to the FlexPipe itself and other components of Plaintiffs' fuel containment, conveyance, and delivery systems, and fuel leaks that contaminate the surrounding environment and require costly mediation.

More specifically, Plaintiffs make the following claims against Polyflow: (1) negligence (Count I); (2) strict products liability (Count II); (3) intentional fraudulent concealment (Count III); (4) fraud in the inducement (Count IV); (5) negligent misrepresentation/ concealment (Count V); (6) breach of express warranty (Count VI); and (7) unjust enrichment (Count VII). Polyflow has moved for summary judgment in its favor on the claims of alter-ego, direct liability (negligence, strict products liability, intentional fraudulent concealment, fraud in the inducement, negligent misrepresentation/ concealment, and unjust enrichment), breach of express warranty, agency, successor-in-interest, and fraudulent conveyance. [D.E. 558 at 1].

## II.   ANALYSIS

### A.   *Summary Judgment Standard*

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Imaging Bus. Mach., LLC. v. BancTec, Inc.*, 459 F.3d 1186, 1189 (11th Cir. 2006) (citing Fed. R. Civ. P. 56(c)).  In deciding a summary judgment motion, the court must view all the evidence and make all reasonable inferences in the light most favorable to the nonmoving party. *Id.* (citing *Cruz v. Public Super Mkts., Inc.*, 428 F.3d 1379, 1382 (11th Cir. 2005)).  A material fact is one that might affect the outcome of the case.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  Where the non-moving party fails to prove an essential element of its case for which it has the burden of proof at trial, summary judgment is warranted.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Hilburn v. Murata Elecs. North Am., Inc.*, 181 F.3d 1220, 1225 (11th Cir. 1999).  Thus, the task is to determine whether, considering the evidence in the light most favorable to the plaintiff, there is evidence on which the trier of fact could reasonably find a verdict in their favor.  *See Anderson,* 477 U.S. at 251; *Hilburn*, 181 F.3d at 1225.

### B.   *Direct Liability Claims*

Polyflow moves for summary judgment on Plaintiffs' direct liability claims against it (negligence, strict products liability, intentional fraudulent concealment, fraud in the inducement, negligent misrepresentation/concealment, and unjust

enrichment). Polyflow points to the following stipulation which the Plaintiffs agreed to:

> Polyflow, Inc. was incorporated in 2002, and subsequently obtained certain pipe production assets from TCI. Polyflow, Inc. was incorporated after all the named Plaintiffs in this cause of action purchased and installed the allegedly defective pipe that is the subject matter of this lawsuit. Accordingly, Plaintiffs stipulate and agree that Polyflow, Inc. did not directly: (I) make any fraudulent or false statements to any of the named Plaintiffs regarding the allegedly defective pipe; or (ii) design, test, manufacture, warrant, advertise, market, sell or distribute any of the allegedly defective pipe to the named Plaintiffs.

[D.E. 437 at 6]. Polyflow argues that because Plaintiffs admit they have no factual basis to support any direct liability claims against Polyflow, summary judgment on the direct liability claims is appropriate as a matter of law.

With regard to the claims based on agency and unjust enrichment, Polyflow points out that it was not incorporated until years after Plaintiffs purchased and installed their TCI piping/systems. Therefore, Polyflow says it could not have acted as the agent or apparent agent of TCI. Similarly, Polyflow contends that the unjust enrichment claims must fail because Plaintiffs cannot show they conferred a benefit on Polyflow (an essential element of an unjust enrichment claim) given the date Polyflow was formed vis-a-vis the dates Plaintiffs purchased their TCI piping/systems. [*Id.* at 7 n.7]. As for Plaintiffs' alter-ego theory, Polyflow explains it was never a shareholder of TCI nor was TCI a shareholder of Polyflow, therefore, Plaintiffs cannot pierce the corporate veils of either TCI or Polyflow by alleging one was the alter ego of the other. [*Id.* at 4 n. 6].[4] According to Polyflow, Plaintiffs are left to rely solely on

---

[4] Plaintiffs did not respond substantively to Polyflow's arguments about agency, unjust enrichment, alter-ego, or corporate veil piercing.

their allegations based on successor-in-interest and fraudulent transaction theories. [D.E. 437 at 7].[5]

Plaintiffs acknowledged in their opposition to Polyflow's summary judgment motion that they did not install or use FlexPipe manufactured by Polyflow. [D.E. 513 at 11]. They nevertheless counsel against summary judgment as a matter of judicial economy and efficiency because members of the putative class have claims against Polyflow for defective FlexPipe. Plaintiffs assert that Polyflow will continue to be a defendant in this case because genuine issues of disputed material fact exist as to Plaintiffs' alter-ego and piercing the corporate veil claims.

In addition, Plaintiffs argue their "uniform defect" theory with regard to Polyflow FlexPipe. They have alleged that all FlexPipe manufactured by other defendants in the case (TCI, Dayco, and Cleveland Tubing) was uniformly defective. Because Polyflow took over TCI's pipe production business, and there is no evidence that Polyflow FlexPipe differs in any material way from TCI FlexPipe, it suffers from the same uniform defect and, therefore, common issues of law and fact predominate. Plaintiffs claim that a Rule 23 class is a superior way to resolve all the claims at issue here. If class certification is granted but summary judgment is denied as to all but Plaintiffs' direct claims against Polyflow, Plaintiffs say that putative class members will be forced to file separate lawsuits against Polyflow.

---

[5] In the reply brief Polyflow filed after Plaintiffs acknowledged they had not installed or used any FlexPipe manufactured by Polyflow, *see* discussion *infra*, Polyflow added the breach of express warranty claim to its request for summary judgment on direct liability. [D.E. 558 at 7].

Finally, Plaintiffs contend that due process concerns mitigate against summary judgment, but that if we grant summary judgment we limit it to the named Plaintiffs only. Alternatively, Plaintiffs ask for permission to amend their complaint to add a class representative who directly suffered damages due to defective Polyflow. [D.E. 513 at 13].

We conclude that Plaintiffs do not have standing to raise direct liability claims against this Defendant. As noted above, the named Plaintiffs have admitted they did not install or use Polyflow-manufactured FlexPipe. Article III standing requires that a party must have suffered injury-in-fact; there must be a causal connection between the injury and the conduct complained of; and it must be likely that the injury will be redressed by a favorable court decision. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992). Stated more expansively,

> [f]irst, the plaintiff must have suffered an "injury in fact"- an invasion of a legally protected interest which is (a) concrete and particularized, and (b) "actual or imminent, not 'conjectural' or 'hypothetical'[]". Second, there must be a causal connection between the injury and the conduct complained of- the injury has to be "fairly ... trace[able] to the challenged action of the defendant, and not ... th[e] result [of] the independent action of some third party not before the court." Third, it must be "likely," as opposed to merely "speculative," that the injury will be "redressed by a favorable decision."

*Id.* at 560-61 (citations omitted). It is apparent that Plaintiffs have not satisfied this test with regard to Polyflow-manufactured products they never installed or used in their stations. Plaintiffs have not directed us to any case that supports the notion that they may proceed under a "uniform defect" theory notwithstanding their failure to

satisfy Art. III standing requirements. Consequently, these Plaintiffs lack standing to assert *any* direct liability claims against Polyflow.

Moreover, because the named Plaintiffs lack standing as to Polyflow-manufactured piping, they cannot represent putative class members with potential claims arising out of damage from Polyflow pipe products. "[A] plaintiff who lacks the personalized, redressable injury required for standing to assert claims on his own behalf would also lack standing to assert similar claims on behalf of a class." *Carter v. West Publ'g Co.*, 225 F.3d 1258, 1262 (11th Cir. 2000) (internal citation omitted); *see also Seacoast Sanitation Ltd., Inc. v. Broward Co., Fla.*, 275 F. Supp. 2d 1370, 1376-77 (S.D. Fla. 2003) ("Advancing one's claims as a putative representative of a class of claimants does not obviate or diminish the Article III standing requirement."); solid waste generator, which operated only in an *incorporated* area of the county, lacked Art. III standing to challenge an ordinance that regulated flow of solid waste in the *unincorporated* areas of the county and thus could not advance claims as an individual party or as a class representative). Accordingly, we recommend that Polyflow's motion for summary judgment as to all of Plaintiffs' direct liability claims be granted.

We recommend denial of Plaintiffs' request to amend their complaint to add a class representative who directly suffered damage from Polyflow-manufactured piping. The deadline to amend the pleadings in this case was April 4, 2007. [D.E. 201]. Plaintiffs' request to amend, contained within a brief filed on February 29, 2008, clearly is untimely. The pretrial scheduling order controls the course of this case and

may only be modified upon a showing of good cause. *Sosa v. Airprint Systems, Inc.*, 133 F.3d 1417, 1418 (11th Cir. 1998). Moreover,

> [W]hile leave to amend may be freely given, parties are bound to comply with the requirements set forth by a court's Rule 16(b) scheduling deadlines. Indeed, where a party seeks leave to amend *after* a scheduling order deadline has passed, as is the case here, that party must first demonstrate good cause for the tardy amendment under Rule 16(b) before a court can consider whether the proposed amendments are proper under Rule 15.

*The Williams Island Synagogue, Inc. v. City of Aventura*, No. 04-20257-CIV-Ungaro, 2004 WL 2278769, at *1 (S.D. Fla. Sept. 16, 2007) (emphasis in original; internal citations omitted). Plaintiffs have not argued, let alone shown, good cause for their tardy request to amend. Their request should be denied.

### C. *Express Warranty Claims*

Polyflow moves for summary judgment on Plaintiffs' breach of express warranty claims because there are no express warranties between it and any of the Plaintiffs. Plaintiffs purchased TCI systems and certain replacement parts between 1995 and 1999, while Polyflow was not formed until 2002. Polyflow asserts that it did not issue, and Plaintiffs did not receive, any express warranties from Polyflow guaranteeing the TCI piping systems. Polyflow also states it did not sell any products to any of the Plaintiffs. Moreover, even if it *had* been in existence when Plaintiffs purchased their TCI systems, Polyflow argues it still would not be liable on any warranty claim. [D.E. 437 at 7-8 (citing caselaw from Pennsylvania (only the *seller* of a product is liable for harms which it causes due to breach of warranty) and Florida (a plaintiff must be in

privity of contract with the defendant to succeed on a claim for breach of express warranty))].

Plaintiffs do not dispute Polyflow's factual or legal assertions. We agree with Polyflow that on these facts it cannot be held liable for Plaintiffs' express warranty claims. Accordingly, we recommend that summary judgment be granted in Polyflow's favor on the breach of express warranty claims.

### D.     *Successor-in-Interest to TCI*

Plaintiffs seek to hold Polyflow liable for TCI's debts on the ground that Polyflow is a successor-in-interest to TCI. The parties agree that, under Florida law, the liabilities of a predecessor corporation are not imposed on a successor corporation except in specifically limited circumstances. The "traditional corporate law rule"

> does not impose the liabilities of the selling predecessor upon the buying successor company unless (1) the successor expressly or impliedly assumes obligations of the predecessor, (2) the transaction is a de facto merger, (3) the successor is a mere continuation of the predecessor, or (4) the transaction is a fraudulent effort to avoid liabilities of the predecessor.

*Bernard v. Kee Mfg. Co., Inc.*, 409 So. 2d 1047, 1049 (Fla. 1982). Imposing liability on a successor corporation is based on the notion that no corporation should be permitted to commit a tort or breach a contract and avoid liability through corporate transformation in form only. *Amjad Munim, M.D., P.A. v. Azar, M.D.*, 648 So. 2d 145, 154 (Fla. 4th DCA 1994).

Polyflow asserts that none of the four exceptions enumerated above are applicable here. Plaintiffs did not argue, nor do we find on these facts, that the first two exceptions have been satisfied, i.e., that Polyflow expressly or impliedly assumed

TCI's obligations or that the elements of a de facto merger have been satisfied. We turn our attention to the other two exceptions to the traditional corporate law rule: mere continuation of the business and fraudulent transaction. It is Polyflow's position that the undisputed facts show it is not a mere continuation of TCI nor was its purchase of TCI's pipe production assets a fraudulent effort to avoid liability of the predecessor. [D.E. 437 at 12-13].

Plaintiffs, on the other hand, argue that the evidence shows that Polyflow is substantially a continuation of TCI's business operations and that the series of financial transactions that took place on or about July 2, 2002 (including Polyflow's purchase of TCI's pipe production assets) "were sham transactions without substance created by [entities that were controlled by Marcel Dutil, namely, Polyflow, Finloc, Inc., Finloc US, Inc., Canam Steel, Finloc Capital, Winston Towers 1988, Inc., and TCI] to gain control of TCI's assets while avoiding successor liability exposure and 'shielding' the transferred TCI's pipe production assets from known non-related party creditors and defective pipe creditors." [D.E. 513 at 9]. These transactions are described in some detail in Plaintiffs' Statement of Material Facts [D.E. 516 ¶¶ 2-45] and in their opposition to summary judgment [D.E. 513 at 2-6].

In summary, Plaintiffs point to facts that show that Polyflow was formed at the direction of Marcel Dutil for the purpose of transferring TCI's pipe production assets to Polyflow. Both Polyflow and TCI were controlled by Dutil by virtue of his ownership and control of Placements CMI and related entities, prior to and after the sale of TCI's pipe assets to Polyflow. The series of financial transactions that took place around July 2, 2002, were all approved directly or indirectly by Dutil. After the transactions

occurred, Polyflow owned TCI's pipe assets but had not incurred its corresponding liabilities. Polyflow and TCI had the same Executive Chief Officer (Jay Wright), same Chief Financial Officer (Thomas Kennedy), overlapping ownership and overlapping employees, operated out of the same location in Pennsylvania, and conducted the same business, i.e., manufacturing flexible piping products. Polyflow and TCI's financial results and cash flows were consolidated and presented as one entity. After TCI's pipe production assets were transferred to Polyflow, TCI continued to shift money to Polyflow, including advancing $1.5 million to fund Polyflow's operations. Approximately twenty months after the asset transfer, Dutil declared TCI bankrupt. Polyflow continues to sell flexible thermoplastic piping to move fuel underground and markets its flexible pipe as an alternative to steel piping.

Plaintiffs say this evidence shows that the creation of Polyflow was merely a sham and that the July 2, 2002, transactions were "structured . . . to transfer TCI's pipe production assets without consideration by immediately returning the $3.6 million paid to TCI to [the aforementioned entities controlled by Dutil] in a circular transaction that created the illusion that cash was contributed by [these parties] when, in fact, there were no cash proceeds generated to TCI from the sale." [D.E. 513 at 3]. Before and at the time of the sale of TCI's pipe assets to Polyflow, these parties allegedly knew that TCI was insolvent, delayed TCI's bankruptcy filing to control TCI's assets, and also knew that notes due from TCI to these parties in the amount of $6.1 million that were deducted from the selling price were worthless. [D.E. 513 at 6].

In response to Plaintiffs' assertions, Polyflow replies that it paid fair market value for TCI's pipe production assets ($6.1 million) based on two independent parties'

appraisals of TCI's tangible and intangible assets. Polyflow says it assumed a $2.55 million debt owed by TCI to Finloc, Inc. and paid the remainder of the sale price (nearly $3.6 million) to TCI, infusing that company with capital which allowed it to pay off high interest loans and all but two of its creditors. There is no proof, Polyflow argues, to support the claim that the financing of the TCI/Polyflow transaction and TCI's subsequent payments to creditors were invalid. Moreover, TCI sold only its pipe production assets to Polyflow; other assets were sold to other entities and in the bankruptcy proceeding.

Additionally, Polyflow says that TCI continued to engineer, assemble, and market TCI systems and maintained businesses in California, Pennsylvania, and Belgium for more than 20 months after selling its pipe assets to Polyflow. Polyflow manufactured pipe for the downhole oil and natural gas industry, a business venture that TCI did not engage in. The two companies sold different *types* of flexible pipe to different markets: corrugated pipe as part of an underground piping/storage system to gas stations (TCI) versus smooth-walled pipe to the downhole oil and natural gas industry (Polyflow). After purchasing TCI's pipe production assets, Polyflow did supply TCI with its requirements of corrugated pipe, but that portion of Polyflow's business decreased annually.

Furthermore, Polyflow asserts that it had similar but not identical shareholders; some of the same high-level employees worked for both companies but performed separate and independent duties for each company; and there were no overlapping employees, rather, TCI employees with pipe manufacturing experience left TCI and joined Polyflow after it purchased the pipe production assets. Finally,

Polyflow acknowledges assuming TCI's lease for the pipe-manufacturing facility but points out that TCI's office, warehouse and other manufacturing facilities were at one address in Oaks, Pennsylvania, while Polyflow's office was at another (also in Oaks). Polyflow argues that none of the aforementioned facts establishes successor liability on its part.

Bearing in mind the standard applicable at this juncture, i.e., we must construe the facts in a light most favorable to the non-moving party, we conclude that the relevant issues here – whether Polyflow was a mere continuation of TCI and whether the asset transfer was a fraudulent effort to avoid TCI's liabilities – are questions of fact that must be resolved by the fact-finder in this case. "The key element of a continuation is a common identity of the officers, directors and stockholders in the selling and purchasing corporation." *Munim*, 648 So. 2d at 154. As Polyflow notes, the fact that it and TCI had common attributes does not automatically impose successor liability on Polyflow. *See Lab. Corp. of America v. Professional Recovery Network*, 813 So. 2d 266, 270 (Fla. 5th DCA 2002) (having common attributes does not automatically impose liability on a successor corporation, but "merely repainting the sign on the door and using new letterhead certainly gives the appearance that the new corporation is simply a continuation of the predecessor corporation."). But the extent of that common identity is a factual matter for the jury to decide.

There is evidence which, if believed by the jury, could support Plaintiffs' claim that TCI and Polyflow were not truly independent corporate entities and that the sale of assets was designed to avoid predecessor liability. For example, Marcel Dutil controlled at least indirectly the entities involved in the July 2, 2002 transactions, and

he approved all those transactions. Polyflow and TCI shared a similar shareholder (Finloc US, Inc.), had the same Chief Executive Officer and Chief Financial Officer, and TCI employees in the pipe manufacturing area started to work for Polyflow after the assets were sold. Although Polyflow claims the high-level employees performed separate and independent duties for TCI and Polyflow and there was no overlap between other employees, the intermingling of ownership, management, and personnel raises questions about whether Polyflow was really just a continuation of TCI's business operations. Other questions for jury resolution include the validity of the TCI/Polyflow transaction and TCI's subsequent payments to creditors; the similarity between TCI's and Polyflow's businesses, particularly the manufacture of flexible piping products; the timing of TCI's bankruptcy some 20 months after the sale its pipe assets to Polyflow in light of the other events that were then on-going; and the extent of co-mingling of TCI's and Polyflow's financial resources.

Because we find genuine issues of disputed material fact exist on the successor-in-interest issue, we recommend denial of Polyflow's motion for summary judgment based on the claim it is not a successor-in-interest to TCI.

E.    *Fraudulent Transaction and the Bankruptcy Proceeding*

In moving for summary judgment, Polyflow noted that TCI filed for bankruptcy in 2004 in the Eastern District of Pennsylvania. That proceeding is still pending. Polyflow then asserted that the alleged fraudulent transaction between TCI and Polyflow is the property of the bankruptcy estate. [D.E. 437 at 14-17]. In response, Plaintiffs explained they "are not making a stand-alone claim for fraudulent conveyance and [] are not seeking avoidance of the transaction." [D.E. 513 at 10].

Rather, they claim the fraudulent conveyance of TCI's pipe assets is one of a number of actions that show the Defendants functioned as alter egos working toward the common goals of defrauding the public and placing TCI's assets out of reach of potential creditors, and further, that Polyflow is a successor in interest to TCI and thus liable for TCI's debts. [*Id.* at 10-11].

In light of that explanation, Polyflow suggests that the fraudulent allegation against it in paragraph 97 of Plaintiffs' Second Amended Complaint [D.E. 211] be stricken.  Paragraph 97 alleges:

> As set forth in this Second Amended Complaint, Polyflow is liable to the Class in at least the following ways:  (1) for its own conduct in connection with the manufacture of defective and deficient products; (2) as a successor in interest of TCI's pipe making operation; (3) as a participant and recipient of the fraudulent transfer of TCI's assets; and (4) its concerted conduct with other Defendants including concealing from the public the defective nature of the Flex Pipe product.

[*Id.* ¶ 97].  We do not think striking the allegation is either appropriate or necessary. It is part and parcel of Plaintiffs' overall theory that Polyflow is liable in this action. Moreover, Plaintiffs have indicated on the record that they are not making a stand-alone claim for fraudulent conveyance or seeking avoidance of the transaction.  There is thus no need to strike the allegation, so long as the record is clear as to Plaintiffs' stipulation on this issue.

### *III.   CONCLUSION*

Based on the foregoing, the undersigned Magistrate Judge recommends that Defendant Polyflow, Inc.'s Motion for Summary Judgment [**D.E. 437**] be **GRANTED in part and DENIED in part**, as follows:

(1)   Judgment be entered for Polyflow, Inc.. and against Plaintiffs on any theory of direct liability as to Count I (negligence), Count II (strict products liability), Count III (intentional fraudulent concealment), Count IV (fraud in the inducement), Count V (negligent misrepresentation/concealment), and Count VII (unjust enrichment);

(2)   Judgment be entered for Polyflow, Inc.. and against Plaintiffs on Count VI (breach of express warranty);

(3)   The remainder of Polyflow, Inc.'s Motion for Summary Judgment be denied.

Pursuant to Local Magistrate Rule 4(b), the parties have ten days from the date of this Report and Recommendation to serve and file written objections, if any, with the Honorable Joan A. Lenard, United States District Judge.  Failure to timely file objections shall bar the parties from a *de novo* determination by the District Judge of an issue covered in the report and bar the parties from attacking on appeal the factual findings contained herein. *R.T.C. v. Hallmark Builders, Inc.,* 996 F.2d 1144, 1149 (11th Cir. 1993); *LoConte v. Dugger*, 847 F.2d 745 (11th Cir. 1988); *Nettles v. Wainwright*, 677 F.2d 404, 410 (5th Cir. Unit B 1982) (en banc); 28 U.S.C. § 636(b)(1).

**DONE AND SUBMITTED** in Chambers at Miami, Florida this <u>4th</u> day of November, 2008.

                                                        EDWIN G. TORRES
                                                        United States Magistrate Judge