# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

## Case No. 06-20953-CIV-LENARD/TORRES

CITY OF ST. PETERSBURG,
a Florida municipality, *et al.,*

      Plaintiffs,

vs.

TOTAL CONTAINMENT, INC.,
a Pennsylvania corporation, *et al.,*

      Defendants.

_____/

## REPORT AND RECOMMENDATION ON
## PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

This matter is before the Court upon Plaintiffs' Motion for Class Certification [**D.E. 441**] and related filings.[1]  The parties thoroughly briefed the issues raised by Plaintiffs' motion, and oral argument was held on October 8, 2008.  Based on careful consideration of the parties' written and oral arguments, the exhibits submitted in support of and opposition to class certification, the court file, and applicable law, the undersigned recommends that Plaintiffs' motion for class certification be Denied.

## I.   BACKGROUND

This case involves thermoplastic flexible piping ("FlexPipe") marketed and distributed by Defendant Total Containment, Inc. ("TCI") for use in underground fuel

_____

[1]    The Honorable Joan A. Lenard referred this case to the undersigned Magistrate Judge for report and recommendation on all dispositive motions.  [D.E. 462].

containment systems to enable petroleum fuels to be pumped from underground storage tanks to above-ground fuel dispensers such as those used to fill vehicles' fuel tanks. Plaintiffs are the City of St. Petersburg, Florida ("City"), Twin Oil Company ("Twin Oil"), and Jeff Montgomery Associates ("JMA") (collectively, "Plaintiffs"), each of which purchased and installed or otherwise used FlexPipe at its fuel dispensing facilities and retail gasoline stations, respectively.

Plaintiffs allege generally that the Defendants in this case designed, manufactured, marketed, distributed, and sold to them FlexPipe that Defendants knew or should have known was fundamentally unsuitable for its intended purpose of conveying and containing petroleum fuels from underground storage tanks to above-ground fuel dispensers. Plaintiffs further allege that Defendants engaged in a fraudulent scheme to market and sell defective FlexPipe for profit, knowing that the product was defective and not approved for sale by federal and state regulatory agencies. Finally, Plaintiffs allege that, as a result of Defendants' conduct, they purchased FlexPipe that has deteriorated and/or is deteriorating, resulting in physical damage to the FlexPipe itself and other components of Plaintiffs' fuel containment, conveyance, and delivery systems, and fuel leaks that contaminate the surrounding environment and require costly mediation. More specifically, Plaintiffs' complaint contains the following allegations against the various Defendants: (1) negligence (Count I); (2) strict products liability (Count II); (3) intentional fraudulent concealment (Count III); (4) fraud in the inducement (Count IV); (5) negligent misrepresentation/ concealment (Count V); (6) breach of express warranty (Count VI); and (7) unjust

enrichment (Count VII). [D.E. 211 ("Plaintiffs' Second Amended Class Action Complaint for Declaratory and Injunctive Relief and for Damages")].

At the heart of this litigation is Plaintiffs' claim that "[a]ll of the FlexPipe is defective because it does not perform as intended during its reasonably expected life, and the defect is uniform and inherent in the FlexPipe." [D.E. 441 at 4]. Plaintiffs assert that FlexPipe cannot function as designed because it is not sufficiently impermeable in two ways: it allows too much fuel to pass from the inner barrier to other layers of the pipe, and it allows too much fuel to pass from the secondary containment pipe to the primary pipe. [*Id.*] Plaintiffs also claim that FlexPipe is chemically incompatible with the petroleum fuels it is exposed to under normal operating conditions. [*Id.*] This defect, Plaintiffs say,

> is inherent and common across all brands and models of FlexPipe. . . . The defect causes FlexPipe to fail prematurely and leak fuel, resulting in physical damage to other equipment and the release of fuel into the surrounding environment. This uniform defect begins to manifest immediately and progressively upon the introduction of fuel into the FlexPipe.

> The defect is not the result of poor installation or maintenance. Because FlexPipe is permeable to and chemically incompatible with fuel, neither perfect installation nor maintenance can stop FlexPipe from failing. . . . Thus, regardless of whether an owner of FlexPipe installs and maintains FlexPipe perfectly, the normal, foreseeable operating conditions will cause FlexPipe to fail prematurely.

[*Id.* at 5 (internal citations omitted)]. Plaintiffs claim that thousands of business owners in the State of Florida each have suffered thousands of dollars in damages in replacement and remediation costs and business interruption losses. [*Id.* at 2].

Plaintiffs ask this Court, pursuant to Federal Rule of Civil Procedure 23, to certify a class comprised of:

> [a]ll persons and entities in the State of Florida (a) who presently own thermoplastic flexible piping ("FlexPipe") (including but not limited to that sold under the brand names "Enviroflex," "Omniflex," and "Monoflex") or (b) who formerly owned FlexPipe located in the State of Florida, and incurred any expense associated with (1) repair or replacement of all or part of the FlexPipe, and/or (2) a fuel leak from the FlexPipe.

[D.E. 441 at 2].  Plaintiffs propose a three-phased class-action trial.  [D.E. 611].   In Phase 1, a jury would try all the direct and indirect liability claims.  [*Id.* at 3-4]. Assuming a finding of liability, the trial would then progress to Phase 2 during which the same jury would determine Plaintiffs' and Class members' entitlement to, and a multiplier formula for, an award of punitive damages against Defendants.  [*Id.* at 4-6]. Finally, in Phase 3, Plaintiffs propose that the Court implement an *Allapattah*-type claims process for assessing and awarding damages on an individual basis.  [*Id.* at 6-8 (citing *Allapattah Services, Inc. v. Exxon Corp.*, 188 F.R.D. 667, 677 (S.D. Fla. 1999), *aff'd*, 333 F.3d 1248 (11th Cir. 2003))].   Defendants oppose the motion for class certification.

## II.    ANALYSIS

Federal Rule of Civil Procedure 23 establishes the requirements for certifying a class action in federal court.  The burden is on the party seeking certification to prove entitlement to class certification.  *Jones v. Jeld-Wen, Inc.*, 250 F.R.D. 685, 692 (S.D. Fla. 2008).  The moving party must satisfy all the prerequisites of Rule 23(a) and at least one of the subsections of Rule 23(b).  *Amchem Prods., Inc. v. Windsor*, 521 U.S.

591, 513 (1997).  Here, Plaintiffs seek class certification pursuant to Rules 23(a) and (b)(3).  A class action may be certified only if the trial court is satisfied, "after a rigorous analysis," that the prerequisites of Rule 23 have been met.  *General Tel. Co. of the S.W. v. Falcon*, 457 U.S. 147, 161 (1982).  A court is not to determine the merits of the case at the certification stage though "[s]ometimes it may be necessary for the court to probe behind the pleadings before coming to rest on the certification question." *Id.* at 160.  A court has broad discretion in deciding whether to certify a class.  *Klay v. Humana, Inc.*, 382 F.3d 1241, 1251 (11th Cir. 2004); *Cohen v. Implant Innovations, Inc.*, No. 07-20777-CIV, 2008 WL 3927223, at *6 (S.D. Fla. Aug. 21, 2008).

### A.    *Rule 23(a) Requirements*

Plaintiffs first must satisfy the four requirements of Rule 23(a):

One or more members of a class may sue or be sued as representative parties on behalf of all members only if:

> (1) the class is so numerous that joinder of all members is impracticable;
>
> (2) there are questions of law or fact common to the class;
>
> (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
>
> (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a).  These requirements are commonly referred to as (1) numerosity, (2) commonality, (3) typicality, and (4) adequacy of representation.  If Plaintiffs fail to satisfy any one of these four, the case may not proceed as a class.  *Cohen*, 2008 WL 3927223, at *6.

### 1. *Numerosity*

Rule 23(a) requires that the class be "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). Joinder need not be impossible but merely difficult or inconvenient. *Cohen*, 2008 WL 3927223, at *14. There is no fixed rule; what constitutes numerosity depends on the facts of each case and may involve consideration of factors such as, e.g., the size of the class and geographic dispersion of class members. *See, e.g., Jeld-Wen, Inc.*, 250 F.R.D. at 692-93; *Cheney v. Cyberguard Corp.*, 213 F.R.D. 484, 489-90 (S.D. Fla. 2003). In this circuit, "[g]enerally, 'less than twenty-one is inadequate, more than forty adequate.'" *Cheney*, 213 F.R.D. at 490 (quoting *Cox v. American Cast Iron Pipe Co.*, 784 F.2d 1546, 1553 (11th Cir. 1986)). The sheer number of possible class members may warrant a conclusion that numerosity is satisfied. *Jeld-Wen*, 250 F.R.D. at 693. Parties seeking class certification need not know the exact number of class members but they "must make reasonable estimates with support as to the size of the proposed class." *Id.* (internal citation omitted).

Here, Plaintiffs claim the number of class members is likely in the hundreds. They note that TCI previously stated that FlexPipe was installed in over 8,450 locations in Florida during the relevant time period, but they believe that the number of sites in which Dayco/Cleveland Tubing FlexPipe was installed is significantly less than that, i.e., approximately 4,000 sites. [D.E. 611 at 7-8 n.5; D.E. 619, Ex. 1 at 1]. Because many putative class members own multiple fueling stations, Plaintiffs suggest the size of the class probably numbers in the hundreds, not thousands. [D.E. 611 at

7-8 n.5; D.E. 619, Ex. 1 at 1-2].  We have no difficulty determining that the numerosity requirement has been satisfied.

### 2. *Commonality*

Rule 23(a)(2) requires that there be "questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2).  "Commonality refers to the group characteristics of the class as a whole, while typicality refers to the individual characteristics of the representative plaintiff in relation to the class."  *Cohen*, 2008 WL 3927223, at *15 (citing *Prado-Steiman v. Bush*, 221 F.3d 1266, 1279 (11th Cir. 2000)).  The rule does not require that *all* of the questions of law or fact raised in the case be common to *all* the plaintiffs, just that there be at least one issue that affects all or a significant number of proposed class members.  *Clausnitzer v. Federal Express Corp.*, 248 F.R.D. 647, 656 (S.D. Fla. 2008).  "The threshold for commonality is not high .... [and f]actual differences between class members do not necessarily preclude a finding of commonality.  The requirement is met if the questions linking the class members are substantially related to the resolution of the litigation even though the individuals are not identically situated.'"  *Id.* (internal citations omitted).

Plaintiffs assert that the common questions of law and fact raised in this case relate to the defective nature of FlexPipe, Defendants' knowledge regarding that defect, Defendants' duty to disclose information about the defect, and Defendants' contractual (warranty) and common law duties relating thereto.  [D.E. 441 at 11].  For their part, Defendants challenge the underlying premise of Plaintiffs' case, that all flexible piping is uniformly defective and that the alleged defect has caused and will continue to cause

fuel leaks. One of their chief arguments in opposition to this "uniform defect" theory is that many significant differences exist in the piping that was manufactured by Defendants TCI, Dayco, Cleveland Tubing, and/or Polyflow over a 15-year period. [*See, e.g.,* D.E. 546 at 12]. They cite Plaintiffs' expert, Thomas J. Schruben, who recognized that Defendants sold at least 27 models of FlexPipe over the relevant time period that can be divided into five generations, and that there were several versions within some of the generations that used different plastics. [*Id.* (citing D.E. 445, Ex. 2 ¶ 4)].

Defendants have challenged (through *Daubert* motions) the opinions of Mr. Schruben and Dr. Charles A. Daniels, Plaintiffs' other expert who also opined that all FlexPipe was uniformly defective. Defendants' challenge is based in part on the failure of these experts to test each and every model or generation of flexible piping alleged to be defective and instead to rely for their opinions on only a small sample of piping that was actually tested. [*Id.* at 12-13]. Defendants assert that examination of the different generations and constructions of flexible piping manufactured by Defendants over the relevant time period reveals there are in fact significant differences among them. [*See, e.g., id.* at 13-14 (citing D.E. 529, Ex. B (Shah Decl.))].

For reasons discussed in greater detail below in connection with the predominance requirement of Rule 23(b)(3)), we agree with Defendants that there were sufficient changes among the models and generations of pipes over the years, and too many variables in terms of installation, maintenance, leak detection, history of each site, and other factors, to question whether there are enough common questions of fact and law between the named Plaintiffs and each of the putative class members.

Resolution of whether and why a particular piece of FlexPipe failed will likely require a great deal of individualized proof that will likely not be applicable on a class-wide basis.

That being said, the threshold necessary to satisfy the commonality prong is not onerous. Plaintiffs have been able to articulate sufficient common issues of law and fact that they can point to overcome that minimal showing. *See, e.g., Mullen v. Treasure Chest Casino LLC,* 186 F.3d 620, 625 (5th Cir. 1999) ("The test of commonality is not demanding."); *Keele v. Wexler,* 149 F.3d 589, 594 (7th Cir. 1998) (common nucleus of operative fact will usually satisfy Rule 23(a)(2) and factual variations among class members are not enough to defeat commonality). And though the issue is certainly close, we should find that Plaintiffs have minimally carried their burden under the commonality prong of Rule 23(a).

### 3.   *Typicality*

Under Rule 23(a), "the claims or defenses of the representative parties [must be] typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). "The key inquiry in determining whether a proposed class has 'typicality' is whether the class representative is part of the class and possesses the same interest and suffers the same injury as the class members." *Clausnitzer*, 248 F.R.D. at 656 (citation omitted). Typicality requires that the claims of the named representative bear the same essential characteristics of the claims of the class at large. *Id.* The named representative's claims need not be identical to class members' claims as long as they "arise out of the same conduct and are grounded on the same legal theory." *Jeld-Wen*,

250 F.R.D. at 694. "The test for typicality, like commonality, is not demanding." *Id.* (citation omitted).

Plaintiffs note the proposed class consists of businesses, cities, and other entities in the State of Florida that own FlexPipe manufactured after June 1990. Plaintiffs claim to be typical because they own FlexPipe and allege that Defendants engaged in a common course to sell a known defective product and to conceal the nature of that defect from end-users. [D.E. 441 at 11]. Plaintiffs' argument is premised on their "uniform defect" theory. On the other hand, the three named Plaintiffs installed only a small fraction of the different models of FlexPipe alleged to be defective. Thus, the particular claims of the named Plaintiffs concerning whether FlexPipe is defective, whether Defendants knew of the alleged defect in FlexPipe, whether Defendants owed a duty to disclose the alleged defect, etc., are not necessarily typical of those of the proposed class. They all installed different pipes and experienced different installation, maintenance, system configuration, and physical and environmental conditions (to name a few) at their sites. Moreover, the named Plaintiffs' warranty claims are not necessarily typical of all other members of the class, especially as it relates to the particular warranty that applied at a given time and how that warranty was relied upon by most members of the class. Their ability to defend against Defendants' statute of limitations defenses are also not necessarily typical of other members of the class.

Again, however, even these real differences between a representative's claims and those of the class are not dispositive of typicality question under Rule 23(a). The named Plaintiffs here are largely in the safe footing as most other members of the

proposed class.  There certainly is a strong similarity between these Plaintiffs' claims and those belonging to the class as a whole.  To a great degree these Plaintiffs together represent a wide cross-section of the class members who would have similar claims against these Defendants.  All these factors support a showing of typicality here.  *See, e.g., Appleyard v. Wallace,* 754 F.2d 955, 958 (11th Cir. 1985) ("strong similarity of legal theories" may satisfy typicality requirement even if factual differences exist); *Alpern v. UtiliCorp United, Inc.,* 84 F.3d 1525, 1540 (8th Cir. 1996) ("Factual variations in the individual claims will not normally preclude [typicality] if the claim arises from the same course of conduct as the class claims, and gives rise to the same legal or remedial theory."); *Armstrong v. Davis,* 275 F.3d 849, 868-69 (9th Cir. 2001) (class representatives should have similar, though not identical, injuries and should include parties who have suffered cross-section of injuries).

And because, like commonality, the showing required for typicality is not demanding, *Mullen,* 186 F.3d at 625, Plaintiffs have also satisfied the typicality prong of Rule 23(a) notwithstanding their failure to show a uniform defect in the different variations of Flexpipe that apply to the class as a whole.

### 4.  *Adequacy of Representation*

Rule 23(a)(4) requires a showing that "the representative parties will fairly and adequately protect the interests of the class."  Fed. R. Civ. P. 23(a)(4).  The analysis "encompasses two separate inquiries: (1) whether any substantial conflicts of interest exist between the representatives and the class; and (2) whether the representatives will adequately prosecute the action."  *Valley Drug Co. v. Geneva Pharms, Inc.,* 350 F.3d 1181, 1189 (11th Cir. 2003) (citation omitted).  In addition to looking at the

adequacy of the named representatives, we also must examine the adequacy of the representatives' counsel. *Dahlgren's Nursery, Inc. v. E.I. Du Pont De Nemours & Co.*, No. 91-8709-CIV, 1994 WL 1251231, at *6-*7 (S.D. Fla. Oct. 30, 1994). Counsel will be deemed adequate if they are shown to be qualified, adequately financed, and possess sufficient experience in the subject matter of the class action. *Id.* at *7.

 We find the named Plaintiffs do not have any apparent substantial conflicts of interest with potential class members, they are actively participating in this litigation, and would adequately represent the interests of potential class members. As for Plaintiffs' counsel, they are well-qualified to prosecute this action on behalf of their clients and have demonstrated skill in pursuing this litigation. Plaintiffs have, therefore, satisfied the adequacy prong of Rule 23(a).

Accordingly, the Plaintiffs have crossed their first hurdle in showing that Rule 23(a) has been satisfied. The next hurdle, however, presents a more difficult problem.

## B. *Rule 23(b)(3) Requirements*

In addition to satisfying the prerequisites of Rule 23(a), a plaintiff seeking class certification must also meet the requirements of Rule 23(b)(3). This subsection requires that (a) "questions of law or fact common to class members predominate over any questions affecting only individual members" and (2) "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). Even if our analysis of Rule 23(a) is arguable, we conclude that the Rule 23(b)(3) issue amounts to a clear and convincing death knell to Plaintiffs' attempt to certify a class.

### 1. *Predominance*

Under the predominance prong of Rule 23(b)(3), "[i]t is not necessary that all questions of law or fact be common, but only that some questions are common and that they predominate over individual questions." *Jeld-Wen*, 250 F.R.D. at 694 (citing *Klay*, 382 F.3d at 1254). The predominance requirement, though similar to the commonality prerequisite of Rule 23(a), is "far more demanding." *Id.* at 694 (citation omitted). "A question is deemed 'common' 'when there exists generalized evidence that proves or disproves the element on a simultaneous, class-wide basis. Such proof obviates the need to examine each class member's individual position.'" *Dahlgren's*, 1994 WL 1251231, at *9 (citation omitted). Our focus is on whether the individual questions in this case "are so overwhelming as to destroy the utility of a class action." *Id.* (citation omitted).

As we have already stated, the essence of Plaintiffs' claims is that all of the FlexPipe suffers from the same manufacturing and design defect; that is, all FlexPipe is permeable to and chemically incompatible with the fuel it is intended to carry, and that the defect in FlexPipe manifests itself immediately and progressively upon the introduction of fuel. This in turn causes the pipe to fail prematurely and leak fuel. Plaintiffs posit that the Defendants engaged in the design and manufacture of FlexPipe (TCI, Dayco, Polyflow, and Cleveland Tubing) failed to follow industry standards and guides for testing thermoplastic piping; disregarded known environmental conditions to which their pipes would be exposed; and failed to devise and implement a "root cause analysis program" to determine the underlying causes of the problems with their pipes

in Florida.  [D.E. 441 at 13-14].  Defendants knew the pipes were defective yet they

allowed them to be marketed and sold by TCI.  According to Plaintiffs, class treatment

is appropriate because:

> the Defendants' conduct foreseeably and substantially proximately
> caused the damages suffered by Plaintiffs and Class members.  According
> to Plaintiffs' experts, the defect - not individual installation or
> maintenance issues - substantially caused the damages.   That
> Defendants may be able to show that other factors affected the FlexPipe
> is irrelevant because Plaintiffs will be able to show that the defect
> substantially caused the FlexPipe to fail.

[*Id.* at 14].  Plaintiffs also posit that, because the defect was uniform across all versions

of flexible piping, causation can be determined on a class-wide basis and any potential

causes are irrelevant.  [D.E. 612 at 3].

Plaintiffs suggest that the following questions of law and fact relating to "core

direct liability claims" are common to all class members and predominate over any

individual questions:  is FlexPipe uniformly defective? did Defendants know FlexPipe

was defective; is the defect material to a reasonable purchaser; did Defendants owe

purchasers a duty to disclose the defect; and what warranty did Defendants extend to

purchasers and did they breach it?  [D.E. 611 at 3].  Plaintiffs contend that resolution

of these questions will require the same evidence and testimony and will not vary

between individual class members.  [*Id.* at 3-4].

As previously discussed, Defendants vigorously dispute the notion that this case

involves a "uniform product."  Rather, their position is that there are *multiple* products

that were designed by different companies; manufactured by different companies at

different and overlapping times; consisted of different raw materials, layers of

construction, corrugation profiles, and specified wall thicknesses; installed by different contractors; and operated and maintained by different individuals or entities. [*See, e.g.,* D.E. 614 at 3]. Defendants argue that the degree of variation in the evidence, even among the three named Plaintiffs, is vast, and many witnesses and documents will need to be examined to resolve individualized questions such as: which pipe was installed, when and how and by whom; which components (such as tanks, sumps, couplings) were installed with the pipe; how the pipe was maintained; whether the pipe leaked and if so, why; what type of leak detection systems were installed; the historic use of the property; the degree of environmental contamination, if any, at the site; whether the facility owner sustained damage as a result of a leak; reliance on Defendants' differing representations, if any, and compliance with the warranty terms; and whether the statute of limitations bars any of the claims.

To satisfy predominance the Plaintiffs must show that their claims in this case are susceptible to class-wide treatment. That is a difficult task indeed. For instance, under Florida law, a products liability claim based on either negligence or strict liability law requires proof of proximate causation and damages. *See, e.g., Pinchinat v. Graco Children's Products, Inc.*, 390 F. Supp. 2d 1141, 1148 (M.D. Fla. 2005) (strict product liability under Florida law requires proof that (1) a product (2) produced by a manufacturer (3) was defective or created an unreasonably dangerous condition (4) that proximately caused (5) injury); *Marzullo v. Crossman Corp.*, 289 F. Supp. 2d 1337, 1342 & n.5 (M.D. Fla. 2003) (basic elements of a products liability claim based on negligence are (1) a duty of care, (2) breach of that duty (or negligence), (3) proximate

cause, and (4) a showing that the product was defective or unreasonably dangerous; the elements of a strict liability claim are the same with the exception that the plaintiff need not prove specific acts of negligence).  Given all the individualized issues at play here, Plaintiffs cannot systematically prove on a class-wide basis that the alleged uniform defect in Defendants' various products is the proximate cause of each of the representative Plaintiffs' and putative class members' alleged damages.

*Dahlgren's* is an analogous case that illustrates the point.  That case involved strict liability and negligence claims against the manufacturer of certain fungicides referred to as "Benlate" that, when applied to plants and other vegetation, allegedly destroyed or otherwise harmed the plants.  1994 WL 1251231, at *1.  In seeking certification of a class of Benlate users, the plaintiff claimed that it could establish the defendant's liability with generalized proof that class members purchased Benlate during the relevant period and that plants and other vegetation to which Benlate was applied thereafter suffered symptomatic distortions.  *Id.* at *10.  The plaintiff argued that the jury could infer from such a showing that Benlate was defective and caused harm to class members' plants.  *Id.*  The defendant countered that "determining whether Benlate *can* cause plant harm in general in no way resolves whether Benlate *did in fact* cause any individual grower's particular harm."  *Id.* (emphasis in original).

To resolve the predominance issue, our district court considered whether proof that Benlate caused injury to plants "would serve any useful purpose in resolving the individual claims given the varied uses of the fungicide and the many consequences of its application."  *Id.* at 11.  The court noted that because both the negligence and strict

liability claims included "causation" as an element of the claim, evidence that tended to prove or disprove "legal cause" would be critical to the outcome of the case. *Id.* As the court explained:

> The issue of causation, as well as that of negligence, must be subject to a "clear out determination" with generalized proof before common questions can be found to predominate. Although generalized proof may be well suited for those cases in which the cause of the damages is "a single tragic happening," [i]t is not well suited for those cases in which no one set of operative facts establishes liability and no single proximate cause equally applies to each potential class member. Generalized proof is also inapposite where the damages do not lend themselves to mechanical calculation but instead depend on facts peculiar to each class member.

*Id.* at *12 (internal citations omitted).

Our court ultimately determined that the strict liability and negligence claims were not subject to a clear-cut determination with generalized proof. *Id.* The manufacture, distribution, and sale of Benlate were not common throughout the class because there were five different types of Benlate; each was formulated, packaged, stored, and distributed over a four-year period by a variety of non-parties. *Id.* The issues of causation and damages were even more individualized, the court said. *Id.* Benlate interacted differently with different plant types, and the alleged harm varied substantially among the users. *Id.* Accordingly, the court concluded that, even if the plaintiff *could* show that Benlate caused plant damage, "it would not significantly advance this litigation or reduce the complexity of the individual issues remaining for later determination." *Id.* Further, calculation of the damages issues would be even more burdensome because it could not be reduced to a simple formula; rather, it would have required an appraisal of thousands of individual claims, each with discovery,

experts, cross-examination, and documents.  *Id.*  For these reasons, the court held that the plaintiff had not satisfied the predominance requirement of Rule 23(b)(3) and that certification of a class was inappropriate.  *Id.*

The Plaintiffs in our case, like the plaintiffs in *Dahlgren's*, are seeking to certify a class on the basis of general causation – that a defective product can, in a general sense, cause damage.   But, as Defendants point out, determining causation is an individual-specific enterprise.  Plaintiffs cannot show that causation here is susceptible to generalized proof on a class-wide basis because determining whether there is a uniform defect in certain models of FlexPipe in no way resolves whether the defect did in fact cause any individual class member's harm.

In addition to pointing to the numerous constructions of flexible piping that were manufactured by various entities over a 15-year period, Defendants point to two incidents in which flexible piping leaked for reasons other than the alleged uniform defect.  In 1998, Twin Oil reported a leak from Enviroflex hose at the North Miami Beach station.  Plaintiffs have stated that the hose broke and they do not claim that the failure resulted from the defect at issue in this case.  [D.E. 614 at 7 (citing D.E. 503 at 10)].  In 2002, Jeff Montgomery Associates reported a leak in flexible piping that was caused by a loose connection or loose fitting, not the alleged uniform defect. [*Id.* (citing Montgomery Dep. (Feb. 27, 2007) at 132 and 145-46, Ex. 53)].  In addition, Defendants cite the discovery at a JMA site of a secondary containment hose that was breached and apparently patched with duct tape, then painted to hide the breach.  [*Id.*

(citing Montgomery Dep. (June 19, 2007) at 326-27)].  The hoses cited in these three examples were not preserved so there is no way to know precisely why each failed.

These examples, Defendants say, demonstrate the need for an individualized analysis of each hose removed from each putative class member's site.  It will be necessary to determine if the hose failed because of the alleged uniform defect or for some other reason such as improper installation, improper maintenance, or any other reason.

We agree with Defendants that we cannot simply subscribe to Plaintiffs' "uniform defect" theory that all models of FlexPipe suffer from the same defect, notwithstanding changes in those models over the years.  We think instead that there is "no one set of operative facts establishing liability and no single proximate cause [that] equally applies to each potential class member." *Dahlgren's*, 1994 WL 1251231, at *12.  The representative Plaintiffs and the putative class members used different models of flexible piping manufactured by different companies at different times and at different locations that were installed in different locations under different circumstances.  We have already determined (in connection with the Dayco Defendants' motion for summary judgment) that after the Supply Agreement between Dayco and TCI ended in 1997, TCI altered the design and construction of the primary hose used in TCI's secondary containment system such that Dayco could not be held liable for alleged defects in pipe it did not manufacture.  [D.E. 629 at 24-25].[2]  We found that

---

[2]      We recognize that this determination was made by way of a Report and Recommendation to which objections have been filed.  The issue will of course ultimately be decided by Judge Lenard.

TCI's modifications – eliminating one layer of hose and changing the bonding process – resulted in a product that was "simply not the same product that Dayco designed and manufactured." [*Id.* at 25].

Many changes in design and manufacture occurred over many years in the flexible piping sold to the named Plaintiffs and putative class members. Consequently, we believe there will be numerous individualized issues to be determined with regard to the proximate cause of each plaintiff's damages, many of which have already been mentioned. Plaintiffs will be required to "introduce a great deal of individualized proof or argue a number of individualized legal points to establish most or all of the elements of their individualized claims." *Jeld-Wen*, 250 F.R.D. at 695 (citing *Klay*, 382 F.3d at 1266). Resolution of these individualized issues will "break . . . down into an unmanageable variety of individual legal and factual issues," *id.* (citation omitted), and that makes this case unsuitable for class treatment. The need to determine causation on an individual basis does nothing to resolve the individual claims of the class. *See, e.g., Dahlgren's*, 1994 WL 1251231, at *11 (citing with approval *Mertens v. Abbott Labs.*, 99 F.R.D. 38, 41 (D. N.H. 1983), in which the court held: "In light of the varied degrees of use, exposure and harm in each Plaintiff's case, a determination in principle [that a particular drug caused injury *in utero*] would serve no useful purpose in resolving the individual claims made in this action."); *Kia Motors Am. Corp. v. Butler*, 985 So. 2d 1133, 1137-38 (Fla. 3d DCA 2008) (proof of deficiencies in the plaintiff's vehicle would not advance the cause of class-wide relief for any other class members because the brake systems found in the different vehicle models were not uniform, as

evidenced by the changes in component parts and design which resulted in significant differences in braking performance over the model years; applying Florida's class certification rule which is modeled on Federal Rule 23).

We are bolstered in our decision by numerous other rulings in products liability cases like this one that causation usually cannot be determined on a class-wide basis. *See, e.g., Sanneman v. Chrysler Corp.*, 191 F.R.D. 441, 449 (E.D. Pa. 2000); *In re Ford Motor Co. Ignition Switch Prods. Liab. Litig.*, 174 F.R.D. 332, 347 (D. N.J. 1997); *In re Ford Motor Co. Vehicle Paint Litig.*, 182 F.R.D. 214, 220 (E.D. La. 1998); *Frosini v. Bridgestone Firestone N. Am. Tire*, No. CV 05-0578 CAS (RZx), 2007 WL 2781656, at *15 (C.D. Calif. Aug. 24, 2007). Because in our case "causation in regards to each claimed product remains a key determinative factor as to the legal cause of damages," *Jeld-Wen*, 250 F.R.D. at 695, and causation will necessitate the individualized inquiries described herein, we find that individual issues of fact predominate over those common to the putative class.[3]

_____

[3]    Other claims raised in this case will require even more individualized proof. For example, with regard to the breach of express warranty claims, we conclude as did the court in *Cohen* that "[e]ven if reliance is not required [to be proven as an essential element of a breach of express warranty claim], individual factual issues would still predominate. Each putative class member would have to show that he or she was injured as a result of the defendant's breach of warranty." 2008 WL 3927223, at *27. Further, each individual class member would have to show it provided notice to TCI in compliance with the express warranty. Whether proper notice was given is a highly individualized factual determination and depends on differing facts and circumstances. *Id.* The necessity of making individualized findings in connection with the express warranty claims supports our finding that individual issues predominate over common ones. And it cannot realistically be argued that Plaintiffs' fraud claims, laden as they are with highly individualized elements like detrimental reliance, are capable of being resolved on a class-wide basis. Indeed Plaintiffs' memoranda pay little attention to their fraud claims for that obvious reason.

Similarly, we agree with Defendants that, as to the issue of damages, this case is wholly unsuited for class-wide treatment because common damage issues do not predominate. As noted, Plaintiffs have proposed a three-phase trial. They suggest that if liability is found in Phase 1, the same jury could determine entitlement to, and a formula for, punitive damages in Phase 2. Plaintiffs say the jury can reach a "common determination of reprehensibility" of the Defendants, which then can be applied as a "multiplier" to individual damages calculations during Phase 3. [D.E. 611 at 5]. In Phase 3, Plaintiffs envision a claims process along the lines of that employed in *Allapattah*. [*Id.* at 7-8].

Plaintiffs' proposal seeks to determine punitive damages prior to determinating compensatory damages, which is contrary to Florida law. "[T]he amount of compensatory damages must be determined in advance of a determination of the amount of punitive damages awardable, if any, so that the relationship between the two may be reviewed for reasonableness." *Engle v. Liggett Group, Inc.*, 945 So. 2d 1246, 1265 (Fla. 2006). This is because due process limits on punitive damages awards require "an evaluation of the punitive and compensatory amounts awarded to ensure a reasonable relationship between the two." *Id.* at 1264; *see also BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 581 (1996) (proper inquiry in evaluating a punitive damages award is "'whether there is a reasonable relationship between the punitive damages award and *the harm likely to result* from the defendant's conduct as well as the harm that actually has occurred") (emphasis in original). According to *Engle*, "without having total compensatory damages determined it would be impossible to determine

whether punitive damages bear a reasonable relationship to the actual harm inflicted on the plaintiff."  945 So. 2d at 1265 (trial court erred in allowing a lump sum determination of punitive damages for the entire class when compensatory damages had been determined only for the three individual class representatives) (internal citation omitted).

For similar reasons Plaintiffs' creative idea to bifurcate punitive damages' concern for "reprehensibility" from the actual measure of those damages makes it more difficult for the Court to comply with Fourteenth Amendment due process.[4]  Plaintiffs unconvincingly explain how an individual class member's damage jury is supposed to apply the class-wide jury's reprehensibility finding without a damages trial that replicates most, if not all, of the evidence presented to the class-wide jury.  Under Plaintiffs' trial proposal, because liability issues will remain to be decided after Phase

---

[4]    The reasonableness of a punitive damages award, for due process purposes, depends on the following three "guideposts:"

> (1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases.

State Farm Mut. Auto. Ins. Co. v. Campbell, 538 U.S. 408, 418 (2003) (citing Gore, 517 U.S. at 575).  The most important, though not the sole, "indicium of the reasonableness of a punitive damages award is the degree of reprehensibility of the defendant's conduct."  Id.  The following factors are considered when determining a defendant's reprehensibility:  "the harm caused was physical as opposed to economic; the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; the target of the conduct had financial vulnerability; the conduct involved repeated actions or was an isolated incident; and the harm was the result of intentional malice, trickery, or deceit, or mere accident."  Id.  at 419 (citing Gore, 517 U.S. at 567-77).

1, punitive damages may not be determined in Phase 2.  This means numerous individualized determinations would still have to be made in Phase 3, including individualized determinations concerning liability and damages (including causation, damages, and affirmative defenses such as comparative fault) and the due process considerations concerning the amount of punitive damages to award.  Even if a "multiplier" is used to determine punitive damages, the relationship between compensatory and punitive damages awarded to each putative class member must be reviewed for reasonableness after individualized compensatory damages are determined.  Moreover, the amount of harm to each putative class member must be determined on a case-by-case basis.  *See Campbell*, 538 U.S. at 425-26 ("The precise award in any case, of course, must be based upon the facts and circumstances of the defendant's conduct and the harm to the plaintiff. . . . [C]ourts must ensure that the measure of punishment is both reasonable and proportionate to the amount of harm to the plaintiff and to the general damages recovered.").  The level of injury suffered by each class member clearly is thus quite material to this analysis, and that inquiry requires individual assessments that Plaintiffs too easily ignore.

Finally, the claims process itself would be unworkable in this case.  This case is nothing like *Allapattah*, which serves as the model for the Plaintiffs' proposed claims process.  That case involved purely contractual claims against a single defendant that were based on a uniform injury, as opposed to our case which involves warranty, product liability and other claims against several defendants that are based on different types of injuries.  There, the claims process did not require a Special Master

to decide liability issues.  That determination had already been made; the only remaining issue was how to distribute the damages using a mathematical formula. *Allapattah*, 333 F.3d at 1258.  Here, a special master cannot summarily decide causation and damage issues; a jury must do so in multiple trials based on disputed evidence.

Consequently Defendants are correct to distinguish *Allapattah* because our case "does not lend itself to a determination of liability and damages in the initial phases such that a final 'damages' phase would simply result in the formulaic allocation of damages."  [D.E. 614 at 14].  Plaintiffs seek damages that must be determined on an individualized basis: for FlexPipe replacement, business disruption, and environmental remediation.  Phase 3 would, therefore, necessarily include a determination of both liability and damages on a number of issues.  Moreover, Defendants are entitled to challenge whether the damages claimed by a particular putative class member were the result of the so-called "uniform defect" or some other reason.  Liability and damages for environmental contamination must be resolved on a facility-by-facility basis.  The class action model proposed by Plaintiffs will require hundreds or more mini-trials on liability and damages in Phase 3.  This clearly does not satisfy the streamlining and efficiency goals of Rule 23.  *See Klay*, 382 F.3d at 1260 ("It is primarily where there are significant individualized questions going to liability that the need for individualized assessments of damages is enough to preclude 23(b)(3) certification."); *Dahlgren's*, 1994 WL 1251231, at * 12 (damages that cannot be reduced

to a simple formula but instead would require complex appraisal of thousands of individual claims would create staggering logistical problems).

For these reasons, we must conclude that, though the effort was valiant, Plaintiffs have failed to satisfy the predominance requirement.   The highly individualized nature of each class member's claims proves to be too great an obstacle to certification of any class in this case.

## 2.  *Superiority*

To achieve class certification, Plaintiffs must, in addition to satisfying the predominance prong, demonstrate that a class action is "superior to other available methods for fairly and efficiently adjudicating the controversy."   Fed. R. Civ. P. 23(b)(3).  The Rule sets forth four factors to consider in evaluating superiority, which balance in varying ways the benefits and costs of a class action to individual class members and to the Court.

Plaintiffs' superiority argument frames the issue thusly:

> At this juncture, the Court must determine whether it is procedurally superior (i) to try all of the common class-wide issues in *one* trial with damages issues determined subsequently on an individual, stream-lined basis only if necessary, or (ii) to try *all* of the liability *and* those same damages issues over and over and over again in thousands of individual separate trials.

[D.E. 618 at 2].

That argument is appealing at first blush but ultimately unravels.  If the resolution of this case could be achieved so simply, perhaps class treatment might be preferable.  But given the predominance of individualized issues over common ones, particularly with regard to causation and damages, adjudicating claims against these

Defendants on a class-wide basis would be far more complex than Plaintiffs suggest and would *not* be the most efficient method of doing so. "Given that adjudication of [some issues here, including causation and damages] on a class basis would still necessitate individual inquiries as described above, treatment of the claim as a class action would hardly be a superior method." *Cohen*, 2008 WL 3927223, at *8; *see also Jeld-Wen*, 250 F.R.D. at 696 (given predominance of individual issues, difficulties in managing the class action would be great).

This is not the type of case for which the class action device was created. The damages to individual class members here is potentially substantial, not de minimis. Absent certification, individual class members certainly have financial incentive to prosecute their individual claims. That incentive presents a real question whether a substantial number of class members may opt out of this action. Whether or not that ultimately turns out to be the case, this factor weighs against certification under Rule 23(b)(3)(A). *See, e.g., Zinser v. Accufix Research Institute, Inc.,* 273 F.3d 1266 (9th Cir. 2001); *In re Northern Dist. of Cal. Dalkon Shield IUD Products Liab. Litig.,* 693 F.2d 847, 856 (9th Cir. 1982) (strong incentive for class members to pursue individual suits favors denial of certification).

Moreover, the greatest factor that weighs most against the superiority of a class device in this case is the difficulty in managing the litigation. *See* Fed. R. Civ. P. 23(b)(3)(D). As discussed above, the resolution of this litigation will likely not be accomplished with one trial. Certain liability issues may be decided in one trial, but the critical causation and damage questions will require multiple individual trials

involving different class members and defendants.  Those trials cannot simply be presented on the paper record to a Special Master.  They must be presented through testimony and evidence before a jury.  The class action determinations will not relieve this Court from having to adjudicate a slew of individual cases, including many which could not be brought in this jurisdiction on their own, increasing the judicial resources expended by this Court.

In short, in our view class treatment is not superior to other litigation devices that are available to all class members.  The class action procedure makes this complex products liability action even more complex than necessary.  We do not share Plaintiffs' simplistic view of the superiority of the class action device in this case.

Therefore, we find that Plaintiffs have also not met their burden as to this prong of Rule 23(b)(3).[5] [6]

---

[5]    In the event a class is not certified pursuant to Rule 23(a) and (b), Plaintiffs suggest alternatively that a class be certified pursuant to Rule 23(c)(4).  That Rule suggests that a class may be certified for isolated issues in a given case.  We doubt, however, that Plaintiffs' inability to satisfy the predominance and superiority factors ever allows the Court to rely on Rule 23(c)(4).  But, even if we could, for the reasons articulated above, particularly the need to try causation and damages on an individual basis here, we decline to recommend that such a course be taken.  No single issue is best addressed on a class-wide basis involving multiple variations of the FlexPipe product and multiple defendants.

[6]    In light of our determination *supra* that Plaintiffs have failed to meet all the Rule 23 requirements for certification, we will not address the allegations made by various Defendants that the class definition is overbroad and vague.

### III.   CONCLUSION

Based on the foregoing, the undersigned Magistrate Judge recommends that Plaintiffs' Motion for Class Certification [**D.E. 441**] be **DENIED**.

Pursuant to Local Magistrate Rule 4(b), the parties have ten days from the date of this Report and Recommendation to serve and file written objections, if any, with the Honorable Joan A. Lenard, United States District Judge.   Failure to timely file objections shall bar the parties from a *de novo* determination by the District Judge of an issue covered in the report and bar the parties from attacking on appeal the factual findings contained herein.   *R.T.C. v. Hallmark Builders, Inc.,* 996 F.2d 1144, 1149 (11th Cir. 1993); *LoConte v. Dugger*, 847 F.2d 745 (11th Cir. 1988); *Nettles v. Wainwright*, 677 F.2d 404, 410 (5th Cir. Unit B 1982) (en banc); 28 U.S.C. § 636(b)(1).

**DONE AND SUBMITTED** in Chambers at Miami, Florida this 30th day of November, 2008.

EDWIN G. TORRES
United States Magistrate Judge