## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

Case No. 06-20953-CIV-LENARD/TORRES

**CITY OF ST. PETERSBURG,**
**a Florida municipality, <u>et al.</u>,**

      Plaintiffs,

vs.

**TOTAL CONTAINMENT, INC.,**
**a Pennsylvania corporation, <u>et al.</u>,**

      Defendants.

_____/

## <u>ORDER ADOPTING THE MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION (D.E. 663) AND DENYING PLAINTIFFS' MOTION FOR CLASS CERTIFICATION (D.E. 441)</u>

**THIS CAUSE** is before the Court on the Report and Recommendation issued by U.S. Magistrate Judge Edwin G. Torres on November 30, 2008 ("Report," D.E. 663), recommending that the Motion for Class Certification filed by Plaintiffs on February 7, 2008 ("Motion," D.E. 441), be denied in its entirety.  On December 15, 2008, Plaintiffs filed their Objections to the Report ("Objections," D.E. 666).  On January 2, 2009, Defendants filed their Response to Plaintiffs' Objections ("Response to Plaintiffs' Objections," D.E. 671).  Having reviewed the Motion, the related pleadings, and the record <u>de novo</u>, the Court finds as follows:

### I.    Background

This case involves thermoplastic flexible piping ("FlexPipe"), marketed and distributed for use in underground fuel containment systems, to enable petroleum fuels to be pumped from

underground storage tanks ("USTs") to above-ground fuel dispensers such as those used at gas stations. (Report, D.E. 663 at 1-2.) Plaintiffs -- the City of St. Petersburg, Florida ("CSP"), Twin Oil Company ("Twin Oil"), and Jeff Montgomery Associates ("JMA") -- claim Defendants designed, manufactured, marketed, distributed and sold to them FlexPipe that Defendants knew, or should have known, was fundamentally unsuitable for its intended use. (Id. at 2.) Defendants -- Total Containment, Inc. ("TCI"), TC Fuel Components, LLC ("TC Fuel"), Dayco Products, Inc. and Dayco Products, LLC (collectively "Dayco"), Cleveland Tubing, Inc. ("CT"), Canam Group, Inc., Canam Manac Group, Inc., Canam Steel Corporation, (collectively "Canam"), Finloc, Inc. and Finloc US, Inc. (collectively "Finloc"), and Polyflow, Inc. ("Polyflow") -- are alleged to have participated in the manufacture, distribution, marketing, and sale of defective FlexPipe in various capacities.[1]

According to Plaintiffs, Defendants also engaged in a scheme to market and sell defective FlexPipe for profit, knowing that the product was defective and not approved for sale by federal and state regulatory authorities. (Id.) As a result of Defendants' conduct, Plaintiffs purchased FlexPipe that has deteriorated or is deteriorating, and will result in environmental contamination and damage to Plaintiffs' FlexPipe and fuel containment systems. (Id.) Plaintiffs also seek compensation for business disruption losses as a result of defective FlexPipe. (Id. at 3.)

---

[1]    AIG Commercial Insurance Company of Canada ("AIG"), f/k/a Commerce & Industry Insurance Company of Canada, the underwriter of an insurance policy issued to TCI, joined the case as an Intervenor-Plaintiff on November 14, 2006. (See Order Granting Motion to Intervene, D.E. 193.)

As the Report notes, the crux of Plaintiffs' claims is that the FlexPipe manufactured and sold by Defendants is inherently and uniformly defective. (Id.) Specifically, Plaintiffs allege a general defect with FlexPipe that allows petroleum fuel to permeate both the inner pipe barrier as well as the secondary containment pipe. (Id.) Plaintiffs allege that this "inside-out permeation causes the other layers to swell, delaminate, and become weaker, thereby rendering it susceptible to bursting, delaminating, and cracking under normal operation conditions. The outside-in permeation results in similar effects, through exposure and degradation." (Motion at 12 n.7.) As a result, FlexPipe fails prematurely and leaks fuel. This general defect is a function of FlexPipe's inherent incompatibility with petroleum fuel, even under normal operating conditions. (See Report at 3; Motion at 13.) Plaintiffs allege that despite knowledge of the defective nature of FlexPipe, Defendants used promotional videos, brochures, and trained sales personnel to fraudulently market their product. (Motion at 15.) Plaintiffs also assert that the warranties provided by TCI, Dayco, and CT were inadequate and misleading to the extent they warranted FlexPipe's compatibility with fuel or that their products were free from material defects. (Motion at 16-17.)

As a result, Plaintiffs commenced the instant lawsuit on April 12, 2006. (See Class Action Complaint, D.E. 1). Plaintiffs subsequently filed their Second Amended Complaint on February 23, 2007, seeking damages for negligence (count I), strict products liability (count II), intentional fraudulent concealment (count III), fraud in the inducement (count IV), negligent misrepresentation/concealment (count V), breach of express warranty (count VI), and unjust

enrichment (count VII).  (See Second Amended Complaint ("SAC"), D.E. 211.)  On February

7, 2008, Plaintiffs filed their Motion seeking to certify a class comprised of:

> All persons and entities in the State of Florida (a) who presently own
> thermoplastic flexible piping ("FlexPipe") (including but not limited to that sold
> under the brand names "Enviroflex," "Omniflex," and "Monoflex") or (b) who
> formerly owned FlexPipe located in the State of Florida, and incurred any
> expense associated with (1) repair or replacement of all or part of the FlexPipe,
> and/or (2) a fuel leak from the FlexPipe (the "Class").

(Motion at 2.)  Plaintiffs' Motion was referred to the Magistrate Judge on February 8, 2008

(D.E. 462).  Defendants filed their response briefs (D.E. 527, 528, 530, 540, 546) in opposition

to class certification on March 7, 2008, and Plaintiffs filed their reply brief (D.E. 568) on March

17, 2008.  In addition, the parties filed numerous briefs supplementing the class certification

motion.  (See D.E. 608, 611, 612, 614, 615).  The Magistrate Judge held oral argument on

October 8, 2008 (see D.E. 631), and issued his Report on November 30, 2008 (D.E. 663),

recommending that class certification be denied.  Plaintiffs filed their Objections on December

15, 2008 (D.E. 666)[2] and Defendants their Response on January 2, 2009 (D.E. 671).

## II.    Discussion

 Prior to certifying a class action, district courts must conduct a "rigorous analysis" of

whether a putative class meets the requirements of Rule 23 of the Federal Rules of Civil

Procedure.  See Castano v. Am. Tobacco Co., 84 F.3d 734, 740 (5th Cir. 1996).  The Magistrate

Judge's Report concludes that although Plaintiffs are able to satisfy the requirements for

---

[2]    Plaintiffs additionally filed a "Supplement to Plaintiffs' Objection to Report and
Recommendation on Plaintiffs' Motion for Class Certification and Renewed Request for Oral
Argument" (D.E. 691).

certification under Rule 23(a), they are unable to meet any of the prerequisites of Rule 23(b), and therefore class certification is inappropriate in this case.  Because the Magistrate Judge determined Plaintiffs were unable to satisfy the prerequisites of Rule 23(b), the Magistrate Judge did not address arguments raised by CT that Plaintiffs' proposed class was overly broad, amorphous and vague.  (See CT's Response in Opposition to Plaintiffs' Motion for Class Certification, D.E. 527, at 2-8.)  Rather, the Report first looks to whether Plaintiffs meet the requirements for class certification under Rule 23(a).

### A.      Rule 23(a)

The Report concludes that Plaintiffs' Motion meets the requirements of Rule 23(a) and no parties object to this finding.  Rule 23(a) lists the prerequisites to a class action and states:

> One or more members of a class may sue or be sued as representative parties on behalf of all members only if: (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a).  Parties seeking class certification bear the burden of establishing each element of Rule 23(a), commonly referred to as numerosity, commonality, typicality and adequacy of representation.  See Valley Drug Co. v. Geneva Pharms., Inc., 350 F.3d 1181, 1187 (11th Cir. 2003); Jones v. Jeld-Wen, Inc., 250 F.R.D. 685, 692 (S.D. Fla. 2008).  Although the Magistrate Judge finds several of the Rule 23(a) requirements to be a closer call than others, the Report concludes Plaintiffs satisfy their burden under Rule 23(a).  Because neither party objects to this finding and the Court finds that the Report's analysis is thorough and well-reasoned, the

Court adopts the Report's finding that Plaintiffs satisfy the Rule 23(a) prerequisites.

"In addition to meeting the four requirements of Rule 23(a), parties seeking class certification must prove that the action is maintainable under one of the three subsections of Rule 23(b)." Jeld-Wen, 250 F.R.D. at 694 (quoting Amchem Products, Inc. v. Windsor, 521 U.S. 591, 614 (1997)).   Plaintiffs contend their proposed class meets the requirements to certify a class under Rule 23(b)(3), or alternatively under Rule 23(c)(4) or 23(b)(1).

**B.     Rule 23(b)(3)**

After conducting the Rule 23(a) analysis, the Magistrate Judge states that "[e]ven if our analysis of Rule 23(a) is arguable, we conclude that the Rule 23(b)(3) issue amounts to a clear and convincing death knell to Plaintiffs' attempt to certify a class." (Report at 12.)  In order to certify a class under Rule 23(b)(3), the court must find "that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3); see Amchem Products, 521 U.S. at 615 ("To qualify for certification under Rule 23(b)(3), a class must meet two requirements beyond the Rule 23(a) prerequisites: Common questions must 'predominate over any questions affecting only individual members'; and class resolution must be 'superior to other available methods for the fair and efficient adjudication of the controversy.'").  These requirements are frequently referred to as "predominance" and "superiority."  Because Plaintiffs object to the Report's analysis of the predominance and superiority prongs of Rule 23(b)(3), the Court

conducts a <u>de novo</u> determination of whether Plaintiffs' proposed class satisfies these requirements.[3]

## 1. Predominance

In order to satisfy the predominance inquiry under Rule 23(b)(3), Plaintiffs need not demonstrate that every question of law or fact is common to the class.  <u>See</u> <u>Jeld-Wen</u>, 250 F.R.D. at 694 ("Under Rule 23(b)(3) it is not necessary that all questions of law or fact be common, but only that some questions are common and that they predominate over the individual questions.") (quoting <u>Klay v. Humana, Inc.</u>, 382 F.3d 1241, 1254 (11th Cir. 2004)). The predominance inquiry, however, is much more stringent than Rule 23(a)(2)'s requirement of commonality.  <u>See</u> <u>id.</u>; <u>Jackson v. Motel 6 Multipurpose, Inc.</u>, 130 F.3d 999, 1005 (11th Cir. 1997).  For the reasons set forth below, Plaintiffs fail to establish that common issues will predominate over individual ones in this case.

In concluding that individual issues predominate common questions of law or fact, the Report first notes that products liability claims based on negligence and strict liability typically require a substantial amount of individualized proof in order to demonstrate proximate causation and damages.  (Report at 17.)  Responding to Plaintiffs' theory of general causation, the Report rejects the notion that strict liability and negligence claims could be subject to a clear-cut determination with generalized proof, and finds evidence that FlexPipe was generally

---

[3]     Pursuant to 28 U.S.C. § 636(b)(1), the Court is only required to make a "<u>de</u> <u>novo</u> determination of those portions of the report or specified proposed findings or recommendations to which objection is made."

defective would do nothing to resolve whether the defect did in fact cause any individual class member's harm.  (Id. at 18.)  In support, the Magistrate Judge notes that this case involves many different models of FlexPipe, manufactured and distributed by different Defendants, installed and maintained at different sites, over a number of years.  (Id. at 19)  The Report states:

> The representative Plaintiffs and the putative class members used different models of flexible piping manufactured by different companies at different times and at different locations that were installed in different locations under different circumstances....Many changes in design and manufacture occurred over many years in the flexible piping sold to the named Plaintiffs and putative class members.

(Id. at 19-20.)  The Report also finds that Plaintiffs' proposal of conducting trial in three phases would still require numerous "individualized determinations concerning liability and damages (including causation, damages, and affirmative defenses such as comparative fault)" as well as implicate "due process considerations concerning the amount of punitive damages to award."  (Id. at 24.)  As a result, the Report finds a lack of predominance fatal to certification, to which Plaintiffs object.

Plaintiffs' objections to the Report's predominance analysis are as follows: (1) this case is distinguishable from Dahlgreen's Nursery, Inc. v. E.I. du Pont de Nemours and Co., Inc., No. 91-8709-CIV, 1994 WL 1251231 (S.D. Fla. Oct. 30, 1994); (2) this case is distinguishable from the other cases cited by the Magistrate Judge; (3) the Magistrate Judge erred because instances of FlexPipe failure unrelated to the defect are not fatal to class certification; (4) individual damage determinations do not defeat class certification; (5) Plaintiffs' punitive damages approach is proper; (6) the Magistrate Judge failed to consider trifurcation; and (7) the

Magistrate Judge failed to consider subclasses.  (Objections at 10-19.)  For the reasons set out below, the Court finds Plaintiffs' objections unpersuasive.

The Court finds that individual issues going to liability and damages predominate any common questions in this case.  Despite Plaintiffs' repeated characterizations that this case involves a uniform defect that can be proven through common proof of causation, the record suggests otherwise.  Highly individualized evidence will be required in order for Plaintiffs to satisfy the elements of each of their claims.  In addition, while not a bar to certification, individual questions as to calculation of damages will require further individualized facts.  The other tools proposed by the Plaintiffs, such as bifurcation, trifurcation, or subclasses do not address this fundamental shortcoming.  As a result, the Court finds Plaintiffs fail to establish predominance.[4]

---

[4]      As a threshold matter, it is worth noting that class certification is often denied in mass tort cases because of problems with establishing class-wide causation.  One treatise notes:

> Courts traditionally have been reluctant to certify class actions under Rule 23(b)(3) in mass tort cases because individual questions would predominate over common ones, due to the inherent nature of personal injury suits....While acknowledging the possibility of using class actions in these mass tort cases, however, the Court also concluded that individual issues are particularly likely to predominate in cases involving long-term torts because members are likely to have suffered different types of injuries at different times and through different causal mechanisms.

5-23 JAMES WM. MOORE ET AL., MOORE'S FEDERAL PRACTICE ¶ 23.45(5)(d)(i) (3d ed. 1999); see also Dahlgreen's Nursery, 1994 WL 1251231at *9 ("'[P]roduct liability actions seldom are found to meet [the predominance] requisite because the individual character of the issues of causation and damages predominate over any common question.'") (quoting JACK H. FRIEDENTHAL, MARY KAY KANE & ARTHUR R. MILLER, CIVIL PROCEDURE § 16.21 (2d ed. 1993)).  The Report correctly notes that many district courts have denied class certification in products liability cases because causation could not be established on a class-wide basis.  (Report at 21 (citing Sanneman v. Chrysler Corp., 191 F.R.D. 441, 449 (E.D. Pa. 2000); In re Ford Motor Co. Ignition Switch Prods. Liab. Litig., 174

Predominance is lacking and certification is inappropriate under Rule 23(b)(3) where the case does not lend itself to generalized proof tending to prove or disprove the elements of plaintiffs' claims.  See Dahlgreen's Nursery, 1994 WL 1251231 at *9 ("A question is deemed 'common' 'when there exists generalized evidence that proves or disproves the element on a simultaneous, class-wide basis.  Such proof obviates the need to examine each class member's individual position....'") (internal citation omitted).  Recognizing the inherent difficulty in certifying a class with so many individual variables, Plaintiffs have repeatedly characterized this case as involving a uniform defect that causes general harm.  (See Motion at 17 ("This is a classic product defect case including warranty and fraudulent concealment claims based on a uniform defect and Defendants' uniform express warranty and uniform concealment of that defect.") (emphasis added).)  Nevertheless, Plaintiffs bring causes of action that require demonstration of, inter alia, elements such as causation, misrepresentation and justifiable reliance for each individual claimant.[5]  As explained below, each of Plaintiffs' claims contain

_____

F.R.D. 332, 347 (D. N.J. 1997); In re Ford Motor Co. Vehicle Paint Litig., 182 F.R.D. 214, 220 (E.D. La. 1998); Frosini v. Bridgestone Firestone N. Am. Tire, No. CV 05-0578 CAS (RZx), 2007 WL 2781656, at *15 (C.D. Calif. Aug. 24, 2007).)  Plaintiffs object that "[t]his case is fundamentally distinct from the other cases the R&R relies upon."  (Id. at 12-14.)  Nonetheless, the cases are cited for the proposition that individual issues of causation often preclude predominance and the Report simply states "[w]e are bolstered in our decision by numerous other rulings in products liability cases like this one that causation usually cannot be determined on a class-wide basis."  (Report at 21.)

[5]     Plaintiffs object that the Report's "predominance analysis gives a disproportionate amount of weight to the alleged problem of establishing causation class-wide" and that "[b]y suggesting that individualized causation issues predominate over common issues, the R&R essentially engrafts a causation element into Plaintiffs' five other claims -- breach of warranty, intentional fraudulent concealment, fraudulent inducement, negligent misrepresentation, and unjust enrichment."  (Objections at 14.)  Plaintiffs overlook the Report's finding that "[o]ther

elements where individual questions predominate.

### a.      Negligence and Strict Liability

Plaintiffs' negligence and strict products liability claims (counts I and II of the SAC) require Plaintiffs to establish proximate cause exists for each class member.  Under Florida law, the elements of a cause of action for negligence in a products liability case are the following: (1) the manufacturer must have a legal duty to design and manufacture a product reasonably safe for use; (2) the manufacturer must fail to comply with that duty; (3) the plaintiff must have an injury that is legally caused by the manufacturer's breach of duty; and (4) the plaintiff must have suffered damages.  Indem Ins. Co. of N. Am. v. Am. Aviation, Inc., 344 F.3d 1136, 1146 (11th Cir. 2003) (per curiam).  Thus, in order to prevail on their negligence claim, putative class members in this case would each need to show by a preponderance of evidence that their pipe failure, fuel containment system failure, soil contamination, and/or any other injury were legally caused by defective FlexPipe.  See also Rink v. Cheminova, Inc., 400 F.3d 1286, 1295 (11th Cir. 2005) ("To establish causation sufficient for a negligence claim in a products liability case, the plaintiff must prove by a preponderance of the evidence that his injury was proximately caused by the manufacturer's breach of its duty to produce a product reasonably safe for use.").

---

claims raised in this case will require even more individualized proof" and statement that "it cannot realistically be argued that Plaintiffs' fraud claims, laden as they are with highly individualized elements like detrimental reliance, are capable of being resolved on a class-wide basis.  Indeed Plaintiffs' memoranda pay little attention to their fraud claims for that obvious reason."  (Report at 21.)  Rather than "engraft" causation into the elements of the rest of Plaintiffs' claims, the Magistrate Judge correctly notes that Plaintiffs' other claims would also require individualized proof so as to defeat predominance.

Similarly, the elements of a strict products liability claim under Florida law require plaintiffs to establish (1) a relationship between the defendant and the product; (2) a defect which caused the product to be unreasonably dangerous; and (3) causation between the defect and the harm suffered by the user.  See West v. Caterpillar Tractor Co., Inc., 336 So. 2d 87 (Fla. 1976) ("In order to hold a manufacturer liable on the theory of strict liability in tort, the user must establish the manufacturer's relationship to the product in question, the defect and unreasonably dangerous condition of the product, and the existence of the proximate causal connection between such condition and the user's injuries or damages.").  As a result, each class member in this case must establish the existence of a proximate causal connection between the defect in FlexPipe and their injury.  Proof that FlexPipe is generally defective would do nothing to prove that FlexPipe's defect proximately caused injury to each putative class member.

The Report illustrates this point by noting three instances where FlexPipe failed for reasons other than the alleged defect.  (Report at 18-19.)  The Report states:

> In 1998, Twin Oil reported a leak from Enviroflex hose at the North Miami Beach station.  Plaintiffs have stated that the hose broke and they do not claim that the failure resulted from the defect at issue in this case.  In 2002, Jeff Montgomery Associates reported a leak in flexible piping that was caused by a loose connection or loose fitting, not the alleged uniform defect.  In addition, Defendants cite the discovery at a JMA site of a secondary containment hose that was breached and apparently patched with duct tape, then painted to hide the breach.  The hoses cited in these three examples were not preserved so there is no way to know precisely why each failed.

(Id. (internal citations omitted).)  Plaintiffs object that evidence "[t]hat in a handful of instances the FlexPipe may have broken or been attached incorrectly does not mean it does not also suffer

from the defect." (Objections at 15 (emphasis in original).) Nevertheless, Plaintiffs' objection proves the point which it refutes. Defective FlexPipe could be only one of several potential causes of any class member's harm. The Court agrees that, "Plaintiffs cannot show that causation here is susceptible to generalized proof on a class-wide basis because determining whether there is a uniform defect in certain models of FlexPipe in no way resolves whether the defect did in fact cause any individual class member's harm." (Report at 18.) Thus, Plaintiffs' strict liability and negligence claims do not present common questions of law or fact that predominate individual issues.

### b.    Fraud

Likewise, Plaintiffs' claims for intentional fraudulent concealment (count III), fraud in the inducement (count IV), and negligent misrepresentation/concealment (count V) all require putative class members to present individual proof that misstatements or misrepresentations were made to them and that they justifiably relied on those statements or omissions. In order to establish liability on their intentional fraudulent concealment and negligent misrepresentation claims, Plaintiffs must demonstrate (1) a misrepresentation of a material fact, (2) knowledge of the representor of the misrepresentation or absence of knowledge by the representor of the truth or falsity of the representation; (3) an intention that the representor induce another to act on it; and (4) resulting injury to the party acting in justifiable reliance on the representation. See Greenberg v. Miami Children's Hosp. Research Inst., Inc., 264 F. Supp. 2d 1064, 1073 (S.D. Fla. 2003); Coral Gables Distrib., Inc. v. Milich, 992 So. 2d 302, 303 (Fla. 3d Dist. Ct. App.

2008).  Thus, in this case, putative class members would need to prove a misrepresentation was made to them and that they in turn relied upon that misrepresentation to their detriment.

While it is true that in this Circuit, "the simple fact that reliance is an element in a cause of action is not an absolute bar to class certification," Klay, 382 F.3d at 1258, this case is not one where class-wide reliance may be established by common evidence.  Klay involved a putative class action brought on behalf of doctors who submitted claims for reimbursement to HMOs and were systematically underpaid.  The Eleventh Circuit determined class certification was inappropriate for the majority of the plaintiffs' claims but held certification appropriate for the plaintiffs' RICO claims for two reasons.  First, the court found that common issues of fact concerning the existence of a national conspiracy, a pattern of racketeering activity, and a Managed Care Enterprise tended to "predominate over all but the most complex individualized issues."  Id. at 1258-59.  Second, the court found that "while each plaintiff must prove his own reliance in this case, we believe that, based on the nature of the misrepresentations at issue, the circumstantial evidence that can be used to show reliance is common to the whole class."  Id. at 1259.  This case does not involve common questions of fact so substantial that they predominate over all but the most complex individual questions.  Furthermore, this case involves misstatements or misrepresentations far different from those in Klay.  Regarding the nature of the misrepresentations involved in Klay, the Eleventh Circuit stated:

> The alleged misrepresentations in the instant case are simply that the defendants repeatedly claimed they would reimburse the plaintiffs for medically necessary services they provide to the defendants' insureds, and sent the plaintiffs various EOB forms claiming that they had actually paid the plaintiffs the proper amounts.

14

> While the EOB forms may raise substantial individualized issues of reliance, the antecedent representations about the defendants' reimbursement practices do not. It does not strain credulity to conclude that each plaintiff, in entering into contracts with the defendants, relied upon the defendants' representations and assumed they would be paid the amounts they were due.

Id.   Thus, the court in <u>Klay</u> found that the nature of the claim made a finding of misrepresentation and reliance obvious enough to be inferred from common evidence.

This case does not involve such a basic misrepresentation.  Plaintiffs claim that different Defendants are responsible for numerous misrepresentations made to class members.  Plaintiffs allege that all Defendants are liable for making misrepresentations that FlexPipe was safe and effective for its intended use, was not subject to permeation, chemical reaction, breakdown or leakage, and would safely and effectively transport petroleum fuels in USTs for a period of at least 10 years.  (SAC at 42.)  Plaintiffs also claim all Defendants are liable for concealing the existence of the defect, that Defendants had not conducted sufficient testing to ensure FlexPipe's suitability for underground transmission of fuels, and the fact that FlexPipe would not perform as warranted.  (Id.)  Plaintiffs allege similar misrepresentations, but only against a subsection of Defendants, in Counts III and IV of the Complaint.  (Id. at 33-42.)  Plaintiffs' allegations do not differentiate between misrepresentations made as to different models or products.  The potential misrepresentations in this case comprise many different alleged untruths or omissions, concerning FlexPipe's longevity, comparisons with steel or fiberglass piping, FlexPipe's compatibility with petroleum fuels, etc.  In addition, putative members might have relied on statements by certain Defendants but not on those of others.

In any event, generalized proof that certain Defendants made misrepresentations would do nothing to avoid the introduction of individual evidence as to what misrepresentations each putative class member may have been subject to or relied upon. As a result, like Plaintiffs' negligence and strict liability claims, generalized proof that misrepresentations were made would do nothing to satisfy reliance on those statements or omissions on a class-wide basis.[6]

### c.   Breach of Express Warranty and Unjust Enrichment

Finally, Plaintiffs' claims for breach of express warranty (count VI) and unjust enrichment (count VII) also would require putative class members to present a substantial amount of individualized proof in order to establish the elements of their claims. In order to establish liability for a breach of express warranty claim, Plaintiffs need to establish both causation and damages. See McCraney v. Ford Motor Co., 282 So. 2d 878, 878 (Fla. 1st Dist. Ct. App. 1973); (see also Report at 21 (stating that even if reliance was not required for a breach of express warranty claim "[e]ach putative class member would [still] have to show that he or she was injured as a result of the defendant's breach of warranty.") (citing Cohen v. Implant Innovations, Inc., No. 07-20777-CIV, 2008 WL 3927223 at *27 (S.D. Fla. Aug. 21, 2008)).) In this case, Defendants issued warranties of varying lengths during different times within the

---

[6]    Like Plaintiffs' claims for intentional fraudulent concealment and negligent misrepresentation, Plaintiffs' claims for fraudulent inducement would also require individualized proof regarding those false statements made by Defendants and any reliance on the part of putative class members. See Simon v. Celebration Co., 883 So. 2d 826, 832 (Fla. 5th Dist. Ct. App. 2004) (explaining that the essential elements for a fraudulent inducement claim are: (1) a false statement of material fact; (2) the maker knew or should have known of the falsity of the statement; (3) the maker intended that the false statement induce another's reliance; and (4) the other party justifiably relied on the false statement to its detriment).

class period.  (See Defendants Finloc US, Polyflow and TC Fuel's Memorandum in Opposition to Class Certification, D.E. 540 at 30 n.18 (stating TCI issued two different two-year warranties for its FlexPipe between 1989-1992, a five-year warranty from 1992-1996, two different ten-year warranties during the period 1996-1997, and a separate ten-year warranty in July 2000 that was reissued in February 2002).)  In order to succeed on their claims, putative class members would need to establish that they were injured in connection with the particular warranty they received.

Similarly, in order to establish liability for unjust enrichment, Plaintiffs would need to demonstrate (1) a benefit was conferred upon one of the Defendants by the plaintiff, (2) Defendant's appreciation of that benefit, and (3) Defendant's acceptance and retention of the benefit under circumstances that make it inequitable for him to retain it without paying the value thereof.  See Greenberg, 264 F. Supp. 2d at 1072; Rollins, Inc. v. Butland, 951 So. 2d 860, 876 (Fla. 2d Dist. Ct. App. 2006)).  Unjust enrichment claims rarely satisfy the predominance prong of Rule 23(b)(3).  See Vega v. T-Mobile USA, Inc., 564 F.3d 1256, 1274 (11th Cir. 2009) ("common questions will rarely, if ever, predominate an unjust enrichment claim, the resolution of which turns on individualized facts.").  That is because a claim for unjust enrichment requires the court to assess whether the individual circumstances of each particular claim would result in inequity.  In this case, Plaintiffs would each need to present evidence that they individually conferred a benefit upon one of the Defendants and that the circumstances surrounding that transaction would make it inequitable for that Defendant to fail to return the benefit to that

Plaintiff.  In sum, Plaintiffs' objections that the Magistrate Judge "engrafts" a causation element into all of Plaintiffs' claims is mistaken.  Each of Plaintiffs' claims contain one or more elements necessary to establish liability which would require highly individualized proof on behalf of each of the putative class members.[7]

### d.   Liability

Where initial determinations such as liability turn upon highly individualized facts, certification under Rule 23(b)(3) is inappropriate.  See Rutstein v. Avis Rent-A-Car Systems, Inc., 211 F.3d 1228, 1235-36 (11th Cir. 2000) ("Serious drawbacks to the maintenance of a class action are presented where initial determinations, such as the issue of liability vel non, turn upon highly individualized facts.") (quoting McCarthy v. Kleindienst, 741 F.2d 1406, 1415 (D.C. Cir. 1984)).  As discussed above, Plaintiffs would need to present a substantial amount of individualized proof just to establish liability.

Moreover, contrary to Plaintiffs' Objections, the Court finds Dahlgreen's Nursery instructive in this case.  Dahlgreen's Nursery involved a proposed class action lawsuit alleging negligence and strict liability claims against the manufacturer of contaminated "Benlate," a fungicide sold throughout Florida.  The lawsuit alleged that Benlate destroyed or otherwise harmed plants upon application.  1994 WL 1251231 at *1.  The plaintiffs in Dahlgreen's

---

[7]      In determining whether common issues predominate individual ones, district courts should look at the "claims, defenses, relevant facts, and applicable law, to assess the degree to which resolution of the classwide issues will further each individual class member's claim."  Klay, 382 F.3d at 1254 (internal citation omitted).  Given the Court's findings regarding the individualized proof required by Plaintiffs' claims, the Court need not address how any defenses by Defendants might further present individual questions of fact or law.

Nursery argued that establishing with generalized proof that a class of Benlate users purchased Benlate during the relevant period and experienced damage to their plants, would allow a jury to infer Benlate was defective and caused harm to class members' plants. Id. at *10.  The district court determined that in order to resolve the issue of predominance, it needed to determine whether evidence that Benlate caused injury to plants "would serve any useful purpose in resolving the individual claims given the varied uses of the fungicide and the many consequences of its application." Id. at *11.

In denying class certification, the district court in Dahlgreen's Nursery found:

> The issue of causation, as well as that of negligence, must be subject to a "clear out [sic] determination" with generalized proof before common questions can be found to predominate.  Although generalized proof may be well suited for those cases in which the cause of the damages is "a single tragic happening," [i]t is not well suited for those cases in which no one set of operative facts establishes liability and no single proximate cause equally applies to each potential class member.

Id. at *12 (internal citations omitted).   In discussing the difficulty in making clear-cut determinations on all of the class members claims based on generalized proof, the district court in Dahlgreen's Nursery noted that:

> To begin with, the manufacture, distribution, and sale of the fungicide is not common throughout the class.  The class description identifies five different types of Benlate.  Each was formulated, packaged, stored, and distributed over a four year period, in a dozen different campaigns, and by a variety of non-parties to this litigation.

Id.   Like in Dahlgreen's Nursery, this case involves many different variables requiring individualized proof.  FlexPipe was manufactured and distributed by various entities over a 15-

year period.  (Report at 18.)  Numerous models of FlexPipe were produced by Defendants with

different changes in design and manufacture over the years.  (See Defendants Canam and

Finloc, Inc.'s Memorandum in Opposition to Class Certification, D.E. 546 at 12; Schruben Dec.

¶ 4 (identifying 27 models of FlexPipe sold by Defendants with variations by generation and

within particular generations).)  Only a small subsection of that FlexPipe is at issue in this case.

(See Objections at 19 n.23 (noting Plaintiff CSP has claims for models PP1500, PP 1501,

PP1503, SP4000 and SP4500, Plaintiff Twin Oil has claims for PP1500, PP1501, PP1503,

PP1503F and CP1503, while Plaintiff JMA has claims for PP1501 and CP1503); Expert Report

of Thomas J. Schruben at 19, Ex. C (noting Defendants produced numerous models of FlexPipe

and identifying many different constructions of FlexPipe).)  In addition, each class member will

likely have encountered different installation, maintenance, and environmental conditions in

using FlexPipe.  As in Dahlgreen's Nursery, this case simply involves more than can be decided

through a showing of generalized proof that a product is generally defective.

As a result, there are "no set of operative facts establishing liability and no single

proximate cause [that] equally applies to each potential class member" in this case.  (Report at

19); Dahlgreen's Nursery at *12; see also Kia Motors Am. Corp. v. Butler, 985 So. 2d 1133,

1141 (Fla. 3d Dist. Ct. App. 2008).  As the Magistrate Judge correctly determined, "[t]he

Plaintiffs in our case, like the plaintiffs in Dahlgreen's, are seeking to certify a class on the basis

of general causation - that a defective product can, in a general sense, cause damage." (Report

at 18 (emphasis in original).)  Similar to Dahlgreen's Nursery, even if Plaintiffs were able to

demonstrate that FlexPipe had a general defect, it would not assist Plaintiffs in meeting their burden of showing that that particular defect was the legal cause of each class member's harm. (See id.)

### e.   Damages

The individualized nature of determining putative class members' damages also contributes to a lack of predominance in this case.  Plaintiffs are correct[8] in their assessment that "the presence of individualized damages issues does not prevent a finding that the common issues in the case predominate."   (Objections at 16 (quoting Klay, 382 F.3d at 1259).) Nevertheless, it certainly does not help. Plaintiffs in this case seek, inter alia, damages including remediation of all soil damage as a result of FlexPipe leaks, the costs of monitoring, repairing, and replacing FlexPipe, and consequential damages including business disruption costs.  (See SAC at 46-47.)  Calculating damages for each putative class member would necessarily require significant amounts of individualized proof as to each installation site and individual business. Additionally, the Report is correct in concluding that Plaintiffs' proposed approach for determining punitive damages is improper.

The Report concludes that Plaintiffs' proposed approach to punitive damages is contrary to Florida law because it seeks to determine punitive damages prior to compensatory damages.

---

[8]      The Court notes, however, Plaintiffs' objection that "[t]he R&R's conclusion that 'this case is wholly unsuited for class-wide treatment because common damage issues do not predominate'" quotes the Report out of context.  (See Report at 22 ("Similarly, we agree with Defendants that, as to the issue of damages, this case is wholly unsuited for class-wide treatment because common damage issues do not predominate.") (emphasis added).)

(Report at 22.)  Plaintiffs' proposal, as set forth in their Supplemental Memorandum in Support of Class Certification ("Plaintiffs' Supplement," D.E. 611), includes a three-phase trial plan in which (1) a class-wide jury trial decides all liability issues in phase one; (2) the same jury determines entitlement to punitive damages and a "multiplier" for reprehensibility in phase two; and damages would be assessed and awarded in phase three on an individual basis in a process similar to that used in Allapattah Services, Inc. v. Exxon Corp., 188 F.R.D. 667 (S.D. Fla. 1999), aff'd, 333 F.3d 1248, 1256-58 (11th Cir. 2003).  The Court agrees with the Magistrate Judge that having a jury determine a "reprehensibility multiplier" in phase two is creative but contrary to Florida law.  Under Florida law, entitlement to punitive damages may be decided once there has been a finding of liability, even if there has not yet been an award of compensatory damages.  Engle v. Liggett Group, Inc., 945 So. 2d 1246, 1262 (Fla. 2006).  However, "the amount of compensatory damages must be determined in advance of a determination of the amount of punitive damages awardable, if any, so that the relationship between the two may be reviewed for reasonableness."  Id. at 1265.  As the Report notes, "[t]his is because due process limits on punitive damages awards require 'an evaluation of the punitive and compensatory amounts awarded to ensure a reasonable relationship between the two.'" (Report at 22 (citing Engle, 945 So. 2d at 1264; BMW of N. Am., Inc. v. Gore, 517 U.S. 559, 581 (1996)).)  Plaintiffs' approach would require the jury in phase two to calculate a basic award of punitive damages without even having established whether any putative class members were harmed by Defendants' conduct or the extent of any such harm.  Plaintiffs'

approach appears to allow the phase one and two jury to pick a number out of a hat and let the number be applied as a damage multiplier without regard to whether any harm was caused or the amount of such harm. Because Plaintiffs' approach attempts to award punitive damages prematurely, it is contrary to Florida law.

The Court also doubts Plaintiffs' plan to bifurcate punitive damages in such a way comports with due process or advances interests in judicial economy. Courts must evaluate punitive damages awards to see whether they comply with the due process rights of the defendants. The degree of reprehensibility of the defendant's misconduct is one of three indicia used to evaluate the reasonableness of a punitive damages award.[9] Under Plaintiffs' proposal, numerous individual determinations as to liability and damages would still have to be made in phase three. A special master or claims administrator would have to make findings as to whether the defect established in phase one was the legal cause of each class member's harm, whether the class member suffered any harm, and come up with a punitive damages award (assuming entitlement was determined in phase two) based on the individual harm to each class member and the conduct of each defendant with respect to that class member. Finally, the punitive damages award would still have to be reviewed for reasonableness in light of any compensatory damages award. Essentially, Plaintiffs propose that we trifurcate a trial so that

---

[9]      In looking at whether a punitive damages award comports with due process, courts must look at "(1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases." State Farm Mut. Auto. Ins. Co. v. Campbell, 538 U.S. 408, 418 (2003) (citing Gore, 517 U.S. at 575).

23

liability, compensatory damages, and punitive damages are awarded by a special master. This case is nothing like <u>Allapattah</u> and such a claims process would be inappropriate here. <u>Allapattah</u> involved a class of gasoline retailers all similarly affected by the breach of a gasoline supplier's contract to provide discounted gasoline. Apportionment of damages in <u>Allapattah</u> came after determination of liability and simply involved the application of mathematical formulas. A similar approach in this case would require hundreds of mini-trials involving issues of liability and damages. Nothing would be gained by such an approach.

### f.      Trifurcation and Subclasses

Plaintiffs continue with their divide and conquer approach to class certification by objecting that the Magistrate Judge failed to adequately consider trifurcation or subclasses as an alternative approach. (Objections at 18-19.) Plaintiffs propose trifurcation where "the first question the jury would answer is: Does FlexPipe suffer from an inherent permeability and chemical incompatibility defect that foreseeably and substantially causes FlexPipe to fail prematurely?" (<u>Id.</u> at 19.) Presumably, the jury would then consider liability and damages. Nonetheless, Plaintiffs fail to suggest how trifurcation might benefit the resolution of this case. The resolution of one common threshold question, such as whether FlexPipe was inherently defective, would not significantly advance the litigation or save resources. If this case was trifurcated and the answer to Plaintiffs' first question was "yes," it would simply mean that identical evidence regarding FlexPipe's defect would be repeated as part of the determination of whether that defect in fact caused any damage. In other words, as stated numerous times

above, a finding that FlexPipe is generally defective does nothing to advance Plaintiffs' claims. Similarly, the Magistrate Judge correctly concluded that subclasses would not solve a lack of predominance. There were numerous changes among FlexPipe models and generations throughout the years. (Report at 8.) Even if a subclass was established for each model of FlexPipe, it would not prevent the individualized questions of whether causation or reliance or harm is present from overwhelming any commonalities within subclass. Plaintiffs fail to meet Rule 23(b)(3)'s first prerequisite that common questions predominate individual ones.

### 2. Superiority

Rule 23(b)(3)'s other requirement is that class resolution must be "superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). "To determine if the superiority requirement of Rule 23(b)(3) is satisfied, the Court must consider the following: (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of the litigation concerning the controversy already commenced by or against members of the class;  (C) the desirability or undesirability of concentrating the litigation of claims in the particular forum; and (D) the difficulties likely to be encountered in the management of a class action." Jeld-Wen, 250 F.R.D. at 695 (citing Rule 23(b)(3)); see also De Leon-Granados v. Eller & Sons Trees, Inc., 497 F.3d 1214, 1220 (11th Cir. 2007)).

The Report finds the predominance of individual inquiries, the substantial nature of potential damages, and issues involving manageability support a finding that class treatment is

not superior to other litigation devices available to class members.  First, the Report reiterates its previous finding that a lack of predominance would turn this class action into a series of individualized inquiries.  Second, the Report finds that this case does not fall within the category of those cases where class certification is superior because the <u>de minimis</u> nature of individual claims would preclude individual suits.  Plaintiffs' expert Thomas J. Schruben estimates that the average cost of replacing FlexPipe could be close to $200,000 per site.  (<u>See</u> Motion, D.E. 441 A.2, Schruben Decl. at ¶ 22 (estimating the average cost of replacement of FlexPipe per site between $220,000 to $260,000)).  If class members have additional claims for soil remediation or other injuries, and/or own more than one facility with FlexPipe, the damages sought are clearly quite substantial.  (<u>See</u> <u>id.</u> (estimating the average cost of remediating a petroleum-contaminated site in Florida at $380,000).)  The Report concludes, and the Court agrees, that individual class members have a sufficient financial interest in prosecuting individual claims.  Finally, the Report finds that any class action determinations "will not relieve this Court from having to adjudicate a slew of individual cases, including many which could not be brought in this jurisdiction on their own, increasing the judicial resources expended by this Court."  (Report at 28.)

Plaintiffs object that the Report's superiority analysis "fails to undertake the required comparative analysis of classwide adjudication versus individual litigation, and specifically the factors that make litigation cost-prohibitive for any individual plaintiff."  (Objections at 20-21.) Specifically, Plaintiffs object that individual plaintiffs would find litigation cost-prohibitive

26

given the complex nature of FlexPipe and this case in general.  (Id. at 19-20.)  Plaintiffs further argue that the cost of duplicating the enormous discovery conducted thus far, as well as the unnecessary cumulative presentation of evidence, especially with regard to the successor-in-liability claims, would be prohibitively costly and wasteful.  (Id. at 20.)  Finally, Plaintiffs argue that the limited prospects of actual recovery and the "vast expense of individual litigation" will deter class members from vindicating their rights.

The Court finds that a class action is not superior to other methods of resolving this case. The substantial nature of damages here provides a compelling reason to believe individual class members would have an interest in controlling the litigation individually.  Where the claims at issue do not involve de minimis sums, individuals are more likely to have an interest in filing suit.  See Jeld-Wen, 250 F.R.D. at 696 ("In addition, the claims at issue here do not involve a de minimis sum so that an individual plaintiff would be discouraged from filing his own suit") (emphasis in original) (citing Klay, 382 F.3d 1270) .  Individual class members have even more interest in controlling litigation where, as here, Plaintiffs seek to certify a class that comprises both former owners and current owners of FlexPipe.  Even if perhaps not enough to rise to the level of a conflict of interest for purposes of the Rule 23(a) adequacy analysis, there may be divergent interests or remedies sought between former owners of FlexPipe and current owners. The record is not clear regarding the extent and nature of any similar litigation already commenced by or against members of the class, but it appears that at least one class action lawsuit has been filed in an Alabama state court alleging similar issues against at least some of

27

the defendants in this case.[10]  As a result, the second factor of the superiority analysis neither supports nor counsels against class certification.  Similarly, there appears no substantial interest in concentrating the litigation in this particular forum.

Finally, the Court must consider whether any difficulties in managing the litigation counsel against class certification.  The Court finds that the same issues preventing common questions from predominating individual ones, also weigh against a class action as the superior method of resolving this case.  The more individual issues predominate common ones, the more difficult it is to manage a class action.  See Jeld-Wen, 250 F.R.D. at 696 ("Furthermore, the difficulties in managing the class action are great, given the predominance of the individual issues discussed above.").  The fact that there is a common nucleus of operative facts and common legal theories does not mean this case would be appropriately manageable as a class action.  The numerous plans proposed by Plaintiffs for managing this case as a class action (i.e., bifurcation of punitive damages involving a "reprehensibility multiplier," trifurcation, subclasses), further suggest a class action is unmanageable here.  As a result, after considering the Report, Objections, and the Rule 23(b)(3) factors for determining superiority, it is the

---

[10]     A similar class action alleging defective FlexPipe was filed in the Circuit Court for Bullock County, Alabama, by a distributor of gasoline and owner of several gas stations against TCI, Dayco, CT, and Mark IV Industries (dismissed from this action on March 11, 2008) (See D.E. 549), among others.  See May's Distrib. Co., Inc., et al v. Total Containment, Inc., et al, Civil Case No. CV-03-02, Circuit Court of Bullock County, Alabama (January 3, 2003); May's Distrib. Co., Inc., et al v. Total Containment, Inc., et al, 523 F.Supp.2d 1303 (M.D.Ala. 2007) (granting Plaintiffs motion to remand back to state court and providing a procedural history of case).

Court's conclusion that a class action is not superior to other methods of litigating this matter.

### C.    Rule 23(c)(4) Partial Certification

Plaintiffs argue that in the event the Court finds class certification inappropriate under Rule 23(b)(3), the Court could alternatively certify a class for resolution of certain issues. (Plaintiffs' Supplement, D.E. 611 at 8-12.)   In support of this argument, Plaintiffs state "[a]lthough Rule 23(b)(3) and Rule 23(c)(4) differ in their focus, they are functionally equivalent: both recognize the presence of both common and individual issues in class actions, and both seek to provide the Court with the tools it needs to manage litigation efficiently and determine which common issues are of sufficient significance to warrant class treatment." (Id. at 9.) Therefore, Plaintiffs argue, "[e]ven if this Court determines that this case as a whole does not meet the predominance requirements under Rule 23(b)(3) (though it does), then it could still certify the direct and indirect liability issues and the entitlement to and a formula for punitive damages under Rule 23(c)(4)." (Id. at 10.)

The Magistrate Judge determined that even if it could certify issues despite a lack of predominance as a whole under Rule 23(c)(4), it would not do so in this case.  The Report states:

> We doubt, however, that Plaintiffs' inability to satisfy the predominance and superiority factors ever allows the Court to rely on Rule 23(c)(4).  But, even if we could, for the reasons articulated above, particularly the need to try causation and damages on an individual basis here, we decline to recommend that such a course be taken.  No single issue is best addressed on a class-wide basis involving multiple variations of the FlexPipe product and multiple defendants.

(Report at 28 n.5.)  Plaintiffs object that the "the R&R gives inadequate consideration to certification of particular issues" and reaches a conclusion "contrary to the overwhelming weight of authority." (Objections at 8.) Plaintiffs argue that despite a Circuit split as to whether Rule 23(c)(4) permits class-wide adjudication of common issues absent a lack of overall predominance, the majority of Circuits support such an approach.[11]   (Objections at 22.) Plaintiffs then point to several district court decisions within our Circuit supporting issue certification under Rule 23(c)(4). (Objections at 24 (citing In re Tri-State, 215 F.R.D. 660, 697-700 (N.D. Ga. 2003) (certifying class in multi-district litigation as to the majority of plaintiffs' claims that satisfied predominance test); Hernandez v. Motor Vessel Skyward, 61 F.R.D. 558, 561 (S.D. Fla. 1973) (granting certification on issue of negligence under Rule 23(b)(1)(A) and 23(c)(4)); Fabricant v. Sears Roebuck, 202 F.R.D. 310, 317 (S.D. Fla. 2001) (certifying class under Rule 23(c)(4) where class members claims under Truth in Lending Act predominated individual questions)).)

However, the cases cited by Plaintiffs involve either certification under Rule 23(b)(1) or 23(b)(2) (which do not require predominance), multi-district litigation, and/or predominance was present as to the cause of action as a whole.  In addition, this case is very different from In re Copley Pharmaceuticals, Inc., 161 F.R.D. 456 (D. Wyo. 1995), also cited by Plaintiffs, which involved multi-district litigation of "albuterol" products liability claims.  The plaintiffs in In re

---

[11]     The Court notes that a difference of opinion exists between the Circuits as to the proper place of Rule 23(c)(4) issue certification where predominance lacks as to the cause of action as a whole and that the Eleventh Circuit has not provided clear guidance on this issue.

<u>Copley</u>, brought a class action products liability lawsuit against the manufacturer of contaminated asthma medicine.  The district court certified a class under Rule 23(c)(4) and 23(b)(3) to determine common issues of liability: strict liability, negligence, negligence per se, breach of warranties and declaratory relief.  (<u>Id.</u> at 458).  The district court in <u>In re Copley</u>, also implemented a bifurcated trial plan whereby a jury would determine any common factual issues going to the defendant's liability and then separate trials would be conducted in the transferor districts that would determine individual causation and membership in the class.  (<u>Id.</u> at 461-62).  The defendant in that case, however, only challenged certification on two grounds: that having separate juries determine negligence violated its Seventh Amendment rights and that a class action lacked superiority because courts would have to apply the laws concerning negligence and products liability of many different states.  (<u>Id.</u> at 458). Unlike this case, the discussion in <u>In re Copley</u> assumed the existence of common questions that predominated individual ones.  <u>In re Copley</u> also involved a single defendant who admitted that at least some of its product was contaminated and that it was liable for any resulting injuries.  <u>Id.</u> at 465.  Additionally, the court found suspicious the defendant's decision to delay its motion to decertify the class until two months before trial.  <u>Id.</u> at 459 n.1.

The Court also  notes that many other courts "have emphatically rejected attempts to use the (c)(4) process for certifying individual issues as a means for achieving an end run around the (b)(3) predominance requirement."  <u>O'Neill v. Home Depot U.S.A., Inc.</u>, 243 F.R.D. 469, 481-82 (S.D. Fla 2006) (quoting <u>Fisher v. Ciba Specialty Chemicals Corp.</u>, 238 F.R.D. 273, 316

(S.D.Ala.2006)); see also Rink v. Cheminova, Inc., 203 F.R.D. 648 (M.D. Fla. 2001) (review

dismissed as moot by Rink v. Cheminova, Inc., 400 F.3d 1286 (11th Cir. 2005)); Castano, 84

at 745.  In O'Neill, a group of Florida plaintiffs brought a class action lawsuit against a home

improvement chain alleging deceptive and unconscionable practices relating to a "damage

waiver" fee added to rental contracts.  243 F.R.D. at 471.  Among the arguments raised in

O'Neill, plaintiffs asserted that whether the damage waiver was a worthless product was a claim

that could be certified regardless of whether the other claims merited certification.  Id. at 481.

The district court determined that Rule 23(c)(4) did not allow it to sever single issues for

certification where individual issues of causation precluded a finding of predominance.  Id. at

481-82.

Nonetheless, the Court finds discussion of whether Rule 23(c)(4) allows certification

absent predominance superfluous as there are no issues in this case proper for such certification.

Plaintiffs suggest in their Objections that a class could be certified to answer the following

common questions:

> (1) are the pipes defective?  (2) did Defendants know they were defective?  (3)
> is the defect material?  (4) did Defendants owe purchasers a duty to disclose the
> defect? (5) did Defendants breach their warranty? (6) does American Pipe tolling
> apply to the claims?  (7) to what extent does the economic loss rule apply?  (8)
> what punitive damages standard applies?  (9) are the alter-ego defendants liable
> under the successor-in-interest, piercing the corporate veil and/or alter-ego
> theories?  (10) to what extent are claims recoverable under the Commerce &
> Industry insurance policies?

(Objections at 25.)  Similar to the discussion above, many of these questions are either not

easily determined on a class-wide basis or their resolution would not advance Plaintiffs' claims.

32

The Court agrees with the Magistrate Judge that "no single issue is best addressed on a class-wide basis involving multiple variations of the FlexPipe product and multiple defendants." (Report at 28.)  Certification is also improper under Rule 23(b)(1).

### D.    Rule 23(b)(1) "Limited Fund" Certification

Rule 23(b)(1) provides that a class may be certified if the requirements of Rule 23(a) are satisfied and if:

> [P]rosecuting separate actions by or against individual class members would create a risk of: (A) inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the party opposing the class; or (B) adjudications with respect to individual class members that, as a practical matter would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests.

Plaintiffs object that the "R&R altogether ignores Plaintiffs' requests for certification against TCI under Rule 23(b)(1)" and that "TCI's insurance policies are like a 'limited fund' at risk of depletion by a few plaintiffs if this case is not treated like a class action under Rule 23(b)(1)." (Objections at 26.)   The Court finds that certification under a "limited fund" theory is inappropriate because the record indicates none of the named Plaintiffs filed timely claims to collect against TCI's insurance policy[12] and no limited fund exists where Plaintiffs are also seeking damages from TCI's successors via their indirect liability claims.  Nor have Plaintiffs

---

[12]      In his Report and Recommendation on AIG's Motion for Partial Summary Judgment (D.E. 680), recommending summary judgment be granted, the Magistrate Judge notes that none of the named Plaintiffs in this case filed a timely claim against TCI under AIG's policy. As no objections were filed, the Court adopted the Magistrate Judge's Report, granting AIG's motion for partial summary judgment (D.E. 379) and denying as moot AIG's motion for separate trial (D.E. 581).

made any showing regarding the amount of aggregated unliquidated damages sought or the

availability of those funds.  See Ortiz v. Fibreboard Corp., 527 U.S. 815 (1999).  As a result,

the Court cannot certify a class in this case under Rule 23(b)(1) or any other provision of Rule

23.  Accordingly, it is hereby **ORDERED AND ADJUDGED** that:

  1. Plaintiffs' requests for oral argument on the issue of class certification are

   **DENIED;**

  2. The Report of the Magistrate Judge (D.E. 663) is **ADOPTED consistent with**

   **this Order**;

  3. Plaintiffs' Motion for Class Certification, filed on December 7, 2007 (D.E. 441),

   is **DENIED.**

  **DONE AND ORDERED** in Chambers, at Miami, Florida, this 10th day of February,

2010.

     _Joan A. Lenard_
     **JOAN A. LENARD**
     **UNITED STATES DISTRICT JUDGE**